T.C. Memo. 2009-130

UNITED STATES TAX COURT

HIE HOLDINGS, INC., HAWAIIAN ISLES KONA COFFEE CO., LTD., AND
ROYAL HAWAIIAN WATER CO., LTD., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5045-05, 5046-05,     Filed June 8, 2009.
            5047-05.

<u>William C. McCorriston</u>, <u>Jonathan H. Steiner</u>, <u>Lisa W.
Cataldo</u>, <u>R. John Seibert</u>, <u>Paul B. K. Wong</u>, <u>Christopher J. Cole</u>,
<u>Brian R. Lynn</u>, <u>Christopher S. Rizek</u>, <u>Lawrence Inouye</u>, <u>Richard W.
Craigo</u>, and <u>John Gaims</u>, for petitioners.[2]

_____

[1]Cases of the following petitioners are consolidated
herewith:  Hawaiian Isles Enterprises, Inc., docket No. 5046-05;
and Michael H. Boulware, docket No. 5047-05.

[2]On Mar. 15, 2005, Sidney E. Boulware, Jr. (an officer),
filed the petitions with the Court in docket Nos. 5045-05 and
                                              (continued...)

Kenneth C. Peterson, Paul K. Webb, Gordon L. Gidlund, and

L. Katrine Shelton, for respondent.


CONTENTS

FINDINGS OF FACT.......................................... 21

    I.      Preliminaries.................................. 21

    II.     NODs.......................................... 22

        A.  NOD Issued to HIE............................ 22
           1.  General Information...................... 22
           2.  First Adjustment--Disallowance of Portion
               of Deductions for NOLs.................... 22
               a.  Overview........................... 22
               b.  Primary Determination............... 22
               c.  Alternate Determination............. 23
                  i.    Overview.................... 23
                  ii.   Adjustments Related to
                      Criminal Indictment......... 24
                  iii.  Adjustments Unrelated to
                      Criminal Indictment......... 25
                  iv.   Some Specifics of
                      Adjustments................. 26
           3.  Second Adjustment--Disallowance of Portion
               of Deductions for Professional Fees....... 27
                a.  Overview........................... 27

---

    [2](...continued)
5046-05, and Michael H. Boulware filed the petition with the Court in docket No. 5047-05. Richard W. Craigo and John Gaims entered their appearances in each of the three resulting cases on Dec. 9 and 21, 2005, respectively, and were allowed to withdraw from those cases on Nov. 15 and Sept. 22, 2006, respectively. Lawrence Inouye, Jonathan H. Steiner, William C. McCorriston, Lisa W. Cataldo, R. John Seibert, Paul B. K. Wong, Brian R. Lynn, Christopher S. Rizek, and Christopher J. Cole entered their appearances in each of the cases on Jan. 19, 2006, July 10, 2006, July 14, 2006, Sept. 8, 2006, Nov. 27, 2006, Dec. 1, 2006, Dec. 7, 2006, Dec. 7, 2006, and July 9, 2007, respectively.

    b.  Personal Expenses of Michael

      Boulware............................ 28

    c.  Unsubstantiated Expenses............ 29

    d.  Capital Expenditures................ 29

    e.  Summary............................. 30

   4. Third Adjustment--Disallowance of

   Deduction for Bad Debt.................... 31

  B. NOD Issued to Holdings........................ 31

   1. General Information........................ 31

   2. Sole Relevant Adjustment--Disallowance of

   Portion of Deductions for Professional

   Fees...................................... 31

  C. NOD Issued to Michael Boulware................ 32

   1. General Information........................ 32

   2. Sole Relevant Adjustment--Constructive

   Dividends................................. 33

III. Background of Michael Boulware................... 33

IV. Relevant Corporations............................ 34

  A. HIE........................................... 34

   1. Formation of Business..................... 34

   2. Officers and Directors.................... 36

    a.  Initially........................... 36

    b.  August 31, 1982, to July 10, 1991,

      or Thereabouts ..................... 37

    c.  On or About July 10, 1991, Through

      an Effective Date of April 15, 2000. 38

    d.  Effective April 15, 2000............ 39

    e.  Board Meetings...................... 40

   3. Shareholders.............................. 40

   4. Michael Boulware's Control................ 42

  B. Holdings...................................... 42

  C. Other Corporations Organized in 1994.......... 43

  D. Restructuring of HIE.......................... 43

  E. Royal Hawaiian Water.......................... 44

  F. Holdings After the Restructuring.............. 44

G. Payment of Common Costs........................ 45

H. Various Names Used by HIE To Conduct Its
   Business During the Subject Years.............. 45

I. No Payment of Formal Dividends by HIE......... 46

J. E&P of HIE and Its Predecessor for 198206
   Through 198806................................. 46
   1. 198206.................................... 46
   2. 198306.................................... 46
   3. 198406.................................... 46
   4. 198506.................................... 47
   5. 198606.................................... 47
   6. 198706.................................... 48
   7. 198806.................................... 49

K. E&P of Holdings for 199706 and 199806......... 50
   1. 199706.................................... 50
      a. Accumulated E&P...................... 50
      b. Current E&P......................... 50
   2. 199806.................................... 50

L. Number of Holdings and HIE Employees.......... 50

V. Officer Loan Account........................... 50

A. Overview...................................... 50

B. Mechanics of Account.......................... 50

C. Repayment of Officer Loans.................... 52

D. Michael Boulware's Claimed Coffee
   Transactions.................................. 52

E. Promissory Notes.............................. 54

F. Lack of Collection on Promissory Notes........ 55

VI. Personal Bank Accounts........................ 55

A. Michael Boulware Individually................. 55

B. Michael Boulware and Mal Sun Boulware Jointly.. 56

C.   Jin Sook Lee................................. 56

VII.   Mal Sun Boulware................................ 56

VIII.   Jin Sook Lee.................................... 57

A.   Background................................... 57

B.   Jin Sook Lee Meets Michael Boulware........... 58

C.   Paradise Roasting............................ 60

D.   Video Consultant............................. 62

1.   Overview............................... 62

2.   Formation.............................. 62

3.   Payments From HIE for False Invoices...... 63

E.   Michael Boulware's Divorce From Mal Sun
Boulware..................................... 64
1.   Discussions Concerning Divorce........... 64
2.   Glenn Lee Boulware Trust................. 65
3.   Divorce Proceeding....................... 66

F.   Transfers of HIE Assets to Jin Sook Lee........ 68
1.   Overview................................. 68
2.   Atkinson Condominium..................... 69
3.   Makaiwa House............................ 70
4.   Koloa House.............................. 71
5.   Punahou Condominium...................... 73
6.   Understanding as to the Transferred
Assets................................... 74
7.   Jin Sook Lee's Use of the Transferred
Funds.................................... 75
8.   Michael Boulware Takes Some of the
Transferred Funds From Jin Sook Lee
Without Her Knowledge.................... 76

IX.   Off-Book Bank Accounts.......................... 77

X.   Off-Book Activities............................. 78

A.   Overview..................................... 78

B.  OTC Sales of Tobacco Products.................. 79

C.  Michael Boulware's Personal Sales of HIE Coffee
    Unknown at the Time to HIE..................... 81
    1.  Overview.................................. 81
    2.  Sales to Hawaii Misuzu.................... 82
    3.  Sales to Pele Trading..................... 83
    4.  Referenced Coffee Sold by Michael Boulware
        Included in HIE's COGS.................... 85

D.  Bonded Construction........................... 85
    1.  Background................................ 85
    2.  Michael Boulware Causes HIE To Pay to
        Remodel Jin Sook Lee's Residence.......... 85
    3.  Paving of the Back Lot at HIE............. 86
        a.  Overview.............................. 86
        b.  Automated Equipment.................. 87

E.  Michael Boulware's Fictitious Leasing
    Transactions.................................. 88
    1.  Overview.................................. 88
    2.  Michael Boulware's First Scheme.......... 89
    3.  Michael Boulware's Second Scheme......... 90
        a.  Need for the Second Scheme.......... 90
        b.  HIE's Relationship With GECC........ 91
        c.  Seven False Invoices............... 92
            i.    Overview...................... 92
            ii.   Four False Invoices Totaling
                  $271,382.80.................. 92
            iii.  Three False Invoices
                  Totaling $224,432............ 93
        d.  First Four Referenced False Invoices. 94
        e.  Last Three Referenced False Invoices. 95
    4.  Funds Transferred to Lorin Kushiyama...... 96

F.  Michael Boulware's International Circular Flow
    of Funds...................................... 96
    1.  Overview.................................. 96
    2.  Relevant Foreign Entities................. 97
        a.  Forest Trading....................... 97
        b.  Pacific Vendors..................... 98
        c.  Harvest International............... 99
            i.    Roxca Limited................ 99
            ii.   Reinvoicing Operation........ 99
            iii.  Bank Accounts................100

iv.    Rationale Underlying Formation....................101

v.    Actual Operation.............101

vi.    False Invoices From Harvest International...............101

    1.  Overview...................101

    2.  Payments of Invoices.......102

    3.  Transfers From Harvest International.............103

        a.  Overview.............103

        b.  Transfers to Personal Account of Michael Boulware.............103

        c.  Transfers on Behalf of Michael Boulware to Paragon Coffee, Gloria Oh Young, and Antoinette Hirai......103

        d.  Transfer on Behalf of Michael Boulware to Briggs Cockerham......104

vii.  Coffee Rebagging............105

3.  Role of Nathan Suzuki....................105

4.  Harold Okimoto...........................106

    a.  Overview...........................106

    b.  Harold Okimoto's Employment........106

    c.  Administration of Harold Okimoto's Estate............................107

    d.  U.S. Attorney Contacts Okimoto Family.............................109

    e.  Claim of an Approximately $1.7 Million Debt.......................110

    f.  After-the-Fact Creation of Promissory Notes...................110

XI.    Michael Boulware's Removal of Funds From the Off-Book Bank Accounts..........................111

    A.  Overview.......................................111

    B.  Michael Boulware Causes Checks To Be Cashed for Him by Employees and Friends...................112

      1.  Stanley Hirai and Antoinette Hirai.......112

      2.  Morris Miyasota.........................113

      3.  Thomas Okimoto.........................114

      4.  Milton Ikeda................................115
      5.  Sydney Murayama...........................116
      6.  Neal Taira................................116
      7.  Paul Takekawa.............................116
      8.  John Torres...............................117
      9.  Other Check Cashers.......................118

XII.   Criminal Investigation of Michael Boulware......118

    A.  Jerry Yamachika Contacts and Meets With
       Michael Boulware..............................118

    B.  Michael Boulware Obtains Professional
       Representation................................120

    C.  Focus of Criminal Investigation...............122

    D.  Applicability of HIE's Indemnification
       Provision Relating to Certain Personal Legal
       Fees Incurred by Its Directors and Officers....124

XIII.  Civil Litigation Initiated by Jin Sook Lee......126

    A.  Background....................................126

    B.  JSL Litigation...............................127
       1.  Complaint.................................127
       2.  Counterclaim..............................129

    C.  Trust Case...................................131

    D.  Shareholder Derivative Case..................132

    E.  HIE's Perception of Civil Litigation..........133

    F.  Actions Taken by HIE Board of Directors.......133
       1.  Resolution................................133
       2.  Payment of Legal Expenses.................134

XIV.   Referral of Michael Boulware for Prosecution
      and Michael Boulware's Grand Jury Indictment....134

    A.  Referral to DOJ for Prosecution...............134

    B.  Referral to Grand Jury........................137

C.   Grand Jury Indictment..........................138

XV.    Resolution of JSL Litigation.....................139

    A.   Overview........................................139

    B.   Jury Verdict....................................140

    C.   Equitable Issues Decided by State Court........140

    D.   Final Judgment Entered..........................142

    E.   HIE Records Receivable From Jin Sook Lee.......142

XVI.   Bankruptcy Case of Jin Sook Lee.................142

    A.   Overview........................................142

    B.   Property Transfers and Claims.................143

    C.   Adversary Proceedings Commenced in 1998........145

    D.   Settlement of 1997 Adversary Proceeding........146

    E.   May 1998 Settlement Agreement..................147
        1.   Overview...................................147
        2.   Property Distributions.....................147
            a.   Cash and Cash Equivalents...........147
            b.   Automobiles.........................147
            c.   Real Properties.....................147
            d.   Jewelry and Furs....................148
            e.   Judgment Against Michael Boulware...148
            f.   Summary.............................148
        3.   Disbursements by HIE.......................149

    F.   Settlement of 1998 Adversary Proceedings.......149

    G.   Claimed Bad Debt Deductions Related to Amounts
        Considered Due From Jin Sook Lee, Trustee......151

XVII.  NOL Adjustments.................................151

    A.   HIE's Filing of Its Federal Income Tax Returns
        for 198906 Through 199906......................151

B.   Pre-199806 Reported NOLs and Applications......152

C.   HIE Claims on Its Federal Income Tax Return for
     199806 That Its NOL Carryover From Earlier
     Years Is Larger Than That Previously Reported..153

D.   Source of Larger NOL Carryover Reported For
     199806...........................................154

E.   HIE's 199906 Federal Income Tax Return.........155
     1.   Overview...................................155
     2.   Exhibit 18-J...............................156
     3.   Claim to Additional COGS...................158

F.   HIE's Position as to Its NOL Carryovers
     Reported for 199806 and Later Years............159
     1.   Overview...................................159
     2.   HIE's Liability for Hawaii Tobacco Tax....160
     3.   HIE's Purported Overpayment of Hawaii
          Tobacco Tax...............................160
     4.   Tobacco Tax Liability Adjustment.........162
     5.   HIE's Monthly Book Adjustments...........164
     6.   HIE's AJEs................................165
     7.   Tobacco Tax Refund Income Claimed Reported
          and Reportable by HIE....................166
          a.   Income Claimed Reportable...........166
          b.   Income Claimed Reported Through
               Monthly Adjustments.................167
          c.   Income Claimed Reported Through AJEs.168
          d.   Summary.............................168
     8.   HIE's Purported Income Shift.............169

XVIII.   Michael Boulware's Criminal Trials.............169

A.   First Trial....................................169
     1.   General Information.......................169
     2.   Relevant Evidence and Arguments..........169
     3.   Jury Verdict.............................170

B.   Sentencing Phase and First Appeal.............171
     1.   Positions as to Sentencing...............171
     2.   Sentence Imposed.........................171
     3.   Appeal of Conviction.....................172

C.   Michael Boulware's Retrial....................172

D.  Criminal Case Heard by U.S. Supreme Court......173

E.  Remand From U.S. Supreme Court.................174

XIX.  Civil Examinations and Requests for
      Information......................................175

A.  Start of Civil Examinations....................175

B.  Requests for Information.......................175
    1.  HIE........................................175
    2.  Holdings...................................177
    3.  Actions During This Proceeding............180

XX.  Professional Fees.................................180

A.  Overview.......................................180

B.  Source of Professional Fees...................181
    1.  HIE........................................181
    2.  Holdings...................................182

C.  Categories of Disputed Professional Fees.......182
    1.  Overview...................................182
    2.  Specifics of Expenses in Each Category....183
        a.  Criminal Investigation..............183
        b.  Grand Jury Proceedings..............183
        c.  Michael Boulware's Criminal Trial...184
        d.  Fees Involving Jin Sook Lee.........184
        e.  Fees Accepted as Ordinary and
            Necessary.........................185
        f.  Other Fees.........................185
    3.  Amounts of Fees Attributable to Each
        Category..................................185

D.  Providers of the Professional Services
    Underlying the Legal Costs....................186
    1.  Criminal Investigation....................186
        a.  Representation of HIE Employees.....186
            i.    Overview.....................186
            ii.   Peter Wolff.................186
            iii.  Benjamin Cassidy............186
        b.  Damon Key..........................187
        c.  Irell Manella......................188
        d.  Shiotani Inouye....................188

|   | e. | Wachi Watanabe.......................189 |

2. Grand Jury Proceedings....................190
    a.   Birney Bervar.......................190
    b.   Brook Hart..........................190
    c.   Chee Markham........................191
    d.   Damon Key...........................191
    e.   Graham James........................192
    f.   Hochman Salkin......................194
    g.   Howard Chang........................194
    h.   Irell Manella.......................195
    i.   Lopeti Foliaki......................195
    j.   Perkin Hosoda.......................195
    k.   Reinwald O'Connor...................196
    l.   Shiotani Inouye.....................198
    m.   Stephen Pingree.....................198
    n.   Wachi Watanabe......................198

3. Criminal Trial...........................199
    a.   Accucopy............................199
    b.   Ayabe Chong.........................199
    c.   Bird Marella........................200
    d.   Bowen Hunsaker......................200
    e.   Brook Hart..........................201
    f.   Candon Consulting/John Candon.......201
    g.   Chicoine Hallett....................203
    h.   Corniel.............................203
          i.  Overview.....................203
          ii. Specifics....................204
    i.   Damon Key...........................204
    j.   Gaims Weil..........................204
    k.   Goodenow............................205
    l.   Graham James........................205
    m.   Hawaii National Bank................205
    n.   Leonard Sharenow....................206
    o.   Lyle Hosoda Associates..............206
    p.   McCorriston Miller..................206
    q.   Michael McCarthy....................207
    r.   Nathan Suzuki.......................207
    s.   Perkin Hosoda.......................207
    t.   PWC.................................207
    u.   Professional Image..................208
    v.   Reinwald O'Connor...................208
    w.   Robert Waters.......................209
    x.   Saranow Pagani......................210
    y.   Sherman Sherman.....................210
    z.   Sheila Balkan.......................211

        aa.  Shiotani Inouye.....................211
            i.    200006........................211
            ii.   200106........................211
           iii.  200206........................212
        bb.  Squire Sanders.....................212
        cc.  Stephen Platt......................213
        dd.  Wachi Watanabe.....................213
        ee.  Wilmington Institute ..............213
    4.   Fees Concerning Jin Sook Lee.............214
        a.   Chee Markham.......................214
        b.   Damon Key..........................214
        c.   Gaims Weil.........................215
        d.   Glenn Lee Boulware Trust...........216
        e.   Reinwald O'Connor..................216
    5.   Fees Accepted as Ordinary and Necessary...217
        a.   Carlsmith Ball.....................217
        b.   Damon Key..........................217
        c.   Marr Hipp..........................218
        d.   Seyfarth Shaw......................218
        e.   Other Legal........................219
    6.   Other Fees..............................219
        a.   Accucopy...........................219
        b.   Case Bigelow.......................219
        c.   Damon Key..........................220
        d.   Foley Jones........................221
        e.   GMK Consulting.....................221
        f.   King King..........................222
        g.   Laird Christianson.................222
        h.   Louis Wai..........................222
        i.   Michael McCarthy...................223
        j.   Nathan Suzuki......................223
        k.   Robert Holland.....................223
        l.   Yoshida, Inc.......................223
        m.   Other Legal........................224
  E.  Other Professional Fees........................224
    1.  Fees Related to Criminal Trial............224
    2.  Fees Accepted as Ordinary and Necessary...224
        a.   Antoneita DeWang-Seo...............224
        b.   Applied Computer...................224
        c.   ASI Food Safety....................225
        d.   Back to Basics Plus................225
        e.   Brewer Environmental...............225
        f.   Business Consulting................225
        g.   Ceridian Employer..................225
        h.   Charles Abraham....................226

          i.    COLIFORM...........................226
          j.    Commercial Plumbing................226
          k.    Communications Pacific.............226
          l.    Datahouse..........................227
          m.    Dataprofit Corp....................227
          n.    Dunn Bradstreet....................227
          o.    Electra Form.......................227
          p.    EMS Solutions......................227
          q.    Fidelity Investments...............228
          r.    Foley Jones........................228
          s.    Food Products......................228
          t.    GEM Communications.................229
          u.    GT Service.........................229
          v.    Hawaiian Hardware..................229
          w.    Intrastate.........................229
          x.    IW.................................229
          y.    John Ching.........................230
          z.    Kimura International...............230
          aa.   KPMG...............................230
          bb.   L.C. Financial ....................230
          cc.   Leung Pang.........................231
          dd.   Melvin Kam.........................231
          ee.   Michael Toigo......................231
          ff.   Pension Services...................231
          gg.   Procomm............................232
          hh.   Professional Image.................232
          ii.   Profit Concepts....................232
          jj.   Quadrel Labeling...................232
          kk.   Rhanda Kim.........................232
          ll.   Richard Kitagawa...................233
          mm.   RJR Packaging......................233
          nn.   Servend of Hawaii..................233
          oo.   Stewart Engineering................233
          pp.   Tricia Young.......................233
          qq.   Wayne Arakaki......................234
    3.  Other Fees.................................234
          a.    Henry Yokogawa.....................234
          b.    Kobayashi Doi......................234
                i.    Overview.....................234
                ii.   199806.......................235
                iii.  199906.......................235
                iv.   200006.......................236
                v.    200106.......................236
                vi.   200206.......................236
          c.    Lorin Kushiyama....................236

d.    Richard Kitagawa....................236
e.    TRI Pac.............................237
f.    Vending Consulting..................237
g.    Watson Wyatt........................237
h.    Amortization........................237

XXI.    Kona Coffee....................................238

A.    Background..................................238

B.    Season for Kona Coffee......................239

C.    Shelia David................................239

OPINION.............................................241

I.    Perception of Witnesses.........................241

II.    Burden of Proof................................244

A.    Overview....................................244

B.    Applicability of Section 7491...............245

C.    Claim That NODs Are Arbitrary...............249

III.    NOL Deduction.................................251

IV.    Bad Debt Deduction............................263

V.    Professional Fees...............................269

A.    Overview of Dispute.........................269

B.    Applicable Law in General...................270
      1.    Deduction of Ordinary and Necessary
            Business Expenses.......................270
      2.    Corporate Taxpayer's Burdens Underlying
            Deduction...............................271
      3.    Payment of Another Taxpayer's Expense.....272
            a.    First Prong of Two-Prong Test.......273
            b.    Second Prong of Two-Prong Test......275

C.    Whether HIE Incurred Any of the Disputed
      Expenses......................................278

D.   Whether All Expenses Were Substantiated........280

E.   "Fees Accepted as Ordinary and Necessary" and "Other Fees"..................................281

F.   Expenses of Michael Boulware's Criminal Defense.......................................282
    1.  Background..............................282
    2.  Expenses Stemmed From Personal Pursuits...284

G.   Professional Fees Related to Civil Litigation Initiated by Jin Sook Lee......................288
    1.  Overview...............................288
    2.  Analysis...............................289
        a.  Fees Determined To Be Capital Expenditures........................289
        b.  Fees Determined To Be Michael Boulware's Personal Expenses........290

H.   Applicability of Indemnification Agreement.....292
    1.  Overview...............................292
    2.  Arrangements Under Section 62(a)(2)(A)....293
    3.  Mandatory Indemnity.......................295
        a.  Overview..............................295
        b.  Analysis..............................296
    4.  Permissive Indemnity......................298
    5.  Repayment Obligation......................299

VI.   Constructive Dividends..........................300

A.   Overview........................................300

B.   Rules Applicable to Distributions..............301

C.   E&P............................................302
    1.  Background..............................302
    2.  Lack of Comprehensive Definition.........302
    3.  Calculation.............................303
        a.  Overview..............................303
            i.  ATI...............................303
            ii. Increases and Decreases to ATI..304
        b.  Current E&P..........................306
        c.  Accumulated E&P......................307
        d.  Summary of Calculation...............307

D.  Adjustments Applicable to These Cases..........309
    1.  Overview..................................309
    2.  First Adjustment..........................309
    3.  Second Adjustment.........................309
    4.  Third Adjustment..........................310
    5.  Fourth Adjustment.........................310
    6.  Fifth Adjustment..........................311

E.  Conclusion...................................311

VII.  Additions to Tax...............................312

VIII.  Epilog........................................313

Appendix A..............................................314

Appendix B..............................................321

Appendix C..............................................322

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  These cases are before the Court consolidated for purposes of trial, briefing, and opinion.[3]  In docket No. 5045-05, HIE Holdings, Inc. (Holdings), and two of its subsidiaries, Hawaiian Isles Kona Coffee Co., Ltd. (Hawaiian Isles Kona Coffee), and Royal Hawaiian Water Co., Ltd. (Royal Hawaiian Water), petitioned the Court to redetermine respondent's determination of deficiencies of $242,546, $77,602, $470,461, $280,489, and $519,760 in the affiliated group's Federal income taxes for its taxable years ended June 30, 1997, 1999, 2000,

---

[3]The cases were consolidated on Feb. 27, 2006, pursuant to the joint motion of the parties.

2001, and 2002, respectively.[4]  In docket No. 5046-05, Hawaiian Isles Enterprises, Inc. (HIE), petitioned the Court to redetermine respondent's determination of deficiencies of $1,057,181, $125,317, $175,524, and $799,433 in HIE's Federal income taxes for 199806, 200006, 200106, and 200206, respectively, and a $264,295 addition to HIE's 199806 tax under section 6651(a)(1).[5]  In docket No. 5047-05, Michael Boulware petitioned the Court to redetermine respondent's determination of deficiencies of $497,926, $603,406, $935,124, $1,339,019, and $874,551 in Michael Boulware's 1998 through 2002 Federal income taxes, respectively.

---

[4]We hereinafter refer to each relevant fiscal year by using a six-digit number.  The first four digits refer to the year in which the fiscal year ended.  The last two digits refer to the month in which the fiscal year ended.

[5]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the dollar.  References to sections and chapters of the Bankruptcy Code are to tit. 11 of the United States Code after the effective date of amendments made thereto by the Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106, that were effective for bankruptcies filed on and after Oct. 22, 1994.  Id. sec. 702, 108 Stat. 4150.  Throughout this Memorandum Opinion, we reference various law, accounting, and other professional firms, many of which changed their names during the relevant period.  We refer to each firm by one of its names and include within that name each of the firm's relevant predecessors and successors.

Following a trial of these cases held primarily in Honolulu, Hawaii, we decide five issues.[6] First, we decide whether to sustain respondent's disallowances of HIE's deductions of net operating losses (NOLs), reported as arising from NOL carryovers from 198906 through 199606, to the extent of $1,636,322 for 199806 and of $1,184,192, $324,767, and $145,145 for 200006,

---

[6]These cases were originally scheduled to be tried in Los Angeles, California, but the Court granted the parties' joint motion to change the situs of trial to Honolulu, Hawaii, where most of the witnesses resided. Because Michael Boulware would otherwise have been detained at a U.S. penitentiary in California during the trial, the Court, pursuant to sec. 7456 and joint motions of the parties, issued writs of habeas corpus ad testificandum causing the U.S. Marshal for the District of Hawaii to move Michael Boulware to a prison in the vicinity of Honolulu and then to transport Michael Boulware (under the escort of Deputy U.S. Marshals) to and from the courtroom in Honolulu on each day that Michael Boulware wanted to attend his trial. For purposes of the trial, the parties generally made electronic copies of each document that was introduced into evidence, and petitioners caused five large electronic screens (including a 42-inch screen) to be present in the courtroom. The parties generally used those screens to display to themselves, to the Court, and to each witness any exhibit that was the subject of the witness's testimony. The Court imposed a time limit on each side's presentation of evidence. On Aug. 28, 2007, these cases were initially submitted to the Court for decision. On Mar. 3, 2008, the U.S. Supreme Court decided Boulware v. United States, 552 U.S. ___, 128 S. Ct. 1168 (2008), a case involving Michael Boulware and much of the same evidence that is in the record here. In the light of that case, this Court granted petitioners' request to reopen the record in these cases so that they could solicit additional testimony and present additional documents during a further trial in Honolulu. The issues tried at the further trial were limited to determinations of the earnings and profit (E&P) of HIE and Holdings and a determination of Michael Boulware's adjusted basis in each of those corporations.

200106, and 200206, respectively.[7]  We shall sustain those disallowances in full.  Second, we decide whether to sustain respondent's disallowance of a $905,340 bad debt deduction HIE claimed for 199806.  We shall sustain none of that disallowance.  Third, we decide whether to sustain respondent's disallowances of professional fees deducted by HIE to the extent of $1,241,995, $1,159,635, $1,156,364, and $2,208,588 for 199806, 200006, 200106, and 200206, respectively, and of professional fees deducted by Holdings to the extent of $228,240, $1,383,710, $794,404, and $2,253,652 for 199906 through 200206, respectively.  We shall sustain those disallowances to the extent stated herein.  Fourth, we decide whether to sustain respondent's determinations that Michael Boulware received constructive dividends of $1,406,343, $1,513,055, $2,332,643, $3,380,947, and $2,231,120 for 1998 through 2002, respectively, primarily because the just-referenced professional fees were paid by his constructive withdrawals of funds from HIE and Holdings (collectively, subject corporations).  We shall sustain those determinations to the extent stated herein.  Fifth, we decide whether to sustain respondent's determination that HIE is liable for the addition to

---

[7]For 199806, HIE claimed an NOL deduction of $2,086,891. Respondent determined that the NOL deduction was $450,569; i.e., $1,636,322 less than claimed.

tax under section 6651(a).  We shall sustain that determination in full.[8]

FINDINGS OF FACT

I.  Preliminaries

Many facts were stipulated, and those facts are found accordingly.  The approximately 2,000 stipulated facts and the thousands of exhibits submitted therewith are incorporated herein by this reference.  The trial transcripts total 5,255 pages, and the number of pages in the exhibits total approximately 50,000. The Court has recorded on the docket sheets of these cases over 900 index entries.

The subject corporations are C corporations that during the relevant years used accrual methods to report their income and expenses for Federal income tax purposes on the basis of fiscal years ended on June 30.[9]  When the petitions commencing these

---

[8]In their posttrial briefs, petitioners attempt to raise certain issues that were not pleaded in their petitions.  We decline to decide those issues as they are not properly before us.  See Rules 34(b)(4), 41(a) and (b); see also Bob Wondries Motors, Inc. v. Commissioner, 268 F.3d 1156, 1161 (9th Cir. 2001), affg. Toyota Town, Inc. v. Commissioner, T.C. Memo. 2000-40; Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990).

[9]The Federal income tax return of a corporate taxpayer such as HIE or Holdings that uses a fiscal year ending on June 30 is generally due on Sept. 15 of the year in which its fiscal year ends, unless the corporation receives an extension to file its return 6 months later; i.e., by Mar. 15 of the following year.

cases were filed, the principal place of business of each subject corporation was in Hawaii.[10]  Also at that time, the "legal residence" of Michael Boulware as stipulated by the parties was in Hawaii; we understand him then to have been imprisoned at a U.S. penitentiary in California, specifically, the Lompoc Correctional Facility in Lompoc, California.

## II.  NODs

### A.  NOD Issued to HIE

#### 1.  General Information

On December 15, 2004, respondent issued a notice of deficiency (NOD) to HIE for 199806 and 200006 through 200206. The NOD contained three adjustments which are relevant herein.

#### 2.  First Adjustment--Disallowance of Portion of Deductions for NOLs

##### a.  Overview

Respondent disallowed HIE's claim of NOL deductions for each year, except for $450,569 that was allowed for 199806.

##### b.  Primary Determination

Respondent determined primarily that HIE failed to establish that it was entitled to an NOL deduction for 199806 of more than $450,569 or that it had an NOL carryover to apply to any of the

---

[10]Unless otherwise noted, all references to Hawaii are to the State of Hawaii.

other subject years.  As part of this primary determination,
respondent also determined that HIE was entitled to reduce its
"miscellaneous income related to HIE's tobacco tax 'self-
correction'" (discussed infra) by $1,927,648 for 200006 and
$962,426 for 200106.[11]

### c.  Alternate Determination

#### i.  Overview

Respondent determined alternatively that adjustments to
HIE's income and deductions for 198906 through 199706, the years
in which HIE claims its NOL carryover to 199806 originated,
limited HIE's NOL carryover to 199806 (and hence HIE's NOL
deduction for that year) to $450,569 and resulted in no NOL
carryover to any of the other subject years.  Many of those
adjustments, as discussed infra, related to the criminal
indictment of Michael Boulware in part with respect to his 1989
through 1997 Federal income taxes.[12]

---

[11]During respondent's civil examination of HIE, respondent
also verified that HIE had reported as taxable income for 199906
"miscellaneous income related to HIE's tobacco tax 'self-
correction'".  Respondent did not determine a deficiency for that
year.

[12]As discussed infra, Michael Boulware's indictment also
related in part to certain false invoicing schemes.

ii.  Adjustments Related to Criminal
Indictment

The adjustments for 198906 through 199706 that were related to the criminal indictment reflected the following determinations by respondent:  (1) For 199006 through 199306, HIE failed to report $3,583,725 of income that was diverted to Michael Boulware from HIE's over-the-counter (OTC) sales of tobacco; (2) for 198906 through 199206, HIE failed to report $1,335,132 of income that was diverted to Michael Boulware and/or his mistress, Jin Sook Lee, from HIE's sales of coffee beans to Pele Trading, Inc. (Pele Trading); (3) for 199006 through 199306, HIE failed to report $1,265,458 of income that was diverted to Michael Boulware and/or Jin Sook Lee from HIE's sales of coffee beans to Hawaiian Kona Coffee Co., d.b.a. Hawaii Misuzu Coffee Co., Ltd. (Hawaii Misuzu);[13] (4) for 199006, HIE improperly deducted $50,785 that HIE paid to Bonded Construction Co., Ltd. (Bonded Construction), for work that HIE reported was performed at HIE's coffee plant but which actually was performed to renovate Jin Sook Lee's residence in Honolulu at 1017 Makaiwa Street (Makaiwa house); (5) for 199306, HIE improperly deducted $638,427 that was diverted from HIE to Michael Boulware through certain fictitious

---

[13]Hawaii Misuzu and Hawaiian Isles Kona Coffee are different entities and are unrelated.

leasing arrangements; (6) for 199506 through 199706, HIE improperly deducted $1,731,000 that HIE paid to a foreign entity, Harvest International King Coffee, Ltd. (Harvest International), which was then transferred to Michael Boulware through a second foreign entity, Forest Trading Corp. (Forest Trading); (7) for 199506, HIE improperly deducted $29,984 that HIE paid to Harvest International, which was then transferred on behalf of Michael Boulware to a domestic entity, Briggs Cockerham, L.L.C. (Briggs Cockerham); and (8) for 199506 and 199606, HIE improperly deducted $89,936 that HIE paid to Harvest International, which was then transferred on behalf of Michael Boulware to Anthony Oh Young and Gloria Oh Young through a foreign entity, Pacific Vendors Equipment, Ltd. (Pacific Vendors).

### iii. Adjustments Unrelated to Criminal Indictment

The adjustments for 198906 through 199706 that were unrelated to the criminal indictment of Michael Boulware reflected respondent's determinations that HIE was not entitled to deduct: (1) Salaries totaling $1,040,000 reportedly paid during 198906 through 199406 to Michael Boulware's then wife, Mal Sun Boulware; (2) payments totaling $385,000 that HIE made during 198906 and 199006 to Paradise Roasting, Inc. (Paradise Roasting), a nonoperating entity that was the alter ego of Jin Sook Lee and

was established to hide the transfer of HIE funds to Jin Sook Lee; (3) professional fees totaling $175,000 reportedly paid to Jin Sook Lee's sole proprietorship, Video Consultant, during 199006 and 199106;[14] (4) bad debts totaling $1,800,000 that were written off during 199306, 199406, 199506, and 199706 as uncollectible but otherwise due HIE from Jin Sook Lee in her capacity as the sole trustee of the Glenn Lee Boulware Trust, a trust established for the primary benefit of the oldest son of Jin Sook Lee and Michael Boulware; and (5) certain other professional fees totaling $4,269,980 for 199406 through 199706.

#### iv.  Some Specifics of Adjustments

Some specifics of the adjustments for 198906 through 199706 are as follows:

---

[14]The record sometimes lists this entity as "Video Consultant" and other times as "Video Consultants".  We consistently refer to this entity in the singular.

| | 198906 | 199006 | 199106 | 199206 | 199306 | 199404 | 199506 | 199606 | 199706 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| OTC sales | -0- | $506,464 | $1,337,213 | $719,755 | $1,020,293 | -0- | -0- | -0- | -0- | $3,583,725 |
| Pele Trading | $264,790 | 1,029,963 | 21,175 | 19,204 | -0- | -0- | -0- | -0- | -0- | 1,335,132 |
| Hawaii Misuzu Bonded | -0- | 116,832 | 382,403 | 347,866 | 418,357 | -0- | -0- | -0- | -0- | 1,265,458 |
| Construction | -0- | 50,785 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 50,785 |
| Leasing arrangement | -0- | -0- | -0- | -0- | 638,427 | -0- | -0- | -0- | -0- | 638,427 |
| Forest Trading | -0- | -0- | -0- | -0- | -0- | -0- | $837,000 | $819,000 | $75,000 | 1,731,000 |
| Briggs Cockerham | -0- | -0- | -0- | -0- | -0- | -0- | 29,984 | -0- | -0- | 29,984 |
| Anthony Oh Young and Gloria Oh Young | -0- | -0- | -0- | -0- | -0- | -0- | 34,986 | 54,950 | -0- | 89,936 |
| Salaries | 30,000 | 95,000 | 190,000 | 275,000 | 300,000 | $150,000 | -0- | -0- | -0- | 1,040,000 |
| Paradise Roasting Video | 185,000 | 200,000 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 385,000 |
| Consultant | -0- | 84,000 | 91,000 | -0- | -0- | -0- | -0- | -0- | -0- | 175,000 |
| Bad debts | -0- | -0- | -0- | -0- | 300,000 | 100,000 | 700,000 | -0- | 700,000 | 1,800,000 |
| Other professional fees | -0- | -0- | -0- | -0- | -0- | 521,690 | 903,695 | 1,296,308 | 1,548,287 | 4,269,980 |
| Total | 479,790 | 2,083,044 | 2,021,791 | 1,361,825 | 2,677,077 | 771,690 | 2,505,665 | 2,170,258 | 2,323,287 | 16,394,427 |

### 3. Second Adjustment--Disallowance of Portion of Deductions for Professional Fees

#### a. Overview

For each subject year, respondent disallowed a portion of HIE's deduction for professional fees. The disallowed fees totaled $1,241,995, $1,159,635, $1,156,364, and $2,208,588 for 199806, 200006, 200106, and 200206, respectively. Respondent determined that some disallowed fees were the personal expenses of HIE's controlling shareholder, Michael Boulware. Respondent determined that other disallowed fees were unsubstantiated. Respondent determined that the remaining disallowed fees were capital expenditures incurred in connection with HIE's acquisition of property from the bankruptcy estate of Jin Sook Lee.

### b.  Personal Expenses of Michael Boulware

The disallowed fees determined to be personal expenses of Michael Boulware stemmed from professional representation that he received in his individual capacity.  He received some of that representation while respondent's Criminal Investigation Division (CID) was conducting a criminal investigation of Michael Boulware and Jin Sook Lee as to their personal Federal income taxes (criminal investigation); while a grand jury was conducting its investigation of Michael Boulware, proceeding to his indictment (grand jury proceedings); and during Michael Boulware's first criminal trial and his appeal of his conviction resulting from that trial.[15]  Michael Boulware received the remainder of that representation while he and HIE were involved in civil litigation initiated by Jin Sook Lee.  Respondent determined that 50 percent of the expenses related to that civil litigation were the personal expenses of Michael Boulware and that the other 50 percent were the business expenses of HIE.

---

[15]As discussed infra, the criminal investigation began on or about June 16, 1993; the grand jury proceedings began at or about the beginning of August 1997; Michael Boulware was indicted on May 19, 1999 (a superseding indictment and second superseding indictment occurred on Apr. 6, 2000, and Feb. 14, 2001, respectively); the jury in Michael Boulware's first criminal trial convicted him on Nov. 29, 2001; and Michael Boulware appealed that conviction in May 2002.

In sum, the amounts of Michael Boulware's personal expenses determined to be attributable to the criminal and civil cases are as follows:[16]

| | 199806 | 199906 | 200006 | 200106 | 200206 | Total |
|---|---|---|---|---|---|---|
| Criminal investigation, grand jury proceedings, first criminal trial, and appeal | $598,602 | $810,688 | $1,016,103 | $1,156,364 | -0- | $3,581,757 |
| 50 percent of expenses related to civil litigation initiated by Jin Sook Lee | 411,678 | 36,245 | 58,588 | -0- | -0- | 506,511 |
| Total | 1,010,280 | 846,933 | 1,074,691 | 1,156,364 | -0- | 4,088,268 |

### c. Unsubstantiated Expenses

The disallowed fees determined to be unsubstantiated totaled $103,313 for 199806, $10,000 for 199906, $66,671 for 200006, and $2,208,588 for 200206.

### d. Capital Expenditures

Respondent determined that $157,979 of the total disallowed fees was capital expenditures attributable to various assets that HIE acquired from the bankruptcy estate of Jin Sook Lee. The specific amounts underlying the $157,979 were $128,402 for 199806, $11,304 for 199906, and $18,273 for 200006 ($128,402 + $11,304 + $18,273 = $157,979). The acquired assets were the Makaiwa house, a condominium in Honolulu at 1117 Punahou Street (Punahou condominium), a condominium in Honolulu at 475 Atkinson

---

[16]Although 199906 is not a year that was the subject of the NOD issued to HIE, we include that year in our findings because it relates to the constructive dividends determined in the NOD issued to Michael Boulware.

Drive (Atkinson condominium), a 1992 Rolls Royce, and jewelry and furs. Of the $157,979, respondent determined that $16,391, $60,134, $22,308, $19,398, and $39,747 were allocable to those respective assets. Respondent determined the allocable amounts as follows:

|  | Applicable Value | Percent of Whole | Capitalized Fees |
|---|---|---|---|
| Makaiwa house | $845,000 | | |
| Less: A life estate retained by Jin Sook Lee in the house | 760,500 | | |
| Acquired interest | 84,500 | 10.38 | $16,391 |
| Punahou condominium | 310,000 | 38.06 | 60,134 |
| Atkinson condominium | 115,000 | 14.12 | 22,308 |
| 1992 Rolls Royce | 100,000 | 12.28 | 19,398 |
| Jewelry and furs | 204,900 | 25.16 | 39,747 |
| Total | 814,400 | 100.00 | 157,979 |

For each of the taxable years 200006, 200106, and 200206, respondent determined that HIE was entitled to deduct $2,459 of depreciation as to the capital expenditures. Respondent determined that depreciation as follows:

|  | Capitalized Fees | Allocation to Building | Depreciable Basis | 200006 | 200106 | 200206 |
|---|---|---|---|---|---|---|
| Punahou condominium | $60,134 | 85% | $51,114 | $1,859 | $1,859 | $1,859 |
| Atkinson condominium | 22,308 | 74 | 16,508 | 600 | 600 | 600 |
| Total | | | | 2,459 | 2,459 | 2,459 |

e. Summary

In sum, the disallowed professional fees are as follows:

|  | 199806 | 199906 | 200006 | 200106 | 200206 | Total |
|---|---|---|---|---|---|---|
| Personal expenses | $1,010,280 | $846,933 | $1,074,691 | $1,156,364 | -0- | $4,088,268 |
| Unsubstantiated expenses | 103,313 | 10,000 | 66,671 | -0- | $2,208,588 | 2,388,572 |
| Capital expenditures | 128,402 | 11,304 | 18,273 | -0- | -0- | 157,979 |
| Total | 1,241,995 | 868,237 | 1,159,635 | 1,156,364 | 2,208,588 | 6,634,819 |

4. Third Adjustment--Disallowance of Deduction
   for Bad Debt

For 199806, respondent disallowed HIE's claimed bad debt deduction of $905,340. That deduction was attributable to HIE's writeoff of a further portion of the debt reportedly due to HIE from Jin Sook Lee in her capacity as trustee of the Glenn Lee Boulware Trust. Respondent determined that the deduction was not allowed primarily because HIE had failed to establish a debtor/creditor relationship with Jin Sook Lee. Respondent determined alternatively that the deduction was not allowed because HIE had failed to establish the accuracy of the amount claimed as the deduction or its worthlessness.

B. NOD Issued to Holdings

1. General Information

On December 15, 2004, respondent issued an NOD to Holdings for 199706 and 199906 through 200206. The NOD related to Holdings and to its wholly owned subsidiaries, Hawaiian Isles Kona Coffee and Royal Hawaiian Water.

2. Sole Relevant Adjustment--Disallowance of Portion
   of Deductions for Professional Fees

The NOD contained one adjustment which is relevant herein; i.e., respondent disallowed a portion of Holdings' deduction of

professional fees for 199906 through 200206.[17]  The disallowed

fees totaled $228,240, $1,383,710, $794,404, and $2,253,652 for

199906 through 200206, respectively.  Respondent determined that

some of the disallowed fees were the personal expenses of Michael

Boulware.  Those personal expenses were determined to stem mainly

from the professional representation Michael Boulware received

during the criminal investigation; during the grand jury

proceedings; and during Michael Boulware's first criminal trial

and his appeal of his conviction resulting from that trial.

Respondent determined that the remaining disallowed fees were

unsubstantiated.  Respondent determined the specific amounts

attributable to the two reasons for disallowance as follows:

|  | 199906 | 200006 | 200106 | 200206 |
|---|---|---|---|---|
| Personal expenses | -0- | $1,110,435 | $575,114 | $1,678,579 |
| Unsubstantiated expenses | $228,240 | 273,275 | 219,290 | 575,073 |
| Total | 228,240 | 1,383,710 | 794,404 | 2,253,652 |

C.  NOD Issued to Michael Boulware

1.  General Information

On December 15, 2004, respondent issued an NOD to Michael

Boulware for 1998 through 2002.

---

[17]For 199706, Holdings had carried back and claimed a
deduction for a $713,370 NOL from 200206.  Because respondent's
disallowance of the amount of professional fees Holdings deducted
for 200206 was greater than $713,370, respondent determined that
Holdings did not have an NOL for 200206 and thus was not entitled
to its claimed NOL deduction for 199706.

### 2. Sole Relevant Adjustment--Constructive Dividends

The NOD contained one adjustment which is relevant herein; i.e., respondent determined that most of the above-mentioned unsubstantiated expenses and personal expenses were personal withdrawals of funds by Michael Boulware from the subject corporations and that the amounts of these funds were includable in Michael Boulware's taxable income as constructive dividends. Respondent determined that the constructive dividends totaled $1,406,343, $1,513,055, $2,332,643, $3,380,947, and $2,231,120 for 1998 through 2002, respectively, Respondent determined these amounts as follows:

| Distribution | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| HIE 199806 | $891,242 | -0- | -0- | -0- | -0- | $891,242 |
| HIE 199906 | 400,981 | $472,235 | -0- | -0- | -0- | 873,216 |
| HIE 200006 | -0- | 477,969 | $596,722 | -0- | -0- | 1,074,691 |
| HIE 200106 | -0- | -0- | 485,610 | $670,754 | -0- | 1,156,364 |
| HIE 200206 | -0- | -0- | -0- | 1,104,294 | $1,104,294 | 2,208,588 |
| Subtotal | 1,292,223 | 950,204 | 1,082,332 | 1,775,048 | 1,104,294 | 6,204,101 |
| | | | | | | |
| Holdings 199906 | | | | | | |
| Unsubstantiated | 114,120 | 114,120 | -0- | -0- | -0- | 228,240 |
| Holdings 200006 | | | | | | |
| Personal expenses | -0- | 312,094 | 798,341 | -0- | -0- | 1,110,435 |
| Unsubstantiated | -0- | 136,637 | 136,638 | -0- | -0- | 273,275 |
| Holdings 200106 | | | | | | |
| Personal expenses | -0- | -0- | 205,687 | 369,428 | -0- | 575,115 |
| Unsubstantiated | -0- | -0- | 109,645 | 109,645 | -0- | 219,290 |
| Holdings 200206 | | | | | | |
| Personal expenses | -0- | -0- | -0- | 839,290 | 839,290 | 1,678,580 |
| Unsubstantiated | -0- | -0- | -0- | 287,536 | 287,536 | 575,072 |
| Subtotal | 114,120 | 562,851 | 1,250,311 | 1,605,899 | 1,126,826 | 4,660,007 |
| Total | 1,406,343 | 1,513,055 | 2,332,643 | 3,380,947 | 2,231,120 | 10,864,108 |

## III. Background of Michael Boulware

Michael Boulware was born on the Island of Maui on March 14, 1948, and he was raised on the Island of Oahu in a lower-middle-income neighborhood. He attended college for approximately 2

years and then served in the National Guard through 1970. He later attended college for one more semester and then quit school to work for a telephone company. He subsequently stopped working for the telephone company and performed a variety of jobs including driving a cab and working at a restaurant bar.

IV. Relevant Corporations

    A. HIE

        1. Formation of Business

In the late 1970s, Michael Boulware started his own business, the operation of a pool hall, and he began working for that business. On the premises of the business were pool tables, video games, and vending machines. In or about 1980, Michael Boulware changed his business to one of video games. Shortly thereafter, on July 10, 1981, Michael Boulware transferred most if not all of the assets and liabilities of his video game business to a newly formed corporation, M&S Vending, Inc. (M&S Vending), in exchange for all of its stock.

M&S Vending was initially a cash business that involved owning and maintaining coin-operated video games and jukebox, pinball, karaoke, and vending machines (including vending machines that sold cigarettes) and leasing those games and machines to hotels, bars, restaurants, and other establishments for use on their premises. M&S Vending generally shared the cash

receipts of each of its games and machines with the establishment in which the game or machine was located.  The establishment generally received 50 percent of the cash receipts in each game or machine (other than a cigarette machine) located on its premises; sometimes, the establishment received the first 10 percent of the cash receipts plus 50 percent of the remaining cash receipts (in other words, the establishment received 55 percent of the cash receipts).  As to the cigarette machines, M&S Vending paid an establishment 10 percent of the receipts from those machines on the premises of that establishment.  In addition to the remaining 90 percent of the cigarette machine receipts that it kept as income, M&S Vending also earned income from cigarette manufacturers that paid M&S Vending to place their brands in the cigarette machines.

In or about the mid-1980s', M&S Vending expanded its business to include the purchase of cigarettes and the sale of those cigarettes through its leased cigarette machines. Initially, M&S Vending purchased its cigarette inventory from Island Tobacco, a local wholesaler owned by Harold Okimoto and run by his brother Thomas Okimoto.  Because M&S Vending had a lot of cigarette machines, it was eventually able to (and did) purchase cigarettes directly from the manufacturers (e.g., Philip Morris), rather than from the wholesalers.

M&S Vending eventually changed its name to Hawaiian Isles Vending and later, on or about June 30, 1987, to HIE. Shortly thereafter, HIE expanded its business further to include the sale of coffee and candy through its vending machines. HIE's coffee business involved selling coffee to business offices through machines that HIE lent to the businesses. In 1988 or 1989, HIE expanded its business even further to include the processing and distribution of a blend of Kona coffee. Kona coffee is grown and sold at approximately 600 small farms in a central region of Kona, a section of the Island of Hawaii, and Kona coffee is one of the most expensive coffees in the world.[18] In order to be labeled and sold as "Kona coffee", a blend of coffee must contain at least 10 percent Kona coffee. HIE's blend of Kona coffee was a mix of 10 percent Kona coffee beans and 90 percent coffee beans grown in places such as Brazil, Costa Rica, or Sumatra.

### 2. Officers and Directors

#### a. Initially

Initially, Michael Boulware was the president, treasurer, and secretary of M&S Vending, and he was one of two directors on its board. Through August 31, 1982, M&S Vending's vice president and only other director was Matthew S.K. Pyun, Jr.

---

[18]The average size of each of the approximately 600 farms is less than 5 acres, and the owners of those farms are natives.

b. <u>August 31, 1982, to July 10, 1991, or
Thereabouts</u>

From August 31, 1982, through July 10, 1991, or thereabouts, Michael Boulware was the only officer of HIE (inclusive of its predecessor), serving simultaneously as president, vice president, secretary, and treasurer.  During that time, Michael Boulware also was either the sole director on the corporation's board or one of its two directors.  Stanley Hirai was the other director of HIE (and its predecessor) during some of that time.

Stanley Hirai helped Michael Boulware form the business that became the business of M&S Vending and was one of M&S Vending's original employees.  Stanley Hirai's role as a director of HIE (and its predecessor) was limited and scripted by Michael Boulware; among other things, Stanley Hirai signed corporate documents as directed by Michael Boulware, without fully reading the documents or understanding them.  In or about 1991, Stanley Hirai contracted diabetes and was instructed by Michael Boulware not to come into the office but to remain at home on full salary. Afterwards, Stanley Hirai was paid approximately $50,000 per year through at least 1997, and he performed few services for HIE in return for that salary.

c.    On or About July 10, 1991, Through an
      Effective Date of April 15, 2000

From July 10, 1991, or thereabouts, through an effective date of April 15, 2000, HIE had two directors in addition to Michael Boulware.  One was Michael Boulware's brother, Sidney E. Boulware, Jr. (Sidney Boulware).  The other was Merwyn Manago, a friend of a friend of Michael Boulware.

Sidney Boulware began working for HIE in or about 1983.  Before that time, Sidney Boulware had worked for the Department of Education as a counselor at a high school.  Sidney Boulware worked part time for HIE through June 1987, at which time he began (and has continued) to work full time for HIE as a chief operations officer.  As of July 10, 1991, Sidney Boulware also took over Michael Boulware's role as vice president of HIE.

Merwyn Manago began working for HIE in or about November 1988.  His position at that time was chief financial officer under the title of controller.  Merwyn Manago has continued to date to work for HIE (and later also Holdings) as chief financial officer.  Merwyn Manago also served as a board member of HIE (and Holdings) through 2006.  In 2006, Michael Boulware removed Merwyn Manago from the board and replaced him with Michael Boulware's daughter.

When Merwyn Manago began working for HIE, HIE's accounting department was weak to inadequate, and its accounting records were not current. Merwyn Manago aimed to make that department stronger. Initially, Merwyn Manago caused HIE to hire a vending accountant and an assistant controller. Later, in 1995 or 1996, Merwyn Manago caused HIE to hire another assistant controller. Scott Yoshida, an employee of HIE and then Holdings from December 1991 to date, was employed as assistant controller through December 1995. In December 1995, Scott Yoshida was promoted to controller of Hawaiian Isles Kona Coffee.

### d. Effective April 15, 2000

Effective April 15, 2000, Michael Boulware resigned his position as president, secretary, and treasurer of HIE. HIE's board (Michael Boulware, Sidney Boulware, and Merwyn Manago) accepted that resignation and appointed Sidney Boulware and Florence Boulware as HIE's sole officers for the next corporate year.[19] Sidney Boulware was appointed president, vice president, and treasurer. Florence Boulware was appointed secretary. Sidney Boulware has continued to date to work for HIE as its president.

---

[19]While we find in the record that Florence Boulware is related to Michael Boulware, we are unable to find the specific relationship between the two.

### e.  Board Meetings

HIE's board of directors met frequently (either formally or informally) and memorialized those meetings in minutes.  The minutes were typically typed into form by an administrative secretary of HIE, who was not at the meeting but who would receive from either Michael Boulware or Sidney Boulware the statements that she would type.  The typed document would then be circulated to the officers who were present at the meeting for their signature.

### 3.  Shareholders

Initially, Michael Boulware was the sole shareholder of M&S Vending.  Through September 8, 1987, Michael Boulware also was the sole shareholder of HIE.  On September 8, 1987, Michael Boulware transferred 50 percent of his stock in HIE to Jin Sook Lee as trustee of the Glenn Lee Boulware Trust.[20]  Jin Sook Lee was Michael Boulware's mistress from 1982 through 1994, and she is the mother of their two children.  Their oldest child is Glenn Lee Boulware.

At the time of the transfer, HIE did not issue a stock certificate to Jin Sook Lee, as trustee, or otherwise record the

---

[20]Immediately before this transfer, Michael Boulware's adjusted basis in his HIE stock was $1,000.  Immediately after the transfer, Michael Boulware's adjusted basis in his HIE stock was $500.

transfer in its books.  In 1995, Jin Sook Lee, as trustee, commenced a lawsuit in the Circuit Court of the First Circuit of Hawaii by filing with the court a "Petition of Jin Sook Lee to Enforce Trust and For An Accounting in Favor of Glenn Lee Boulware, A Minor, Beneficiary" (trust case).  The court docketed the trust case as No. 95-0029.  On June 14, 1996, while the lawsuit was pending, HIE issued a stock certificate to Jin Sook Lee, as trustee, reflecting the ownership of 47.5 percent of the outstanding shares of HIE.  Contemporaneously, HIE also issued stock to Sidney Boulware so that thereafter Sidney Boulware reportedly owned a 5-percent interest in HIE and Michael Boulware and Jin Sook Lee, as trustee, each reportedly owned a 47.5-percent interest in HIE.

On or about March 15, 1998, Sidney Boulware rescinded his reported 5-percent interest in HIE so that thereafter Michael Boulware and Jin Sook Lee, as trustee, each owned 50 percent of HIE's stock.  Sidney Boulware's action of rescission was in response to a ruling made by the court in the trust case.  Specifically, on July 31, 1997, the court ruled that the Glenn Lee Boulware Trust was entitled to own 50 percent of the stock of HIE as of September 8, 1987.

### 4. Michael Boulware's Control

Michael Boulware was viewed by the directors, officers, and employees of HIE as the "boss". When he was a director on HIE's board, Michael Boulware always had the final say at board meetings, and he always had the final say with respect to the operation and the business of HIE. Michael Boulware controlled HIE during the relevant years, and its employees routinely followed his directions and instructions without questioning the propriety of his actions.

### B. Holdings

On April 4, 1994, Holdings was formed by Michael Boulware as a corporation with 1,000 outstanding shares all owned by HIE. Holdings began its operations in and filed its initial Federal corporate income tax return for 199706. As of the first day of that taxable year, i.e., July 1, 1996, Michael Boulware caused HIE to effect a tax-free reorganization (spinoff) through which it transferred its shares in Holdings as follows: 475 shares to Michael Boulware, 475 shares to Jin Sook Lee, as trustee of the Glenn Lee Boulware Trust, and 50 shares to Sidney Boulware. As of the first day of the following taxable year, i.e., July 1, 1997, Holdings reverse-split its stock tenfold so that thereafter Holdings had 100 outstanding shares and the numbers of shares

owned by the three just-mentioned individuals were 47.5, 47.5, and 5, respectively.

For each of the taxable years 199906 through 200206, Michael Boulware was Holdings' principal officer, principal employee, and controlling shareholder.  At some point, Sidney Boulware also served as a director of Holdings.  From 199706 to date, Sidney Boulware worked for Holdings as an officer, including as its president from April 15, 2000, or thereabouts, to date.

C.  Other Corporations Organized in 1994

Three other relevant corporations also were organized in 1994:  Hawaiian Isles Vending, Inc.; Hawaiian Isles Distributors, Ltd.; and Hawaiian Isles Kona Coffee.  HIE owned all of the shares of each of these corporations.

D.  Restructuring of HIE

Effective June 30, 1995, Michael Boulware and HIE entered into an Agreement and Plan of Reorganization and Corporate Separation (restructuring).  Pursuant to the restructuring, Hawaiian Isles Vending, Inc., changed its name to Holdings, and all shares of Hawaiian Isles Kona Coffee owned by HIE were transferred to Holdings.  Also pursuant to the restructuring, HIE reorganized its businesses so that thereafter HIE generally sold cigarettes and Holdings generally sold and leased vending machines and processed and sold coffee.

E.  Royal Hawaiian Water

Royal Hawaiian Water bottles purified drinking water and sells that bottled water to retailers in Hawaii.  Royal Hawaiian Water conducts its business under the name "Hawaiian Isles Water Company".  Royal Hawaiian Water is presently a subsidiary of Holdings.

In September 1995, Michael Boulware formed Royal Hawaiian Water as his wholly owned corporation and elected to have that corporation taxed as an S corporation.  As of July 1, 1997 (but after the reverse split mentioned supra), Michael Boulware contributed the net assets of Royal Hawaiian Water to Holdings in exchange for 162.5 newly issued shares of Holdings.  This transaction increased Michael Boulware's ownership interest in Holdings to 210 shares (47.5 + 162.5 = 210) or in other words to 80 percent of its stock (210/(100 + 162.5) = 80%).

F.  Holdings After the Restructuring

As now relevant, the primary business of Holdings and its subsidiaries is the wholesaling, distribution, leasing, and maintenance of vending machines (it was the largest vending company in Hawaii before its vending operation was sold on December 29, 2006); the bottling, wholesaling, and distribution of purified drinking water (it has approximately 40 percent of the market in Hawaii); and the processing, wholesaling, and

distribution of coffee (it has approximately 60 percent of the "gourmet end coffee" market in Hawaii).  Holdings conducts most of its business in Hawaii but also exports coffee to the continental United States and to some foreign countries.

For 199706, 199906, 200006, 200106, and 200206, Holdings had the following compensated officers, each of whom received the indicated compensation:

| Taxable Year | Officer | Compensation |
|---|---|---|
| 199706 | Michael Boulware | $1,372,008 |
|  | Sidney Boulware | 126,322 |
| 199906 | Michael Boulware | 375,700 |
|  | Sidney Boulware | 177,769 |
| 200006 | Michael Boulware | 1,496,006 |
|  | Sidney Boulware | 192,200 |
| 200106 | Michael Boulware | 396,006 |
|  | Sidney Boulware | 142,000 |
| 200206 | Michael Boulware | 396,006 |
|  | Sidney Boulware | 142,000 |

G.  Payment of Common Costs

At all relevant times, Holdings shared certain common costs with HIE, d.b.a. Hawaiian Isles Distributors.  At one point, Holdings began paying HIE's overhead and other expenses.

H.  Various Names Used by HIE To Conduct Its Business During the Subject Years

During the subject years, HIE sometimes did business as Hawaiian Isles Distributors, sometimes as Hawaiian Isles Vending, or sometimes as Kona Coffee Service.

I.  No Payment of Formal Dividends by HIE

From in or about November 1988 until the end of 2005, HIE paid no formal dividends.

J.  E&P of HIE and Its Predecessor for 198206 Through 198806

1.  198206

As of June 30, 1982, the accumulated E&P of HIE's predecessor, M&S Vending, was $189,252.

2.  198306

For 198306, the current E&P of M&S Vending was $234,989. The current E&P reflected M&S Vending's taxable income as reported on its Federal income tax return for 198306 ($339,960), less negative adjustments totaling $104,971 for Federal income taxes ($103,324) and political contributions and penalties ($1,647).  As of June 30, 1983, the accumulated E&P of M&S Vending was $424,241 ($189,252 + $234,989).

3.  198406

For 198406, the current E&P of M&S Vending was $341,224. The current E&P reflected M&S Vending's taxable income as reported on its Federal income tax return for 198406 ($424,392), less negative adjustments totaling $83,168 for Federal income taxes ($77,319) and political contributions and penalties ($5,849).  As of June 30, 1984, the accumulated E&P of M&S Vending was $765,465 ($424,241 + $341,224).

### 4. 198506

For 198506, the current E&P of M&S Vending was $126,955. The current E&P reflected M&S Vending's taxable income as reported on its Federal income tax return for 198506 ($151,550), plus a $34,779 positive adjustment to reflect an error on that return, less negative adjustments totaling $59,374 for Federal income taxes ($45,589), political contributions and penalties ($8,649), prior period income included in the return ($136), and a bad debt ($5,000). In addition to that year's current E&P, the calculation of the accumulated E&P of M&S Vending as of June 30, 1985, included a $10,110 positive adjustment to reflect an overaccrual of prior years' taxes. As of June 30, 1985, the accumulated E&P of M&S Vending was $902,530 ($765,465 + $126,955 + $10,110).

### 5. 198606

For 198606, the current E&P of M&S Vending was $252,942. The current E&P reflected M&S Vending's taxable income as reported on its Federal income tax return for 198606 ($271,420), less the sum of various positive and negative adjustments totaling negative $18,478. The positive adjustments totaled $133,981 and were attributable to a prior year adjustment for "FA" ($120,000), bad debt reversals ($4,000), depreciation ($3,733), an NOL carryover ($5,798), and a recording of the

correct book value of "FA" ($450). The negative adjustments totaled $152,459 and were attributable to Federal income taxes ($70,001), depreciation adjustments ($11,094), an overaccrual of tax ($60,871), and penalties ($10,493). In addition to that year's current E&P, the calculation of the accumulated E&P of M&S Vending as of June 30, 1986, included two positive adjustments. The first positive adjustment, $17,132, was made to reflect an adjustment to HIE's net income for 198506 as reported in its books. The second positive adjustment, $16,283, was made to reflect an adjustment to HIE's net income as reported in its books for years before 198506. As of June 30, 1986, the accumulated E&P of M&S Vending was $1,188,887 ($902,530 + $252,942 + $17,132 + $16,283).

    6.  198706

For 198706, the current E&P of M&S Vending was negative $329,574. The current E&P reflected M&S Vending's taxable loss as reported on its Federal income tax return for 198706 ($367,487), less the sum of various positive and negative adjustments totaling negative $37,913. The positive adjustments totaled $68,912 and were attributable to a Federal income tax refund ($39,377) and depreciation ($29,535). The negative adjustments totaled $30,999 and were attributable to Federal income taxes ($1,193), goodwill ($4,065), depreciation on capital

leases ($10,815), contribution carryovers ($2,473), bad debt expenses ($5,955), and book depreciation greater than tax depreciation ($6,498). As of June 30, 1987, the accumulated E&P of M&S Vending was $859,313 ($1,188,887 + (-$329,574)).

7. 198806

For 198806, the current E&P of HIE was negative $859,431. The current E&P reflected HIE's taxable loss as reported on its Federal income tax return for 198806 ($813,106), less the sum of various positive and negative adjustments totaling negative $46,325. The positive adjustments totaled $930,937 and were attributable to an income tax benefit ($273,200), depreciation ($21,393), and a lease rental expense ($636,343). The negative adjustments totaled $977,262 and were attributable to Federal income taxes ($107), an adjustment to a bad debt reserve ($2,250), gain on investment property ($132,978), inventory capitalization ($18,000), pension contribution adjustments ($96,858), goodwill ($6,093), interest on leases ($103,942), further depreciation ($5,500), contribution carryover ($1,425), depreciation on leases ($436,761), penalties ($172,877), and meals ($471). As of June 30, 1988, the accumulated E&P of HIE was negative $118 ($859,313 + (-$859,431)).

K. E&P of Holdings for 199706 and 199806

    1. 199706

        a. Accumulated E&P

As a result of HIE's spinoff of Holdings on July 1, 1996, 45.9206 percent of HIE's accumulated E&P is allocated to Holdings as of that date.

        b. Current E&P

For 199706, the current E&P of Holdings was $722,937.

    2. 199806

For 199806, the current E&P of Holdings was $346,579.

L. Number of Holdings and HIE Employees

At all relevant times, HIE and Holdings each had fewer than 500 employees.

V. Officer Loan Account

A. Overview

Before the restructuring, an officer loan account was kept on the books of HIE. After the restructuring, that account was kept on the books of Holdings.

B. Mechanics of Account

Michael Boulware routinely requested that checks be written to him from HIE's checking accounts. Those checks were written as requested. HIE did not always know how Michael Boulware would use the funds reflected in those checks. Merwyn Manago

anticipated that the dollar amounts of the checks written to Michael Boulware would be charged to Michael Boulware's officer loan account (officer loan account) as borrowings by him and that the officer loan account would be reduced by any amount repaid by or on behalf of Michael Boulware.

Merwyn Manago kept a running balance of the amounts that he knew that Michael Boulware borrowed (including by way of checks written to him) and that Michael Boulware repaid. Merwyn Manago generally caused those transactions to be recorded in the officer loan account contemporaneously with the transactions. As discussed infra, Michael Boulware participated in certain transactions that were not reported on the books of either subject corporation (off-book activities), and he caused deposits and withdrawals to be made to and from two bank accounts (off-book bank accounts) that were neither reported on the books of either subject corporation nor known about by Merwyn Manago or the other independent (of Michael Boulware) managers of the subject corporations (collectively, independent managers). Merwyn Manago did not know about the funds that were deposited into or withdrawn from the off-book bank accounts, and he did not reflect those funds in the officer loan account. Merwyn Manago did not know about or cause HIE to record contemporaneously in

the officer loan account transactions related to the off-book activities.

C.  Repayment of Officer Loans

Bonuses were declared to Michael Boulware at the end of each year to repay some of the balance in the officer loan account. Merwyn Manago caused to be recorded as reductions of the officer loan account any portion of a loan to Michael Boulware that was repaid.  Michael Boulware's repayments were not always made in cash.

D.  Michael Boulware's Claimed Coffee Transactions

Michael Boulware told Merwyn Manago that Michael Boulware was using HIE funds in his individual capacity to purchase coffee for resale to HIE.  Merwyn Manago caused the balance of the officer loan account to be increased by the amount of HIE funds that Merwyn Manago believed that Michael Boulware was using for that purpose.  Michael Boulware told Merwyn Manago when Michael Boulware purportedly sold and delivered coffee to HIE, and Merwyn Manago recorded those sales and alleged deliveries as reductions to the balance in the officer loan account.

Merwyn Manago told Michael Boulware that HIE needed invoices to document any coffee transaction between him and HIE. Afterwards, Michael Boulware gave Merwyn Manago invoices stating that Michael Boulware had sold Kona coffee to Hawaiian Isles Kona

Coffee or to HIE and that he had delivered that coffee to the purchasing corporation. Michael Boulware did not always give those invoices to HIE contemporaneously with the dates that Michael Boulware said he had delivered coffee to HIE. Other than through Merwyn Manago's receipt of the invoices from Michael Boulware and Merwyn Manago's related discussions with Michael Boulware, Merwyn Manago did not attempt to verify that HIE received the coffee Michael Boulware said he sold to HIE; Merwyn Manago relied primarily upon the representations and actions of Michael Boulware.

From November 1988 through June 1994, Michael Boulware gave HIE various invoices for coffee that he purportedly sold to HIE or one of its subsidiaries. These invoices for the most part are consecutively numbered. One invoice stated that Michael Boulware sold and delivered to Hawaiian Isles Kona Coffee 80,000 pounds of Kona coffee. Merwyn Manago did not see this coffee but credited Michael Boulware's loan account for the $500,000 sales price listed on the invoice. Nor did Merwyn Manago verify that Hawaiian Isles Kona Coffee had received 40,000 pounds of Kona coffee that a second invoice stated that Michael Boulware had sold and delivered to Hawaiian Isles Kona Coffee for $250,000. Merwyn Manago also did not verify that Hawaiian Isles Kona Coffee received 200,000 pounds of Kona coffee that a third invoice

stated that Michael Boulware had sold and delivered to Hawaiian Isles Kona Coffee for $800,000. Michael Boulware did not actually deliver this 320,000 pounds of coffee (200,000 + 40,000 + 80,000 = 320,000) but through the officer loan account was credited with doing so.[21]

E. Promissory Notes

Before 1993, the year in which the CID investigation began, Michael Boulware was not required to sign promissory notes for checks written to him from an HIE account. Afterwards, at the end of each year, Merwyn Manago generally took the total amount of checks written to Michael Boulware in each month of that year and drafted promissory notes for each of those months. None of the funds that were deposited into the off-book bank accounts were reflected in the promissory notes.

Payment of the promissory notes was not secured. The promissory notes set forth a repayment date within 24 months after their making and stated that a holder of a note in default could declare that the entire unpaid balance was immediately due and payable.

---

[21]In addition to these amounts credited to the officer loan account as coffee repayments, we are unable to verify other items for which Merwyn Manago credited the officer loan account.

F.  Lack of Collection on Promissory Notes

Some of the loans recorded as made to Michael Boulware were not repaid, and defaults occurred on the related and some of the other promissory notes.  Merwyn Manago never declared that any amount due under a promissory note related to Michael Boulware was immediately due and payable.  Nor did Merwyn Manago ever attempt to collect repayment of an obligation of Michael Boulware that was in default; Merwyn Manago viewed Michael Boulware as the owner of the subject corporations and, hence, as the boss of Merwyn Manago and every other employee of one or both of the subject corporations.  When the period of limitations expired on the enforcement of a promissory note related to Michael Boulware, Merwyn Manago never recorded on the books of either subject corporation that those amounts were uncollectible.  The board of directors never took any action with respect to collection on the promissory notes.

VI.  Personal Bank Accounts

A.  Michael Boulware Individually

As relevant herein, Michael Boulware had three personal bank accounts listed in his name.  These accounts were checking account No. 05-389054 at First Interstate Bank of Hawaii, checking account No. 49-507151 at First Hawaiian Bank, and checking account No. 09-365508 at First Hawaiian Bank.  Michael

Boulware also maintained a checking account at the Bank of Hawaii in his reported capacity as president, treasurer, and secretary of his wholly owned corporation, Automated Equipment, Ltd. (Automated Equipment). That account number was 17-134698.

B. Michael Boulware and Mal Sun Boulware Jointly

Michael Boulware and Mal Sun Boulware had a joint savings account, account No. 17-009762 at Liberty Bank. They also had a joint checking account, account No. 37-251410 at First Hawaiian Bank.

C. Jin Sook Lee

Jin Sook Lee had a personal checking account, account No. 65-565579 at First Hawaiian Bank. Jin Sook Lee also maintained a savings account at First National Bank in her capacity as trustee of the Glenn Lee Boulware Trust. That account number was 65-570109.

VII. Mal Sun Boulware

Mal Sun Boulware was born in Korea in 1944, and she moved to the United States in 1963. She was married to Michael Boulware from 1975 through May 5, 1994. She and Michael Boulware have one child, Karen Min Boulware, a Korean girl whom they adopted. Karen Min Boulware was born on May 2, 1979.

M&S Vending reportedly paid Mal Sun Boulware wages of $16,560 and $21,210 during 1981 and 1982, respectively, and

$24,000 during each of the years 1983 through 1986. HIE reportedly paid Mal Sun Boulware wages of $47,000, $59,000, $60,000, $130,000, $250,000, $300,000, $300,000, and $75,000 during 1987 through 1994, respectively. Mal Sun Boulware generally received her reported wages in equal installments throughout the corresponding year. For 198906 through 199406, HIE deducted wages paid to Mal Sun Boulware of $30,000, $95,000, $190,000, $275,000, $300,000, and $150,000, respectively. Respondent disallowed the deductions for 198906 through 199406 in the total amount of $1,040,000.

Mal Sun Boulware has just a few years of education, all in Korea, and she reads little English. She did not have either an office or a desk at HIE (or at any related entity). Mal Sun Boulware performed no meaningful work for HIE (or M&S Vending) that would support characterizing the disputed payments to her as compensation.

VIII. Jin Sook Lee

A. Background

Jin Sook Lee was born in Seoul, Korea, in 1955, and she moved to the United States in 1980. When she moved, Jin Sook Lee had a high school education and had been married for approximately 2 years to a man who lived in Hawaii. Shortly after her move, Jin Sook Lee divorced her husband because he was

jobless and, she believed, incapable of supporting her desired lifestyle.

After her divorce, Jin Sook Lee started working at a Korean hostess bar in Hawaii as a hostess retained by the bar owners to socialize with their patrons and to allure the patrons to buy a lot of drinks from the bar.  Such bars usually involve prostitution and are generally staffed with young women from Korea who speak little English, have few job skills, and are looking for someone to take care of them.  Jin Sook Lee and the other hostesses were paid for their services at the Korean hostess bar through commissions earned on the drinks they caused to be sold and through their receipt of tips left for them by the patrons.

B.  Jin Sook Lee Meets Michael Boulware

In or about 1981, Jin Sook Lee met Michael Boulware at the Korean hostess bar where and while she was working.  Shortly thereafter, Michael Boulware and Jin Sook Lee began an intimate relationship which Michael Boulware endeavored to keep hidden from Mal Sun Boulware and others.[22]  Throughout their relationship, Michael Boulware provided Jin Sook Lee with housing and supported her financially.

---

[22]Merwyn Manago, for example, did not know of Jin Sook Lee until June 1993 or thereafter.

Jin Sook Lee stopped working at the Korean hostess bar soon after she met Michael Boulware, and she moved from her studio apartment to what she considered to be Michael Boulware's Atkinson condominium.  Jin Sook Lee lived at the Atkinson condominium rent free.  Later, Jin Sook Lee moved from the Atkinson condominium to what she considered to be Michael Boulware's house in Honolulu at Hawaii Kai, 3 Lumahai Street. She lived at that house rent free.  Later, after Mal Sun Boulware learned that Jin Sook Lee was living at the house at 3 Lumahai Street, Jin Sook Lee moved from that house to the Punahou condominium, which Jin Sook Lee bought with money given to her by Michael Boulware.  Jin Sook Lee has not worked since she stopped working at the Korean hostess bar.  During her relationship with Michael Boulware, Jin Sook Lee attended business college, and she received a diploma and certificate in 1994.  Jin Sook Lee currently receives $10,000 a year from HIE as a "settlement".

Jin Sook Lee began her relationship with Michael Boulware because she thought she would be better off financially, and she almost daily told him during their relationship that they should get married to each other.  Michael Boulware eventually told Jin Sook Lee that they would marry but that he first had to divorce Mal Sun Boulware.  Jin Sook Lee repeatedly fought with Michael Boulware about his not getting a divorce, and Jin Sook Lee

repeatedly told Michael Boulware that she would leave him unless he got a divorce. Michael Boulware informed Jin Sook Lee that he would divorce Mal Sun Boulware in due time. Jin Sook Lee did not believe that Michael Boulware actually wanted to or would divorce Mal Sun Boulware.

During their relationship, Jin Sook Lee and Michael Boulware had two children together. Both of those children were planned. The older child, Glenn Lee Boulware, was born on September 15, 1985. The younger child, Steven Boulware, was born on October 13, 1988. Currently, Michael Boulware's relationship with each of his sons is good.

C. Paradise Roasting

Beginning at least in 1986, Michael Boulware caused M&S Vending to pay Jin Sook Lee wages although she did not perform any work for M&S Vending in return for the wages. After M&S Vending was renamed HIE, HIE continued to pay Jin Sook Lee wages although she performed no work for HIE in return for the wages.

In or about 1987, Mal Sun Boulware learned that Michael Boulware was having an affair with Jin Sook Lee and that Michael Boulware and Jin Sook Lee had a son, Glenn Boulware. Because Michael Boulware believed he could no longer cause HIE to pay wages to Jin Sook Lee, he sought an indirect, surreptitious way to give her money. Michael Boulware helped Jin Sook Lee form

Paradise Roasting as her wholly owned corporation and instructed her to open a bank account for Paradise Roasting in part so that he could give her money in the form of checks. Jin Sook Lee was named president of Paradise Roasting, and her sister, Hong Sun Hirai, was named vice president. During 198906 and 199006, Paradise Roasting had no employees.

Paradise Roasting sent invoices to HIE indicating it had sold coffee to HIE, and Michael Boulware caused HIE to pay those invoices. During 198906, HIE generally sent Paradise Roasting one check every month. The first four checks were each in the amount of $10,000. The next three checks were each in the amount of $15,000. The last five checks were each in the amount of $20,000. During 199006, HIE generally sent to Paradise Roasting one check in the amount of $20,000 for each of the first 10 months. In total, HIE paid Paradise Roasting $185,000 and $200,000 during 198906 and 199006, respectively. HIE deducted those payments for Federal income tax purposes.

Paradise Roasting never sold or delivered any coffee to HIE. Nor did Paradise Roasting ever have a business, ever have any customers, or ever sell any goods (e.g., coffee) or perform any services. Jin Sook Lee used the money that HIE transferred to Paradise Roasting as she pleased, including to pay her living expenses, to travel, and to purchase expensive jewelry for

herself. When HIE wrote the above-referenced checks to Paradise Roasting, HIE did not reflect those checks as loans on its books. Except by means of the adjusting journal entries (AJEs) discussed infra, HIE did not ever record those payments as loans on its books.

### D. Video Consultant

#### 1. Overview

HIE also paid Jin Sook Lee at least $175,000 during the 2-year period beginning in July 1988 purportedly for work as a video consultant. Jin Sook Lee received those funds through Video Consultant, an entity that was formed as her sole proprietorship. Jin Sook Lee was not a video consultant, and she has never worked as such. Nor did Video Consultant ever have any employees or any customers. Michael Boulware caused that money to be paid to Jin Sook Lee for her living expenses and for her other desires.

#### 2. Formation

Michael Boulware helped Jin Sook Lee form Video Consultant as another way to get money to her indirectly and surreptiously. Michael Boulware filled in a form application for a general excise license for Video Consultant, and he had Jin Sook Lee sign the application. Michael Boulware caused Jin Sook Lee to open an account at First Interstate Bank of Hawaii in the name of Jin

Sook Lee d.b.a. Video Consultant.  That account, No. 24-100804, was a market interest investment account, with check writing privileges.

### 3.  Payments From HIE for False Invoices

During 198906 and 199006, Video Consultant invoiced HIE for goods or services totaling $84,000 and $91,000, respectively, and Michael Boulware caused HIE to pay Video Consultant the amount of the invoices and to deduct those payments on HIE's Federal income tax returns.  HIE paid those amounts to Video Consultant through 22 checks.  During 198906, 12 of those checks were written monthly in the amount of $7,000.  During 199006, the first three monthly payments were in the amount of $7,000 and the next seven monthly payments were in the amount of $10,000.  All 22 payments were received by Video Consultant and deposited into First Interstate bank account No. 24-100804.

Neither Jin Sook Lee nor Video Consultant performed any service for or provided any good to HIE in exchange for any of the 22 payments.  Jin Sook Lee spent the money that HIE transferred to Video Consultant as she pleased.  When HIE wrote the above-referenced checks to Video Consultant, HIE did not reflect those checks as loans on its books.  Except by means of the AJEs discussed infra, HIE did not ever record those payments as loans on its books.  Although Michael Boulware knew Jin Sook

Lee was not performing any service for HIE as Video Consultant, he never told that to Merwyn Manago during the period she was being paid by HIE. It was not until later that Merwyn Manago learned that Video Consultant was related to Jin Sook Lee.

E. Michael Boulware's Divorce From Mal Sun Boulware

1. Discussions Concerning Divorce

In 1987, Michael Boulware informed his attorney, Michael McCarthy, a general practitioner who is now deceased, that he wanted to divorce Mal Sun Boulware and to marry Jin Sook Lee.[23] Mal Sun Boulware had recently informed Michael Boulware that she knew he was having an affair with Jin Sook Lee and that Jin Sook Lee and Michael Boulware had a child from that relationship. Mal Sun Boulware also informed Michael Boulware that they should divorce and that she desired as a condition of their divorce one-half of the value of HIE, which she estimated had a total value of at least $10 million, plus their house in Honolulu at 382 Puu Ikena Drive, which she believed was worth $1 million. Michael Boulware contemplated that HIE would be the source of any cash that he needed to effect his divorce from Mal Sun Boulware, and

---

[23]Shortly thereafter, Michael Boulware informed Jin Sook Lee that their relationship was over because of actions she had taken against Glenn Lee Boulware. At or about that time, Michael Boulware also agreed with Mal Sun Boulware that he would end his relationship with Jin Sook Lee. Michael Boulware later made up with Jin Sook Lee.

Mal Sun Boulware was content to postpone their divorce until Michael Boulware had the necessary funds to pay her. Michael Boulware understood from his conversations with Michael McCarthy that Mal Sun Boulware might be entitled to receive less than $5 million as to HIE (i.e., one-half of the $10 million that Mal Sun Boulware believed HIE was then worth) if the value of HIE as shown on its books decreased from the current date to the applicable valuation date for his divorce.

### 2. Glenn Lee Boulware Trust

In 1987, while Michael Boulware and Mal Sun Boulware were discussing the terms of their divorce, Jin Sook Lee became concerned about the welfare and future of herself and Glenn Lee Boulware should Michael Boulware die before that divorce. Jin Sook Lee asked Michael Boulware to transfer one-half of his shares in HIE to her for the future benefit of Glenn Lee Boulware. Michael McCarthy advised Michael Boulware not to put the shares in the name of Jin Sook Lee personally but to transfer the shares to Jin Sook Lee as trustee of a trust that Michael Boulware could establish for the benefit of Glenn Lee Boulware. Michael Boulware understood from his conversations with Michael McCarthy that it was not permissible for him (as an employee, officer, or director of HIE) to give HIE property to Jin Sook Lee to hold for his divorce from Mal Sun Boulware.

On September 8, 1987, Michael Boulware established the Glenn Lee Boulware Trust as an irrevocable trust with Jin Sook Lee as the sole trustee. Michael Boulware funded the trust with $500 plus 50 percent of his stock in HIE. The principal beneficiary of the trust was Glenn Lee Boulware, who at the sole discretion of Jin Sook Lee, as trustee, could receive distributions of income and/or principal until he was 35 years old; alternatively, until that time, Jin Sook Lee, as trustee, had sole discretion to expend any or all of the principal or income of the trust for the benefit of Glenn Lee Boulware. The trust was stated to terminate when Glenn Lee Boulware became 35 years old, at which time he would receive all of the trust estate. If Glenn Lee Boulware died beforehand, the trust was stated to terminate upon his death at which time all of the trust estate would be distributed to Jin Sook Lee. Under the terms of the trust, Jin Sook Lee, as trustee, was entitled to receive compensation for ordinary services, and Jin Sook Lee, as trustee, was entitled to receive additional compensation for extraordinary services.

3. Divorce Proceeding

On May 5, 1994, the Family Court of the First Circuit of Hawaii decreed in the uncontested divorce proceeding of Boulware v. Boulware, FC-D No. 94-1225, that Michael Boulware and Mal Sun

Boulware were thereafter divorced.[24]  The court ordered as part of the property settlement that Michael Boulware pay Mal Sun Boulware $3.65 million and transfer to her full ownership of their property in Honolulu at 382 Puu Ikena Drive.  The court also ordered Michael Boulware to pay Mal Sun Boulware child support of $1,500 per month, starting April 5, 1994, to maintain sufficient health coverage for his daughter, and to pay for his daughter's education.  The court also ordered Michael Boulware to pay off the approximately $1,350,000 mortgage debt on the property at 382 Puu Ikena Drive, by February 20, 1999.  As to the division of property, the court order states:

> The parties assume and intend that the division of property incident to their divorce shall not itself result in any tax consequences.  Each party will take each property interest awarded to him or her at its pre-divorce basis, and that any tax which must be paid upon the subsequent sale or exchange of such interest shall be paid by the party who received and subsequently sold or exchanged such interest.

Immediately after his divorce, Michael Boulware informed Jin Sook Lee about the divorce, and he asked Jin Sook Lee to marry him.  Jin Sook Lee declined, and she ended their relationship. Michael Boulware and Jin Sook Lee presently speak to each other very little, and they have difficulty dealing with each other.

---

[24]Following their divorce, Michael Boulware and Mal Sun Boulware continue to have a good relationship, and his relationship with their daughter is excellent.

When Jin Sook Lee testified at the trial of these cases, it was the first time that Michael Boulware had seen her in approximately 18 months.

Mal Sun Boulware has yet to receive all of the payments that Michael Boulware owes her incident to their divorce. Mal Sun Boulware lost through gambling most of the money she received from Michael Boulware incident to their divorce.

F. Transfers of HIE Assets to Jin Sook Lee

1. Overview

From 1987 through 1994, Michael Boulware delivered to Jin Sook Lee a total of at least $6.7 million of assets diverted from HIE. During that time, Michael Boulware also regularly gave Jin Sook Lee at least another $2 million in cash and other assets (e.g., jewelry). Michael Boulware did not contemporaneously record or otherwise keep track of the funds and other assets that he gave to Jin Sook Lee.[25]

The diverted assets included primarily cash obtained by Michael Boulware mainly by way of checks drawn against HIE's bank

---

[25]Michael Boulware testified at trial that he kept accurate records of the funds of HIE that he transferred to Jin Sook Lee. We consider that testimony incredible. Michael Boulware at various times has stated the total amount of funds as drastically different amounts. Moreover, at trial, he failed to produce any accurate documentation and admitted that no such documentation existed as of the time he testified at trial.

accounts and against the off-book bank accounts, and from funds sourced in the off-book activities.  The diverted assets also reflected at least four real properties in Honolulu that were purchased with HIE funds and that were put in the name of Jin Sook Lee without any offsetting debt.  The four real properties were the Atkinson condominium, a house at 1050 Koloa Street (Koloa house), the Makaiwa house, and the Punahou condominium.

Michael Boulware diverted HIE's assets from HIE to hide the assets from Mal Sun Boulware in connection with their divorce and to accumulate personal wealth for what he hoped to be the benefit of himself, Jin Sook Lee, and their children.  Michael Boulware diverted those assets from HIE for his personal use in that he then gave the underlying assets to Jin Sook Lee to use, hold, or spend as she desired, but with his expectation and belief (neither told to her) that she would chose on her own to hold, use, or spend the assets for the common benefit of himself, her, and their children.

2.  Atkinson Condominium

On September 9, 1987, Jin Sook Lee purchased the Atkinson condominium for $115,000.  Jin Sook Lee paid for that purchase with funds that came from Michael Boulware which in turn came from HIE without the knowledge of the independent managers.

Jin Sook Lee rented the Atkinson condominium out to tenants, she freely spent the money received as rent, and she reported that rent as her taxable income. Michael Boulware never told Jin Sook Lee to save the rent money from the Atkinson condominium for his divorce or that the rent money was his or HIE's. Michael Boulware never told Jin Sook Lee that she would someday have to transfer the Atkinson condominium to him or to HIE. Michael Boulware never told Jin Sook Lee that the Atkinson condominium would be used (or was otherwise needed) to effect his divorce from Mal Sun Boulware.

After the start of the criminal investigation discussed infra, the Atkinson condominium was added to the books of HIE by recording it as an asset of HIE.

### 3. Makaiwa House

On or about March 21, 1989, Jin Sook Lee purchased the Makaiwa house from an unrelated party for $560,000. Jin Sook Lee paid for that purchase with money that came from Michael Boulware which in turn came from HIE without the knowledge of the independent managers. Michael Boulware never told Jin Sook Lee that she would someday have to transfer the Makaiwa house to him or to HIE. Michael Boulware never told Jin Sook Lee that the Makaiwa house would be used (or was otherwise needed) to effect his divorce from Mal Sun Boulware.

Jin Sook Lee lived (and continues to live) in the Makaiwa house. Jin Sook Lee has never paid any rent to live in the Makaiwa house. After the start of the criminal investigation discussed infra, the Makaiwa house was added to the books of HIE by recording it as an asset of HIE.

### 4. Koloa House

On February 7, 1991, Jin Sook Lee purchased the Koloa house from an unrelated party for $1,150,000, and the property was placed in the name of Jin Sook Lee. Jin Sook Lee paid for that purchase with funds that came from Michael Boulware which in turn came from HIE without the knowledge of the independent managers. Michael Boulware never told Jin Sook Lee that she would someday have to transfer the Koloa house back to him or to HIE. Michael Boulware never told Jin Sook Lee that the Koloa house would be used (or was otherwise needed) to effect his divorce from Mal Sun Boulware.

On or about November 24, 1992, in connection with a rift between Michael Boulware and Jin Sook Lee, Michael Boulware forged Jin Sook Lee's name without her permission to the deed for the Koloa house, caused a notary who was an employee of HIE to attest in writing that Jin Sook had signed the deed personally, and caused that property to be transferred into the name of Michael Boulware. Contemporaneously, Michael Boulware deeded the

Koloa house to HIE in return for a credit against the amount reflected in his officer loan account.

Afterwards, when Jin Sook Lee did not receive the tax bill for the Koloa house as she usually did, Jin Sook Lee learned that Michael Boulware had transferred the Koloa house from her name. Jin Sook Lee was upset and confronted Michael Boulware about the transfer. Michael Boulware promised Jin Sook Lee that he would pay her back for inappropriately taking the Koloa house from her. On July 25, 1993, Michael Boulware agreed in a writing bearing his signature to pay Jin Sook Lee $1.2 million, the amount they agreed was the value of the Koloa house, and to secure his payment of the $1.2 million with a security interest in HIE's vending machines. The writing states:[26]

> I, Michael H. Boulware, president of Hawaiian Isles Enterpr. Inc. do hereby acknowledge that I owe Jin Sook Lee of 1017 Makaiwa St. the sum of One Million, Two Hundred Thousand Dollars, $1,200,000. For which I agree to pay the sum of Twenty Thousand Dollars, $20,000, for each and every month starting September 1, 1993 up until August 1, 1993 [sic]. On September 1, 1994 a balloon payment of the balance is on demand + payable on this day.
>
> The loan will be secured by way of vending machines equal to the balance of Loan even by ways of Auction or any other means.

---

[26]Michael Boulware stated in the writing that he was the president of HIE as a way to further identify himself in his individual capacity.

Michael Boulware later signed and executed a more formal, but undated, promissory note promising to pay $1.2 million to Jin Sook Lee as follows: $25,000 on September 1, 1993, and on the first day of each of the 12 months thereafter; and on September 1, 1994, any amount remaining due on the note. The note stated that interest accrued on any unpaid amount at the rate of 12 percent per year. The note stated that it was secured by a "Security Agreement and Financing Statement of even date herewith".

### 5. Punahou Condominium

Jin Sook Lee purchased and initially lived in the Punahou condominium with money that came from Michael Boulware which in turn came from HIE without the knowledge of the independent managers. Subsequently, Jin Sook Lee rented the Punahou condominium out to a tenant, she freely spent the money received as rent, and she reported that rent as her taxable income. Michael Boulware never told Jin Sook Lee to save the rent money from the Punahou condominium for his divorce or that the rent money was his or HIE's. Michael Boulware never told Jin Sook Lee that she would someday have to transfer the Punahou condominium to him or to HIE. Michael Boulware never told Jin Sook Lee that the Punahou condominium would be used (or was otherwise needed) to effect his divorce from Mal Sun Boulware.

After the start of the criminal investigation discussed infra, the Punahou condominium was added to the books of HIE by recording it as an asset of HIE.

      6.   Understanding as to the Transferred Assets

Jin Sook Lee understood that the funds that Michael Boulware gave her during their relationship came from Michael Boulware, and not from HIE, and that the funds were hers to spend as she desired.  Michael Boulware never told Jin Sook Lee she had to save the money he gave her so that he could use the money for his divorce.  Nor did HIE's board of directors sign any resolution that specifically approved of Michael Boulware's taking HIE money for him to save for his divorce from Mal Sun Boulware.

Jin Sook Lee believed that Michael Boulware was giving her money because she was his girlfriend and the mother of one (and later two) of his children.  Jin Sook Lee sometimes demanded money from Michael Boulware; other times, he just gave money to her.  On one occasion, in or about December 1992, Michael Boulware asked Jin Sook Lee to lend him $200,000 to use for his divorce from Mal Sun Boulware.

Michael Boulware claims that he transferred HIE's assets to Jin Sook Lee between 1987 and 1994 for her to hold and to save for him so he could accumulate funds to satisfy his property settlement incident to his divorce from Mal Sun Boulware.

Michael Boulware claims that Jin Sook Lee wanted to hold the money that he was saving for his divorce, that Jin Sook Lee knew the money he was giving her was to be saved for his divorce, and that Jin Sook Lee agreed to give the money back to him upon his request. We find these claims incredible. Michael Boulware never told Jin Sook Lee any reason for giving her money or what she had to do with the money. Jin Sook Lee understood that Michael Boulware gave her the money to use as her own for whatever she desired.

### 7. Jin Sook Lee's Use of the Transferred Funds

Jin Sook Lee spent the transferred funds as she desired, and Michael Boulware knew that Jin Sook Lee was spending a lot of the funds that he gave her. During their relationship, Michael Boulware provided Jin Sook Lee with an extravagant lifestyle that included her driving a Mercedes, z Porsche, a Rolls Royce, and a BMW (some of which she owned), her owning and wearing expensive designer clothes and jewelry (e.g., a $70,000 diamond), her traveling to foreign countries and to New York City, and her regularly receiving cash from Michael Boulware. Jin Sook Lee charged freely and extravagantly on her credit cards (e.g., charging more than $240,000 from August 24, 1991, through December 15, 1994), and she paid her credit card bills with money that Michael Boulware gave to her.

Jin Sook Lee used some of the funds that she received from Michael Boulware to purchase certificates of deposit earning over $220,000 in interest in 1992 and 1993.  Michael Boulware did not tell Jin Sook Lee that the interest was not hers, and Jin Sook Lee spent that interest on herself and otherwise as she desired. Jin Sook Lee transferred out of the country some of the funds she received from Michael Boulware, including at least $100,000 that she sent to her mother in Korea.  After commencing the civil litigation against Michael Boulware and HIE, Jin Sook Lee paid to her attorneys approximately $1 million using some of the funds given to her by Michael Boulware.

### 8.  Michael Boulware Takes Some of the Transferred Funds From Jin Sook Lee Without Her Knowledge

Jin Sook Lee kept in a safe at her house (the Punahou condominium) some of the funds given to her by Michael Boulware. The combination to the safe was known by both Jin Sook Lee and Michael Boulware.  On one occasion, in or about the fall of 1990, Michael Boulware removed from the safe $840,000 of the approximately $1.5 million that was then there.  Jin Sook Lee was upset by that action, and she demanded that Michael Boulware give the money back to her because it was hers.  Michael Boulware gave Jin Sook Lee a check drawn on HIE's corporate bank account in return for the money he removed from the safe.  Michael Boulware

promised Jin Sook Lee that he would not borrow or steal any money from her again.

IX.  Off-Book Bank Accounts

Michael Boulware surreptiously caused the opening of the two off-book bank accounts.  In or about October 1990, the first account, No. 03-038866, was opened at Hawaii National Bank in the name of "Hawaiian Isles Distributors, Inc."  In or about October 1991, the second account, checking account No. 01-06586-6, was opened at Central Pacific Bank in the name of "Hawaiian Isles Enterprises, Inc. DBA Hawaiian Isles Distributors".  Activity in the earlier off-book bank account stopped shortly after the later off-book bank account was opened.  Activity in the later off-book bank account stopped 2 days after Michael Boulware learned he was under criminal investigation by the CID.  The deposits into the off-book bank accounts totaled at least $6,139,567 during 199006 through 199306.

The off-book bank accounts were not reported on the books of any of the relevant corporations (including the subject corporations), and those accounts (and the deposits therein and the withdrawals therefrom) were kept secret during the subject years from the independent managers.  Michael Boulware told Sidney Boulware about the off-book bank accounts so that Sidney Boulware could oversee those accounts personally and could keep

the accounts secret from the independent managers.  Sidney Boulware kept the deposit slips for the off-book bank accounts in his office.  The deposit slips for the subject corporations' bank accounts which the independent managers knew about were kept outside Sidney Boulware's office by others.

X.  Off-Book Activities

A.  Overview

During the relevant years, Michael Boulware engaged in a number of off-book activities and other improper transactions (collectively, off-book activities).  The off-book activities were OTC sales of HIE tobacco products, Michael Boulware's personal sales of HIE coffee to Pele Trading and Hawaii Misuzu, Michael Boulware's fabrication of work performed for HIE by Bonded Construction, Michael Boulware's fictitious equipment leasing transactions by HIE, and Michael Boulware's fictitious international transactions by HIE.  Michael Boulware kept the off-book activities secret from the independent managers.  Much of the money that Michael Boulware diverted from HIE through the off-book activities was deposited into the off-book bank accounts or into a personal account of Michael Boulware or Jin Sook Lee.

Michael Boulware caused Jin Sook Lee to receive at least $3,147,923 of the funds deposited into the off-book bank accounts.  When Jin Sook Lee received those funds, and during

198906 through 199306, HIE did not record those receipts as loans on its books and records. The $3,147,923 received by Jin Sook Lee was in addition to the payments that Jin Sook Lee received through Paradise Roasting and Video Consultant (i.e., at least $385,000 and $175,000, respectively). Jin Sook Lee also received other amounts from Michael Boulware that he diverted from HIE. Jin Sook Lee used some of the funds referenced in this paragraph to purchase the Punahou condominium, the Atkinson condominium, the Makaiwa house, and the Koloa house.

   B. OTC Sales of Tobacco Products

   HIE had a "cash and carry business" where small wholesalers and retailers (mostly mom-and-pop type stores and employees of the subject corporations) came to HIE's warehouse and bought HIE's tobacco products over the counter by paying cash or by using checks. The warehouse was separate from the building that housed HIE's accounting department. The warehouse had a register, an order desk, and a computer to use with respect to HIE's OTC sales. The register in the warehouse related to the cash and carry business, and the computer in the warehouse was neither connected to HIE's main computer nor part of HIE's regular accounting system.

   Each day, the receipts from the OTC sales were given to Irene Takamiya, a cashier at HIE. Irene Takamiya forwarded those

receipts to Sidney Boulware, either directly or through Thomas Okimoto, the general manager of Hawaiian Isles Distributors. Sidney Boulware, or sometimes Thomas Okimoto, deposited those receipts into the off-book bank accounts. Sidney Boulware never told the independent managers about the receipts from the OTC sales or that those receipts were deposited into the off-book bank accounts. HIE's accounting department also did not know that OTC proceeds were deposited into the off-book bank accounts. Unbeknownst to the independent managers, Michael Boulware caused HIE's OTC sales not to be recorded on HIE's invoice register, not to be reported in HIE's books, and not to be reported as income by HIE.

The funds deposited into the off-book bank accounts came primarily from the receipts of HIE's OTC sales. Of the total deposits into those accounts, the funds that Michael Boulware diverted from OTC sales totaled $506,464, $1,337,213, $719,755, and $1,020,293 for 199006 to 199306, respectively, or $3,583,725 in total. When those OTC proceeds were deposited into the off-book bank accounts, the transactions were not recorded as loans on HIE's books. Nor were the proceeds reflected in the promissory notes related to the officer loans.

C. Michael Boulware's Personal Sales of HIE Coffee Unknown at the Time to HIE

1. Overview

HIE sold blended coffee to consumers. HIE purchased coffee beans from third parties, and the beans were delivered directly to HIE's warehouse, where they were stored. When coffee beans were delivered to HIE, an HIE employee checked the shipping document to see that the coffee purchased was in fact delivered. HIE's accounting department relied on the shipping document and the signature of a designated employee to verify that the coffee beans were delivered.

As relevant herein, Robert Kong was the employee designated by HIE to sign the shipping documents verifying that the coffee beans purchased by HIE were delivered. Upon the request of Sidney Boulware, Robert Kong sometimes signed such shipping documents after the coffee was supposedly delivered. The shipping documents did not always list the date on which the coffee was purportedly received, and Robert Kong did not always read the invoices that he signed. When Robert Kong signed shipping documents upon the request of Sidney Boulware, Robert Kong neither read those documents nor checked them for accuracy.

Merwyn Manago knew that Michael Boulware was selling coffee beans to companies other than the subject corporations, and

Michael Boulware led Merwyn Manago to believe that the coffee beans sold by Michael Boulware were not from HIE's inventory. Unbeknownst to the independent managers, Michael Boulware sold coffee beans that were inventoried by HIE to at least two purchasers and diverted from HIE the proceeds from those sales. The first purchaser, Hawaii Misuzu, was a coffee roasting company that during the relevant years was buying Kona coffee from HIE regularly. The second purchaser, Pele Trading, was an independent company that also bought coffee from HIE.

### 2. Sales to Hawaii Misuzu

Hawaii Misuzu purchased and roasted coffee beans and then sold the roasted coffee to its customers. From 199006 through 199306, Michael Boulware sold HIE's coffee beans to Hawaii Misuzu and caused HIE to invoice Hawaii Misuzu for those sales. Michael Boulware caused HIE to specify on the invoices that payment be made directly to Michael Boulware, or in some cases directly to Jin Sook Lee, or in still other cases directly to HIE. Hawaii Misuzu paid the invoices by check made payable to the payee specified on the invoice; i.e., Michael Boulware, Jin Sook Lee, or HIE. Of the amount that Hawaii Misuzu paid for HIE's coffee, at least $1,265,458 was deposited into bank accounts controlled by either Michael Boulware or Jin Sook Lee; the deposits totaled $116,832 for 199006, $382,403 for 199106, $347,866 for 199206,

and $418,357 for 199306.  These payments were not reflected as officer loans at the time of the transactions.  Merwyn Manago did not know that Michael Boulware was selling coffee to Hawaii Misuzu and causing Hawaii Misuzu to pay Michael Boulware or Jin Sook Lee directly.  Neither HIE nor Michael Boulware reported these payments as income.

### 3.  Sales to Pele Trading

In 1989, Pele Trading was an exporter of coffee that was seeking a new supplier of coffee beans.  Timothy Inoue was Pele Trading's vice president who was responsible for purchasing coffee beans for Pele Trading.  From 1989 through 1993, Timothy Inoue purchased coffee from Michael Boulware and from Marvin Fukumitsu, an HIE employee, believing that HIE was the seller of the coffee.  Timothy Inoue received his purchased coffee in HIE burlap bags, and he received invoices from HIE for the purchases.

At the direction of Michael Boulware, Timothy Inoue paid for his coffee purchases with checks that he made payable to Michael Boulware.  Those checks totaled at least $1,335,132; by taxable year, the deposits underlying this total aggregated $264,790 for 198906, $1,029,963 for 199006, $21,175 for 199106, and $19,204 for 199206.  All but seven of such checks received from Timothy Inoue were deposited into a personal checking account of Michael Boulware, specifically, account No. 05-389054 or account No.

49-507151.  In one instance, a check in the amount of $73,500 was deposited in 199006 into Jin Sook Lee's trustee account No. 65-570109.  In a second instance, a check in the amount of $65,000 was deposited in 199006 into Jin Sook Lee's personal account No. 65-570109.  On five other instances, a check was cashed in 199006, rather than deposited; those five checks totaled $196,532.  Some of the checks were written payable to HIE, but at the direction of Michael Boulware, "HIE" was crossed out by Timothy Inoue and the name of Michael Boulware (or in one case Jin Sook Lee) was written in.  The proceeds from the checks rewritten to Michael Boulware ended up in the accounts he controlled.  The proceeds from the check rewritten to Jin Sook Lee ended up in her account.

At the time of the transactions, Merwyn Manago did not know that Michael Boulware was selling coffee to Pele Trading or that HIE was supplying coffee sold to Pele Trading.  The $1,335,132 that Pele Trading paid Michael Boulware was not directly recorded as income on HIE's books.  From 1989 through 1993, the coffee sales to Pele Trading were not booked as loans to Michael Boulware.  Michael Boulware did not report these payments as income.

4. Referenced Coffee Sold by Michael Boulware Included in HIE's COGS

As to its coffee sales, HIE computes its cost of goods sold (COGS) using a system that takes into account the difference in weight (i.e., shrinkage) between actual coffee bean inventory at the beginning and end of the accounting period. That "shrinkage" is a plug number that reflects the loss in weight from roasting coffee beans and from any other unexplained loss in weight of inventory between the inventory dates. The coffee that Michael Boulware sold to third parties was included in HIE's COGS as shrinkage.

D. Bonded Construction

1. Background

Bonded Construction is a general construction company owned and operated by John Yamada. Bonded Construction performed work for both HIE and Michael Boulware. Bonded Construction rented and occupied a warehouse from HIE.

2. Michael Boulware Causes HIE To Pay to Remodel Jin Sook Lee's Residence

In 199006, Bonded Construction completely renovated the Makaiwa house where Jin Sook Lee lived (and continues to live today) and which was then titled in her name. The renovation cost $156,647. Bonded Construction invoiced HIE for part of the work and at the direction of Michael Boulware stated on two of

the invoices that a total of $50,785 of the work was done on HIE's coffee roasting plant.[27]  At the direction of Michael Boulware, Merwyn Manago caused HIE to pay both of those invoices upon receipt.

3.   Paving of the Back Lot at HIE

a.   Overview

HIE paid Bonded Construction to "fill" (i.e., raise the elevation of) and pave a 70,000-square-foot lot owned by HIE and located at the back of its property behind the warehouse leased by Bonded Construction.  Bonded Construction was the general contractor of the project, and Automated Equipment was the sole subcontractor.  Michael Boulware had asked John Yamada to act as general contractor and to use Automated Equipment as the subcontractor.  HEI paid Bonded Construction for the job, and Bonded Construction then paid Automated Equipment with some of the money that Bonded Construction had just received from HIE. Merwyn Manago authorized the payments to Bonded Construction not

---

[27]The first invoice, dated Mar. 15, 1990, stated that $23,580 was due for "Materials and Labor needed to make necessary improvements to the Coffee Roasting Plant according per instructions".  The second invoice, dated Apr. 11, 1990, stated that $27,205 was due for "Materials and Labor to fabricate and modify certain areas in the coffee plant to accept the new mill assembly as per instructed".

knowing that part of the payments would then be transferred to Automated Equipment.

James Kunihiro and Rodney Nohara owned a construction company named Jayar Construction (Jayar). In 1994, Jayar was working on a large excavation project in downtown Honolulu at the site of the Bank of Hawaii. The project required that Jayar haul away from the site approximately 100,000 cubic yards of soil in the form of coral material. James Kunihiro and Michael Boulware discussed Michael Boulware's need for approximately 4,000 cubic yards of that type of soil to fill HIE's back lot. Jayar sold Michael Boulware approximately 4,000 cubic yards of the soil excavated from the downtown project. Jayar also trucked, dumped, and spread that soil at HIE's back lot.

Jayar received at least $31,000 for the job. James Kunihiro and Rodney Nohara were each paid separately for the job through checks that were payable to them personally from the bank account of Automated Equipment. James Kunihiro received $17,000 through three checks in the amounts of $9,000, $5,000, and $3,000. Rodney Nohara received at least $14,000 through two checks in the amounts of $9,000 and $5,000.

### b.  Automated Equipment

On or about December 22, 1993, Michael Boulware asked his attorney, Michael McCarthy, to form quickly for Michael Boulware

a wholly owned corporation known as Automated Equipment. Michael McCarthy did so on December 22, 1993, using form documents that he had previously used to set up other corporations and listing himself as the only initial officer. Approximately 3 weeks later, Michael Boulware replaced Michael McCarthy as the sole officer of Automated Equipment. Michael Boulware did not tell his and the subject corporations' accountants, Kobayashi, Doi & Lum CPAs LLC (Kobayashi Doi), about the formation or existence of Automated Equipment.

In 1993, HIE started making monthly payments of approximately $35,000 to Automated Equipment for a lease of equipment. HIE did not actually lease any equipment from Automated Equipment. When HIE was making these payments, Merwyn Manago did not know that Michael Boulware owned Automated Equipment.

E. Michael Boulware's Fictitious Leasing Transactions

1. Overview

Lorin Kushiyama owned three businesses named Aloha Games, Automatic Coin Equipment, Inc. (Automatic Coin Equipment), and NA, Inc. Lorin Kushiyama has known Michael Boulware since the 1960s. In the early 1990s, Lorin Kushiyama asked Michael Boulware to lend him approximately $25,000. Michael Boulware refused to do so. Later, in 1992, Michael Boulware asked Lorin

Kushiyama in exchange for money to assist him in two false invoicing schemes that would eventually underlie one or more of the counts for which Michael Boulware was indicted. Lorin Kushiyama agreed to do so. Eventually, as a result of Lorin Kushiyama's participation in Michael Boulware's false invoicing schemes, Lorin Kushiyama was named an unindicted coconspirator with Michael Boulware regarding a count of his indictment that, as discussed infra, alleged a conspiracy knowingly to make a false statement and report for purposes of influencing the action of an institution insured by the Federal Deposit Insurance Corporation.

2. Michael Boulware's First Scheme

On or about January 8, 1992, Michael Boulware asked Lorin Kushiyama to cause Aloha Games to prepare and deliver to HIE an invoice purporting to show that HIE paid $157,612 to purchase video games identified in the invoice. Lorin Kushiyama agreed to do so and caused Aloha Games to issue HIE an invoice stating that Aloha Games had sold 48 games to HIE on January 8, 1992, at a total cost of $157,612 (inclusive of 4-percent Hawaii tax of $6,062). On January 8, 1992, HIE issued a $75,000 check to Aloha Games to pay part of the invoice. On the same day, Lorin Kushiyama wrote a $70,000 check from Aloha Games to Michael Boulware, which Michael Boulware deposited on that day into his

First Hawaiian Bank account No. 49-507151. On January 10, 1992, HIE issued a $82,612 check to Aloha Games to pay the remainder of the invoice. The $82,612 check was endorsed by Lorin Kushiyama and deposited into one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6. HIE deducted the $157,612 in payments on its 199206 Federal income tax return. Neither Lorin Kushiyama nor Aloha Games sold or otherwise transferred to HIE any of the games listed on the invoice; HIE already owned those games.

### 3. Michael Boulware's Second Scheme

#### a. Need for the Second Scheme

Michael Boulware asked Merwyn Manago to make additional payments to Aloha Games for the purchase of video games but did not submit to Merwyn Manago any additional invoices to support those additional payments. Merwyn Manago made the additional payments to Aloha Games and recorded those payments as personal loans to Michael Boulware. Michael Boulware devised a second scheme to obtain invoices in response to the actions of Merwyn Manago.

Under the second scheme, Lorin Kushiyama prepared false invoices for Michael Boulware showing a sale of equipment to HIE from one of Lorin Kushiyama's businesses, and Michael Boulware received financing on those invoices from General Electric Credit

Corporation Financial Corporation (GECC). GECC financed purchases of equipment secured by a security interest in the equipment, and transactions with GECC were structured as if the borrower was leasing the equipment from GECC. The typical transaction facilitated by GECC involved GECC as the lessor and a commercial customer as the lessee seeking to lease equipment from a particular vendor that the customer had selected. Because HIE was a regular and well-rated customer of GECC with respect to HIE's prior purchases of video games, GECC generally required from HIE just an invoice to finance any purchase price shown on the invoice.

### b. HIE's Relationship With GECC

HIE and GECC had had a financial relationship since October 8, 1985, and HIE had had an account with GECC since at or about the same time. On April 10, 1989, HIE and GECC entered into a "Master Lease Agreement" (MLA) under which GECC agreed to lease to HIE and HIE agreed to lease from GECC equipment as described in subsequent schedules to the MLA. The MLA appointed HIE as GECC's agent for inspection and acceptance of equipment from a supplier, and HIE upon receipt of equipment was required to execute a certificate of acceptance and a delivery receipt acknowledging receipt of the equipment in good condition. Under

the MLA, the equipment remained the property of GECC while HIE made payments under the lease schedule.

### c.  Seven False Invoices

#### i.  Overview

In early 1992, Michael Boulware asked Lorin Kushiyama to cause Aloha Games and Automatic Coin Equipment to prepare and deliver to HIE seven invoices purporting to show the purchase of video games at a total cost of $495,814.80.  Lorin Kushiyama agreed to do so.  Lorin Kushiyama prepared in the names of his businesses four false invoices totaling $271,382.80 and three false invoices totaling $224,432.

#### ii.  Four False Invoices Totaling $271,382.80

Lorin Kushiyama caused his businesses to issue four false invoices in the total amount of $271,382.80.  First, Lorin Kushiyama caused Automatic Coin Equipment to prepare and deliver to HIE an invoice dated February 3, 1992, listing that Automatic Coin Equipment had sold 17 games to GECC (on behalf of HIE) at a total cost of $54,563.60 (inclusive of 4-percent Hawaii tax of $2,098.60).  Second, Lorin Kushiyama caused Aloha Games to prepare and deliver to HIE an invoice dated February 5, 1992, listing that Aloha Games had sold 15 games to GECC (on behalf of HIE) at a total cost of $42,900 (inclusive of 4-percent Hawaii tax of $1,650).  Third, Lorin Kushiyama caused Automatic Coin

Equipment to prepare and deliver to HIE an invoice dated February 10, 1992, listing that Automatic Coin Equipment had sold 15 games to GECC (on behalf of HIE) at a total cost of $53,851.20 (inclusive of 4-percent Hawaii tax of $2,071.20).  Fourth, Lorin Kushiyama caused Automatic Coin Equipment to prepare and deliver to HIE an invoice dated March 6, 1992, listing that Automatic Coin Equipment had sold 35 games to GECC (on behalf of HIE) at a total cost of $120,068 (inclusive of 4-percent Hawaii tax of $4,618).  As noted above, the amounts of these 4 invoices total $271,382.80 ($54,563.60 + $42,900 + $53,851.20 + $120,068 = $271,382.80).

### iii.   Three False Invoices Totaling $224,432

Lorin Kushiyama caused his businesses to issue three other false invoices in the total amount of $224,432.  First, Lorin Kushiyama caused Aloha Games to prepare and deliver to HIE an invoice dated March 3, 1992, listing that Aloha Games had sold 22 games to GECC (on behalf of HIE) at a total cost of $66,705.60 (inclusive of 4-percent Hawaii tax of $2,565.60).  Second, Lorin Kushiyama caused Automatic Coin Equipment to prepare and deliver to HIE an invoice dated March 11, 1992, listing that Automatic Coin Equipment had sold 22 games to GECC (on behalf of HIE) at a total cost of $65,442 (inclusive of 4-percent Hawaii tax of $2,517).  Third, Lorin Kushiyama caused Aloha Games to prepare

and deliver to HIE an invoice dated March 17, 1992, listing that Aloha Games had sold 28 games to GECC (on behalf of HIE) at a total cost of $92,284.40 (inclusive of 4-percent Hawaii tax of $3,549.40).  As noted above, the amounts of these three invoices total $224,432 ($66,705.60 + $65,442 + $92,284.40 = $224,432).

### d. First Four Referenced False Invoices

On March 3, 1992, HIE submitted the February 3, 5, 10 and March 6, 1992, invoices to GECC as if the invoices reflected typical leasing arrangements.  GECC processed the invoices as such and on March 10, 1992, joined with HIE in executing a document with respect thereto stating that HIE had to make monthly payments to GECC of $8,833.51.  One day later, on March 11, 1992, GECC issued a $42,900 check payable to Aloha Games and a $228,482.80 check payable to Automatic Coin Equipment.  Neither Lorin Kushiyama nor either of his businesses, Aloha Games and Automatic Coin Equipment, sold or otherwise transferred to HIE or GECC any of the games listed on the four just mentioned invoices; HIE already owned those games.

On March 12, 1992, Lorin Kushiyama caused Aloha Games to transfer $32,900 to the Bank of Hawaii and caused the Bank of Hawaii to issue a $32,900 cashier's check to Michael Boulware in return for the transfer.  Also on that day, Lorin Kushiyama caused NA, Inc., to issue a $228,482.80 check payable to Michael

Boulware; on the same day, Michael Boulware deposited that check into his First Hawaiian Bank account No. 49-507151. On March 13, 1992, Michael Boulware deposited the $32,900 cashier's check into his First Hawaiian Bank account No. 49-507151.

HIE paid GECC each of the $8,833.51 monthly payments and deducted those payments on its 199206 through 199506 Federal income tax returns.

### e. Last Three Referenced False Invoices

On March 23, 1992, HIE submitted the March 3, 11, and 17, 1992, invoices to GECC as if the invoices reflected typical leasing arrangements. GECC processed the invoices as such and on March 27, 1992, joined with HIE in executing a document with respect thereto stating that HIE had to make monthly payments to GECC of $7,206.51. On April 1, 1992, GECC issued a $66,705.60 check payable to Aloha Games, a $92,284.40 check payable to Aloha Games, and a $65,442 check payable to Automatic Coin Equipment. Neither Lorin Kushiyama nor either of his businesses, Aloha Games and Automatic Coin Equipment, sold or otherwise transferred to HIE or GECC any of the games listed on the three just mentioned invoices; HIE already owned those games. On April 1, 1992, the $66,705.60, $92,284.40, and $65,442 checks were all deposited into one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6.

HIE paid GECC each of the $7,206.51 monthly payments and deducted those payments on its 199206 through 199506 Federal income tax returns.

### 4. Funds Transferred to Lorin Kushiyama

After Lorin Kushiyama prepared and delivered the false invoices for Michael Boulware, Michael Boulware lent Lorin Kushiyama the money he had previously requested. Later, in 1999 and 2000, HIE paid Lorin Kushiyama as a full-time consultant although he performed no meaningful substantive activity for HIE.

### F. Michael Boulware's International Circular Flow of Funds

#### 1. Overview

Respondent determined in the NOD issued to HIE that HIE improperly deducted $1,731,000 for 199506 through 199706 as to funds transferred from HIE to various foreign entities and then to Michael Boulware; that HIE improperly deducted $29,984 for 199506 as to funds transferred from HIE to various foreign entities and then to Briggs Cockerham, an entity in Amarillo, Texas, as a potential personal investment by Michael Boulware; and that HIE improperly deducted $89,936 for 199506 and 199606 as to funds transferred from HIE to various foreign entities and then to Anthony Oh Young and Gloria Oh Young to pay off a personal gambling debt of Michael Boulware.

Nathan Suzuki was a tax adviser to Michael Boulware and to the subject corporations and a former certified public accountant elected in 1992 (and continuing to serve through 1996) as a member of the Hawaii House of Representatives.  On or about March 25, 2004, Nathan Suzuki pleaded guilty to conspiring with Michael Boulware from June 16, 1993 or thereabouts, to February 10, 2000, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of Michael Boulware's Federal income taxes.  That plea related in part to the formation and operation of Forest Trading, Pacific Vendors, and Harvest International, the relevant foreign entities referred to in the prior paragraph.

2.  <u>Relevant Foreign Entities</u>

a.  <u>Forest Trading</u>

On April 7, 1992, Forest Trading was established in Hong Kong as a corporate type entity.  Its original shareholders were Sek Nga Kwan and Raymond Lam Man Shing (Raymond Lam), each holding 50 percent of its shares.  The office of Forest Trading in an office building in Hong Kong.  The office was staffed by Raymond Lam, his wife, and a third individual.

### b.  Pacific Vendors

Harold Okimoto was a close personal friend of Michael Boulware.  Harold Okimoto referred either Nathan Suzuki or a Tongan national named V. Hemaloto Alatini (Hemaloto Alatini) to Barney Shiotani for assistance in forming for Michael Boulware a corporate type entity in the Kingdom of Tonga.[28]  On or about December 9, 1994, Nathan Suzuki and Hemiloto Alatini incorporated that entity, Pacific Vendors, as a private company in and under the laws of the Kingdom of Tonga (in other words, an entity that was similar to a corporation in the United States).  Subsequently in December 1994, Barney Shiotani contacted the officials of the Kingdom of Tonga inquiring as to why the corporate charter had not as of then been issued for Pacific Vendors.  Barney Shiotani was informed that the charter was "well on its way".  The charter was later issued.

Pacific Vendors was owned nominally for Michael Boulware. Originally, its nominal shareholders were Nathan Suzuki, owning 80 percent of the shares of the company, and Hemaloto Alatini, owning the rest.  Hemaloto Alatini was nominally given shares in

---

[28]As discussed infra, Barney Shiotani is an attorney who became a close confidant of Michael Boulware after Michael Boulware learned that he was under criminal investigation. Barney Shiotani advised Michael Boulware on ways to defeat that investigation.

Pacific Vendors to facilitate its creation and the opening of its bank accounts in the Kingdom of Tonga. Nathan Suzuki was appointed secretary and director of Pacific Vendors.

Pacific Vendors and its bank accounts were established by Nathan Suzuki and Michael Boulware to help Michael Boulware avoid the consequences of the criminal investigation of Michael Boulware and to impede, impair, obstruct, and defeat that investigation. Merwyn Manago was not aware of Pacific Vendors.

### c. Harvest International

#### i. Roxca Limited

In or before 1994, Harold Okimoto contacted Barney Shiotani because Harold Okimoto wanted to form a corporate type entity in and under the laws of Hong Kong. Barney Shiotani referred Harold Okimoto to a Hong Kong law firm named King & Co. (King Co.). The desired entity, Roxca Limited, was incorporated in Hong Kong on October 14, 1994.

#### ii. Reinvoicing Operation

James Chan was a friend of Nathan Suzuki and of Raymond Lam. Sometime during 1993 through 1995, Nathan Suzuki asked James Chan to help him establish an offshore reinvoicing operation in Hong Kong. James Chan asked Raymond Lam, who was then in Hong Kong, if he would assist Nathan Suzuki in that matter. Raymond Lam agreed to do so.

James Chan referred Nathan Suzuki to Raymond Lam, and Nathan Suzuki and Raymond Lam formed Harvest International on or about January 12, 1995, by changing the name of Roxca Limited to Harvest International. Harvest International had no personnel, and its office in Hong Kong was the same office as that of Forest Trading. The office had a separate phone and fax line for Harvest International. Harvest International reported that its initial directors were Harold Okimoto and Pacific Vendors and that its initial shareholders also were Harold Okimoto and Pacific Vendors. Harold Okimoto owned 1 percent of the shares in Harvest International as a nominee of Pacific Vendors and of Michael Boulware, and Pacific Venders owned the other 99 percent of the shares. Harold Okimoto's shares were formally transferred to Pacific Vendors after Harold Okimoto died of colon cancer on October 12, 1996.

### iii. Bank Accounts

From March 24, 1995, until his death, Harold Okimoto was the sole signatory on Harvest International's bank accounts. Those accounts were a "HK Dollar Current Account" and a "US Dollar Savings Account" opened on or about March 24, 1995, at the Hongkong & Shanghai Banking Corporation Limited.

### iv.  Rationale Underlying Formation

Nathan Suzuki had explained to James Chan that he wanted to form a reinvoicing company in Hong Kong to buy coffee from HIE on credit and then to sell the coffee to overseas customers, the end users, who would receive their purchased coffee as drop shipments from HIE.  Further, Nathan Suzuki explained, the reinvoicing company would collect payments on its sales long before the time that it would have to pay its credit owed HIE and could lend the excess cashflow to Forest Trading which in turn could lend the money to Michael Boulware net of certain fees.  James Chan often acted as a messenger and translator for Nathan Suzuki and Raymond Lam regarding Harvest International, and James Chan later learned that the excess cash was wired directly to Michael Boulware rather than lent to him.

### v.  Actual Operation

HIE did not actually sell coffee to Harvest International.

### vi.  False Invoices From Harvest International

### 1.  Overview

False invoices were prepared that reported that Kona coffee was sold from Harvest International to HIE.  From March 1, 1995, through January 6, 1997, Harvest International issued HIE at least the following invoices with respect to Kona coffee:

| Invoice Date | Pounds | Price/Lb. | Invoice Amount | Note |
|---|---|---|---|---|
| 3/1/95 | 30,600 | $6.50 | $198,900.00 | Shipped Dec. 1994 |
| 3/1/95 | 10,000 | 6.50 | 65,000.00 | Shipped Nov. 1994 |
| 3/1/95 | 35,000 | 6.50 | 227,500.00 | Shipped Mar. 1995 |
| 4/24/95 | 35,000 | 6.50 | 227,500.00 | Shipped Apr. 1995 |
| 5/30/95 | – | | (89,129.03) | Credit memo: Inferior Product |
| 6/15/95 | 35,000 | 7.25 | 253,750.00 | --- |
| 7/31/95 | 35,000 | 7.25 | 253,750.00 | --- |
| 10/15/95 | 40,000 | 7.25 | 290,000.00 | --- |
| 12/13/95 | 35,000 | 7.50 | 262,500.00 | --- |
| 2/8/96 | 40,000 | 8.00 | 320,000.00 | Shipped Feb. & Mar. 1996 |
| 3/3/96 | 6,500 | 10.75 | 69,875.00 | Shipped Mar. 1996 |
| 4/9/96 | 38,000 | 8.00 | 304,000.00 | --- |
| 6/29/96 | 38,000 | 8.00 | 304,000.00 | --- |
| 10/10/96 | 38,000 | 8.50 | 323,000.00 | --- |
| 12/1/96 | 38,000 | 8.50 | 323,000.00 | --- |
| 1/6/97 | 38,000 | 8.50 | 323,000.00 | --- |
| Total | | | 3,656,595.97 | |

Not all of these invoices were received contemporaneously with the corresponding date on which the coffee was stated on the invoices to have been shipped.

## 2. Payments of Invoices

During 199506 through 199706, HIE paid the Harvest International invoices through checks and wire transfers. At least $3,361,827.62 was sent by wire. With respect to the $3,361,827.62, Michael Boulware caused HIE to wire $3,037,984.19 directly to Harvest International and $323,843.43 directly to King Co. Michael Boulware then caused $164,067.01 of the $323,843.43 to be wired from King Co. to Harvest International.

### 3.  Transfers From Harvest International

#### a.  Overview

As just mentioned, Michael Boulware caused $3,202,051.20 to be wired to Harvest International ($3,037,984.19 + $164,067.01 = $3,202,051.20).  Michael Boulware then caused Harvest International and others to transfer portions of the $3,202,051.20 in the manner that he directed.

#### b.  Transfers to Personal Account of Michael Boulware

During 199507 through 199706, Michael Boulware caused Harvest International to transfer $1,805,128 to Forest Trading and then caused Forest Trading to transfer $1,731,000 of the $1,805,128 to his First Hawaiian Bank account No. 09-365508.  Specifically, Michael Boulware caused $837,000, $819,000, and $75,000 to be transferred to his account in 199506, 199606, and 199706, respectively ($837,000 + $819,000 + $75,000 = $1,731,000).

#### c.  Transfers on Behalf of Michael Boulware to Paragon Coffee, Gloria Oh Young, and Antoinette Hirai

During 199507 through 199706, Michael Boulware caused Harvest International to transfer $1,095,943.62 to Pacific Vendors and then caused Pacific Vendors to transfer the $1,095,943.62 to Paragon Coffee Trading Co., L.P. (Paragon

Trading), Gloria Oh Young, and Antoinette Hirai.  Paragon Coffee was a seller of green (i.e., unroasted) Colombian coffee beans, and Sidney Boulware assisted Harold Okimoto in purchasing coffee for Harvest International by placing orders with Paragon Coffee. Gloria Oh Young, the then wife of Anthony Oh Young, was hired to collect a $500,000 gambling debt from Michael Boulware.  Michael Boulware agreed to pay Anthony Oh Young approximately $100,000. During 199606 and 199706, Pacific Vendors wired $69,961 and $19,975 to the bank account of Gloria Oh Young, as payments that Michael Boulware agreed to make to Anthony Oh Young related to the gambling debt.  As discussed infra, Antoinette Hirai was the then wife of Stanley Hirai, and both of them cashed checks for Michael Boulware as directed by him so as to minimize any connection that Michael Boulware had to the off-book activities and to the off-book bank accounts.

> d.  Transfer on Behalf of
>     Michael Boulware to Briggs
>     Cockerham

On August 16, 1995, Michael Boulware (through Harold Okimoto) caused Harvest International to transfer $29,984 to Briggs Cockerham.  The $29,984 represented a speculative investment by Michael Boulware.  That investment was the purchase of a minority ownership interest in a possible bank venture in Ecuador.  Barney Shiotani had learned of the investment in July

1995 through some of his acquaintances at Briggs Cockerham, and he relayed that information to Michael Boulware.  The bank venture ultimately failed.

### vii.  Coffee Rebagging

Additional moneys were wired from Harvest International to a Swiss bank account for the benefit of Michael Norton.  Michael Norton used Harvest International to evade his own tax liabilities by transferring funds he obtained by selling Colombian coffee as Kona coffee.  Michael Boulware sent empty burlap bags marked "Kona coffee" to Michael Norton in Berkeley, California, with the intent that Michael Norton buy South American coffee, fill those bags with it, and send it back to HIE as Kona coffee.

### 3.  Role of Nathan Suzuki

Nathan Suzuki used the official facsimile line in his legislative office to authorize transfers from the bank accounts of Pacific Vendors.  As part of his plea agreement, Nathan Suzuki admitted that he conspired with Michael Boulware to transfer money from HIE to Michael Boulware by way of Harvest International and Pacific Vendors to help Michael Boulware defeat the criminal investigation of Michael Boulware.

4. <u>Harold Okimoto</u>

a. <u>Overview</u>

Michael Boulware claims that the $1,731,000 transferred to him from Harvest International was actually a loan from Harold Okimoto through Forest Trading. Michael Boulware never made any payments on the purported loan. Nor did Harold Okimoto have sufficient assets to lend Michael Boulware $1,731,000. Harold Okimoto was a heavy gambler who expended almost all of his assets during his lifetime. Harold Okimoto died with minimal assets and huge debts, including a debt of more than $1 million to the Internal Revenue Service.

During the last few years of his life, Harold Okimoto was dependent financially on his two sons, Blake Okimoto and Bruce Okimoto. Blake Okimoto is an attorney with a general practice, a per diem (part time) district court judge for the First Circuit of Hawaii, and a member of the disciplinary board of the Hawaii Supreme Court. Bruce Okimoto owns a business that supplies construction materials.

b. <u>Harold Okimoto's Employment</u>

Harold Okimoto owned Island Tobacco for a period that ended in or about 1985. When Island Tobacco was dissolved, Harold Okimoto went to work for HIE. Harold Okimoto was an employee of HIE from May 1, 1986, through April 1, 1995.

c.  Administration of Harold Okimoto's Estate

Harold Okimoto's estate was not probated.  When he died on October 12, 1996, his survivors (including Blake Okimoto, Bruce Okimoto, and their mother Clara Okimoto (collectively, Okimoto family)) believed that Harold Okimoto did not have enough assets to require a probate of his estate.  The only assets that they knew that Harold Okimoto owned at the time of his death were a car, some jewelry, some personal effects, and four checks written as payable to him by Michael Boulware in the aggregate amount of $143,500.[29]  Two of the checks were in the amounts of $28,500 and $30,000 and were payable from Michael Boulware's First Hawaiian Bank account No. 49-507151; those checks were dated October 27 and November 8, 1993.  The other two checks were in the amounts of $30,000 and $55,000 and were payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6; those checks were dated 1992 and January 15, 1993.[30]  When Harold Okimoto was dying, he told Blake Okimoto about the 4 checks but did not mention any money that Harold Okimoto had lent Michael Boulware.

_____

[29]When Harold Okimoto died, the house in which he had been living was owned by an irrevocable trust, the beneficiaries of which were Bruce Okimoto and Blake Okimoto.

[30]The check dated 1992 has no corresponding month or date on its face.  We also note that this check is No. 386, while the check dated Jan. 15, 1993, is No. 376.

Approximately 2 months after Harold Okimoto died, Blake Okimoto asked Michael Boulware to pay him the aggregate amount of the uncashed checks. Michael Boulware was a heavy gambler on sporting events, and he used to place bets with Harold Okimoto, who was his gambling bookie.[31] Harold Okimoto and Michael Boulware also used to travel together to gamble in Las Vegas, Nevada. When taking bets from Michael Boulware, Harold Okimoto would take Michael Boulware's personal check as a substitute for a promissory note; if Michael Boulware lost the bet, Harold Okimoto would give the check back to Michael Boulware when Michael Boulware paid Harold Okimoto cash in the amount of the check. The uncashed checks reflected amounts that Michael Boulware owed to Harold Okimoto on lost bets. Michael Boulware denied that he owed Harold Okimoto any money and insisted that Harold Okimoto owed him money for funds that Michael Boulware had lent Harold Okimoto. The Okimoto family decided not to pursue collection of the amounts reflected in the four checks, and those checks have never been paid.

---

[31]Mal Sun Boulware also was a heavy gambler. Michael Boulware paid gambling debts of hers aggregating at least $300,000 to $600,000.

### d.  U.S. Attorney Contacts Okimoto Family

Shortly after the Okimoto family decided not to pursue collection of the four checks, Blake Okimoto was approached by Assistant U.S. Attorney J. Michael Seabright (who is now a U.S. District Court judge) with respect to the Kingdom of Tonga bank accounts that were at issue in a then-ongoing criminal case involving Michael Boulware.  Harold Okimoto had ties to that account that allowed Blake Okimoto to consent to a request by the United States to receive records on the account, and the United States wanted Blake Okimoto to give such consent.  Shortly thereafter, Michael Boulware strongly suggested to Blake Okimoto that he not give any such consent and requested that the two meet to discuss certain matters.  Blake Okimoto immediately contacted the U.S. Attorney's Office to report that request.  Blake Okimoto then learned that Michael Boulware wanted to pay the Okimoto family approximately $1.7 million that Michael Boulware said Harold Okimoto had lent him beginning in 1995 through monthly wire transfers from Hong Kong.  Blake Okimoto also learned that Michael Boulware wanted to hire Blake Okimoto's law firm to represent HIE.  Before he died, Harold Okimoto had routinely and regularly disclosed his personal finances and other matters to Blake Okimoto, and Blake Okimoto neither heard from his father that he had lent Michael Boulware approximately $1.7 million, nor

believed that his father had the funds to lend that amount to Michael Boulware.

e. <u>Claim of an Approximately $1.7 Million Debt</u>

Approximately 1 year after Harold Okimoto's death, Michael Boulware telephoned Bruce Okimoto unexpectedly and asked that they meet at Michael Boulware's house. Shortly thereafter, the two of them met alone next to Michael Boulware's garage, and Michael Boulware told Bruce Okimoto that Michael Boulware owed Harold Okimoto approximately $1.7 million and had a promissory note to that effect. Bruce Okimoto was aware of no such debt and did not believe that his father had enough money to have lent anyone anything. Bruce Okimoto and his brother, Blake Okimoto, did not do anything about collecting the money from the alleged loan because they did not believe that the loan existed. Michael Boulware asked Bruce Okimoto to send him a demand letter for the money, but Bruce Okimoto declined. The Okimoto family never received payment for the approximately $1.7 million loan that Michael Boulware said he owed Harold Okimoto.

f. <u>After-the-Fact Creation of Promissory Notes</u>

Sometime after Harvest International was formed, James Chan met with Barney Shiotani and Nathan Suzuki in Nathan Suzuki's legislative office at the State Capitol. At this meeting, the three men acknowledged the absence of a promissory note or other

document indicating that the funds previously transferred from the foreign entities to Michael Boulware were loans. The three men discussed their desire to create promissory notes for that purpose. The three men agreed that Barney Shiotani would draft promissory notes from Michael Boulware to Harvest International for funds previously transferred to Michael Boulware.

XI.  Michael Boulware's Removal of Funds From the Off-Book Bank Accounts

A.  Overview

A total of $4,058,732 deposited into the off-book bank accounts was removed through transfers to Michael Boulware's personal bank accounts, by checks written directly to Jin Sook Lee, by checks written directly to Mal Sun Boulware, or by checks cashed for Michael Boulware mostly by his loyal employees and friends. Of the $4,058,732, $1,356,100 was transferred to Michael Boulware's personal account No. 05-389054; $641,412 was transferred to Michael Boulware's personal account No. 49-507151; $151,000 was transferred to Jin Sook Lee through checks written to her; $601,700 was transferred to Mal Sun Boulware through checks written to her; and $1,308,520 was received by Michael Boulware through a check cashing arrangement where Michael Boulware wrote a check payable to cash or to the name of a loyal (to him) individual, and the individual cashed the check and gave

the proceeds to Michael Boulware. When these checks were cashed, in 1989 through 1992, Michael Boulware had not yet filed his Federal income tax returns for any of those years.

B. **Michael Boulware Caused Checks To Be Cashed for Him by Employees and Friends**

1. **Stanley Hirai and Antoinette Hirai**

Michael Boulware gave Stanley Hirai and his then wife, Antoinette Hirai, various checks usually payable either to cash or to Antoinette Hirai. As directed by Michael Boulware (or sometimes in the case of Antoinette Hirai at the direction of Stanley Hirai), Antoinette Hirai, or sometimes Stanley Hirai or their daughter, cashed the checks and gave the cash to Michael Boulware. Antoinette Hirai did not know why she was cashing the checks; she simply cashed the checks, put the cash in an envelope, and gave the envelope to Stanley Hirai who in turn gave the money to Michael Boulware. From 1992 through 1994, Michael Boulware wrote $230,000 of checks payable to cash or to Antoinette Hirai; those checks were payable from an off-book bank account, from one of Michael Boulware's personal accounts, or from the Automated Equipment bank account. Michael Boulware told Stanley Hirai that the money was Michael Boulware's personal funds and that he was giving those funds to Jin Sook Lee.

2. Morris Miyasota

Morris Miyasota has worked for Holdings (and its predecessor) since 1983 and was its human resource manager in 1990 and 1991. In the late 1980s to early 1990s, Morris Miyasota cashed at the request of Michael Boulware approximately 150 checks totaling approximately $2 million. The amounts payable on approximately 30 percent of the checks were greater than $10,000, and most of the checks were made payable to cash; sometimes, the checks were made payable to Morris Miyasota. As directed by Michael Boulware, Morris Miyasota gave the proceeds to Michael Boulware upon cashing the checks. On at least one occasion, when Morris Miyasota was asked to fill out a cash transaction report for one of the transactions, he reported that he, rather than Michael Boulware, was receiving the proceeds.[32] Morris Miyasota knew it was not typical for someone in his position with Holdings (and its predecessor) to cash checks.

The checks written as payable to Morris Miyasota totaled $198,600 and were written from February 1992 through January 1993. Of those checks, $147,700 was payable from one of the off-book bank accounts, Central Pacific Bank account No.

---

[32]Currency transaction reports are generally required to be filed by banks as to deposits or withdrawals (including by way of check) exceeding $10,000.

01-06586-6; $3,700 was payable from Michael Boulware's First Interstate Bank of Hawaii account No. 05-389054; and $47,500 was payable from Michael Boulware's First Hawaiian Bank account No. 49-507151.

The checks written as payable to cash totaled $1,791,700 and were written from January 1989 through February 1992. Of those checks, $3,000 was payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6; $1,681,200 was payable from Michael Boulware's First Interstate Bank of Hawaii account No. 05-389054; and $107,500 was payable from Michael Boulware's First Hawaiian Bank account No. 49-507151.

### 3. Thomas Okimoto

Thomas Okimoto began working for HIE in 1984, and he worked for HIE until he retired in 1997. Thomas Okimoto was the manager of HIE who oversaw its OTC sales. Thomas Okimoto also was the brother of Harold Okimoto. During 1994, Michael Boulware wrote nine checks totaling $44,800 that were payable to Thomas Okimoto. None of the individual checks was payable in an amount greater than $10,000. Two of the nine checks were payable from Michael Boulware's First Hawaiian Bank account No. 49-507151 in the total amount of $9,800. The remaining checks were payable from Michael Boulware's Automated Equipment account No. 17-134698 in the total amount of $35,000. As directed by Michael Boulware, Thomas

Okimoto cashed each of the nine checks and gave the proceeds to Michael Boulware.  Thomas Okimoto never asked Michael Boulware why he was cashing checks for him.

### 4.  Milton Ikeda

Milton Ikeda was employed by HIE (or its predecessor) as a karaoke machine salesman from the early 1980s through sometime in the 1990s, and he was a good friend of Michael Boulware.  From 1991 through 1993, Michael Boulware wrote at least 80 checks totaling $1,394,663 that were payable to Milton Ikeda.  The amount payable on most of the individual checks was greater than $10,000.  Of the at least 80 checks, $426,143 was payable from Michael Boulware's First Hawaiian Bank account No. 49-507151; $806,920 was payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6; and $161,600 was payable from Michael Boulware's First Interstate Bank of Hawaii account No. 05-389054.  As directed by Michael Boulware, Milton Ikeda cashed each of the checks and gave the proceeds to Michael Boulware.  Milton Ikeda knew that check cashing was not part of his job, but he did it as a favor to Michael Boulware.  No one at HIE, besides Michael Boulware, knew that Milton Ikeda was cashing checks for Michael Boulware.

### 5. Sydney Murayama

Sydney Murayama was an employee of HIE. From February 4, 1994, through September 21, 1996, Michael Boulware wrote checks payable to Sydney Murayama totaling $64,000. Of those checks, $47,000 was payable from one of Michael Boulware's personal accounts, and the balance of $17,000 was payable from Michael Boulware's Automated Equipment account. As directed by Michael Boulware, Sydney Murayama cashed the checks and gave the proceeds to Michael Boulware.

### 6. Neal Taira

Neal Taira was an employee of HIE. In September and October 1992, Michael Boulware wrote five checks that were payable to Neal Taira in the total amount of $39,400. None of the individual checks was payable in an amount greater than $10,000. In September 1992, Michael Boulware also wrote a check payable to Harold Okimoto in the amount of $9,800. All six of these referenced checks were payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6. As directed by Michael Boulware, Neal Taira cashed each of the six checks and gave the proceeds to Michael Boulware.

### 7. Paul Takekawa

Paul Takekawa was an employee of HIE. During 1993, Michael Boulware wrote five checks totaling $20,000 that were payable to

cash or to Paul Takekawa.  One of the checks was written in January 1993 and was made payable in the amount of $4,000 from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6.  The remaining checks were written in October through December 1993 and were made payable in the total amount of $16,000 from Michael Boulware's First Hawaiian Bank account No. 49-507151.  None of the individual checks was payable in an amount greater than $10,000.  As directed by Michael Boulware, Paul Takekawa cashed each of the five checks and gave the proceeds to Michael Boulware.

8.  John Torres

John Torres was an employee of HIE.  In 1990 and 1992, Michael Boulware wrote 14 checks payable to John Torres in the total amount of $103,400.  One check was written in March 1990 and was made payable in the amount of $5,000 from Michael Boulware's First Interstate Bank of Hawaii account No. 05-389054. Ten of the checks were written in January through December 1992 in the total amount of $84,400 and were payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6; the amount payable on 1 of the 10 checks was greater than $10,000.  The remaining three checks were written in January through August 1992 in the total amount of $14,000 and were payable from Michael Boulware's First Hawaiian Bank account No.

49-507151. None of the individual checks was payable in an amount greater than $10,000. As directed by Michael Boulware, John Torres cashed each of the 14 checks and gave the proceeds to Michael Boulware.

### 9. Other Check Cashers

In addition to the checks mentioned above, from 1989 through 1996 Michael Boulware wrote 85 checks payable to cash in the total amount of $465,382 and gave those checks to individuals other than those discussed above. The amounts payable on four of the checks were greater than $10,000. Of the 85 checks, $132,282 was payable from Michael Boulware's First Hawaiian Bank account No. 49-507151; $181,600 was payable from one of the off-book bank accounts, Central Pacific Bank account No. 01-06586-6; $133,000 was payable from Michael Boulware's First Interstate Bank of Hawaii account No. 05-389054; and $18,500 was payable from Michael Boulware's First Hawaiian Bank account No. 09-365508. As directed by Michael Boulware, these individuals cashed the checks and gave the proceeds to Michael Boulware.

## XII. Criminal Investigation of Michael Boulware

### A. Jerry Yamachika Contacts and Meets With Michael Boulware

On or about June 16, 1993, the CID began a criminal income tax investigation of Michael Boulware. The criminal investigation stemmed from respondent's receipt of information

that showed that Michael Boulware was enjoying an extravagant lifestyle and might have realized substantial income during the recent years but not reported that income on his personal Federal income tax returns. This information included, inter alia, hundreds of currency transaction reports related to Michael Boulware that numerous banks in Honolulu had filed with the Commissioner. This information also included, inter alia, other independent reports that the referenced banks had filed with the Commissioner to notify him of transactions with respect to Michael Boulware that appeared to have been structured to avoid the filing of a currency transaction report.

Jerry Yamachika was an experienced special agent in the CID. As part of the criminal investigation, Jerry Yamachika met with Michael Boulware on or about June 16, 1993, advised him of his constitutional rights, and informed him that he was under criminal investigation for failing to file his personal Federal income tax returns for 1988 through at least 1991.[33] This was the first time that Michael Boulware was notified by the CID that he was under criminal investigation. Jerry Yamachika ascertained

---

[33]Michael Boulware told Jerry Yamachika at that meeting that Michael Boulware had just recently filed his 1989 through 1991 Federal income tax returns. Jerry Yamachika later verified that claim. Michael Boulware filed those returns on June 12, 1993. Michael Boulware filed his 1992 return on or after June 8, 1993.

at or before the meeting that Michael Boulware had received large sums of income from HIE as to those years and had received certain personal benefits through his relationship with his corporation (e.g., receipt of proceeds lent from HIE, use of automobiles owned by HIE). At the meeting, Jerry Yamachika gave Michael Boulware a request for his personal income tax documents and a summons for the records of HIE, explaining as to the summons that it was necessary because HIE was Michael Boulware's controlled entity.[34] Michael Boulware perceived from the meeting that he and not any of the subject corporations was the focus of the criminal investigation.

B.  Michael Boulware Obtains Professional Representation

Shortly after meeting with Jerry Yamachika, Michael Boulware traveled to California to ask Barney Shiotani to represent him in the criminal investigation. Barney Shiotani is an attorney licensed to practice law in California. Barney Shiotani and Michael Boulware had never met before they spoke on that occasion, but they knew of each other from an investment that Michael Boulware had made in a program managed by Barney Shiotani. Barney Shiotani declined Michael Boulware's request to

---

[34]All summonses issued during the criminal investigation were in the names of Michael Boulware or possibly Jin Sook Lee, but not HIE.

represent him because Barney Shiotani was not a criminal tax attorney or a litigator.  Barney Shiotani recommended to Michael Boulware that he retain Martin Gelfand, a criminal tax litigator. Following the meeting of Barney Shiotani and Michael Boulware, Barney Shiotani became and remains a close confidant and adviser to Michael Boulware and to a lesser extent to the subject corporations.

In 1993, shortly after meeting with Barney Shiotani, Michael Boulware retained Martin Gelfand and his California law firm, Irell & Manella L.L.P. (Irell Manella), to represent Michael Boulware in connection with the criminal investigation.  At and after that time, Barney Shiotani remained a close confidant and adviser to Michael Boulware and to the subject corporations on the topic of Federal income taxes and, with respect to Michael Boulware, on theories to pursue to avoid any possible criminal conviction as to the subject matter of the investigation; e.g., by arguing that there was no tax loss as to either Michael Boulware or HIE, and by formulating steps that Michael Boulware should take to maximize the chance of such an avoidance.  Barney Shiotani retained the services of Nathan Suzuki, whom he had known for at least 10 years, to assist him as a "Kovel

accountant"[35] with respect to accounting matters as well as to advise Michael Boulware and the subject corporations. HIE was informed by Barney Shiotani and Martin Gelfand that HIE was a target of the criminal investigation.[36] HIE did not retain any attorney to represent solely its interests in the criminal investigation.

C. Focus of Criminal Investigation

During the criminal investigation, Jerry Yamachika focused on the books, records, and transactions of HIE and considered making HIE and various other entities or individuals targets in the investigation. Jerry Yamachika was concerned as to whether HIE's tax returns were correct, and he sought and received documents from HIE to develop criminal cases primarily against

---

[35]We understand petitioners to use the term "Kovel accountant" to refer to an accountant described in United States v. Kovel, 296 F.2d 918 (2d Cir. 1961). The court held in that case that an accountant who assists an attorney in communicating effectively with the attorney's client does not serve to waive any attorney-client privilege that would otherwise apply to privileged information that was disclosed to the accountant. We use that term for simplicity and do not mean to suggest that we have found that any of the "Kovel accountants" whom we refer to herein meet the specifics of United States v. Kovel, supra.

[36]A target of a criminal investigation is a person or entity that the CID is investigating for a possible criminal violation of a Federal statute. A "target" becomes a "subject" (i.e., the target is "subject numbered") if the CID concludes that the CID has sufficient evidence to indicate that the statute was violated and that the CID has jurisdiction to pursue a prosecution as to that violation.

Michael Boulware and Jin Sook Lee but, if warranted, against HIE or others as well. Jerry Yamachika thoroughly reviewed HIE's records because he considered HIE to be Michael Boulware's sole source of funds and believed that any income that Michael Boulware failed to report as relevant to the criminal investigation would have come from that corporation.

On January 11, 1995, Martin Gelfand and Barney Shiotani met with Jerry Yamachika and two of his colleagues, and Barney Shiotani asked Jerry Yamachika whether the criminal investigation included any subjects other than Michael Boulware, Jin Sook Lee, and HIE. Jerry Yamachika heard and understood the question and recorded it in his notes as such. Jerry Yamachika did not deny that HIE was a subject of the investigation and indicated that there might be other subjects later if, for example, a conspiracy was found to have existed with respect to the subject matter of the investigation. Throughout the criminal investigation, Jerry Yamachika contemplated characterizing as conspirators numerous persons including Barney Shiotani, Lorin Kushiyama, John Yamada, and the various individuals who cashed checks for Michael Boulware at his direction.

Jerry Yamachika never formally made HIE a subject of his investigation because he concluded that HIE was a victim of crimes perpetrated primarily by Michael Boulware. Applicable

internal procedures pertaining to the CID would have required in order to have made HIE a subject that Jerry Yamachika recommend in writing that HIE be made a subject, that this recommendation be approved by his chief/manager, and that HIE be "subject-numbered".  While each of these three steps happened in the cases of Michael Boulware and Jin Sook Lee (subject-numbered as 99-93-3-0525 and 99-93-3-0559, respectively), none of those steps happened with respect to HIE.  Applicable procedures also would have required that Jerry Yamachika notify the officials of HIE at the beginning and end of his investigation.

   D.  Applicability of HIE's Indemnification Provision
       Relating to Certain Personal Legal Fees Incurred by Its
       Directors and Officers

Early on in the criminal investigation, Michael Boulware asked HIE to indemnify him for any personal legal fees that he incurred with respect to the investigation.  Michael Boulware based his request on provisions set forth in the articles of incorporation and/or bylaws of HIE and the other relevant corporations of which he was an officer.  Each of those provisions states that officers and directors of the corporation shall be indemnified by the corporation for all reasonable legal fees and costs actually and necessarily incurred in connection with a claim in which that officer or director is involved "by reason of his being or having been a director or officer of the

corporation". The provisions except matters as to which an officer or director "shall be finally adjudged in such action, suit, proceeding, investigation or inquiry to be liable for willful misconduct, willful neglect or negligence toward the corporation in the performance of his duties as such director or officer". The provisions state as to the just-quoted exception that absent such a final adjudication, the board of directors may conclusively rely on the opinion of legal counsel.

In addition to receiving legal advice on the subject from Michael McCarthy and Martin Gelfand, Michael Boulware (both personally and in his capacity as an officer of HIE) sought and received legal advice from Douglas Smith of the Hawaii law firm Damon Key Bocken Leong Kupchak (Damon Key). Sidney Boulware and Merwyn Manago, in their capacities as members of HIE's board, met informally with Douglas Smith and discussed the propriety of the subject corporations' paying Michael Boulware's legal fees. Douglas Smith advised HIE's board that Michael Boulware and the other HIE employees were entitled to indemnification from HIE under the referenced provisions to the extent that he and the other HIE employees were acting in the best interest of HIE. Douglas Smith researched the issue (including reading the statute and the applicable corporate provisions) and rendered that advice

strictly on the basis of his assumption of facts that had been provided to him by one or more members of HIE's board.

Upon receiving the advice of Douglas Smith, HIE's board of directors determined that Michael Boulware was acting in the best interests of HIE and that he was entitled to indemnification for his legal fees. In connection with such indemnification, Damon Key asked Michael Boulware to pledge (and as of July 21, 1999, he did pledge) his HIE shares to HIE in exchange for debts that he might owe HIE, including any debt that arose from the indemnification for legal fees for which it was not proper to indemnify him.[37]

## XIII. Civil Litigation Initiated by Jin Sook Lee

### A. Background

As relevant herein, Jin Sook Lee initiated three civil lawsuits involving Michael Boulware and/or HIE. First, Jin Sook Lee sued Michael Boulware and HIE for recovery of the $840,000 that he took from her safe and for an award equal to the value of

---

[37]In early 2006, after Michael Boulware was convicted following his first criminal trial, discussed infra, Damon Key became aware that provisions under the revised model business code had been adopted requiring more stringent affirmation in writing. The then current members of HIE's board of directors (Sidney Boulware, Karen Min Boulware, and Merwyn Manago as outgoing director) executed an affirmation (i.e., a consent of directors) as to the pledge and recorded in HIE's board minutes the board's approval for indemnification of Michael Boulware's legal fees.

the Koloa house that he had taken from her through his forged signature of her name (JSL litigation). Michael Boulware and HIE made a counterclaim in the JSL litigation to recover approximately $5 million of funds received by Jin Sook Lee and to recognize HIE as the owner of the four relevant real properties. Second, Jin Sook Lee, as trustee of the Glenn Lee Boulware Trust, commenced the trust case by petitioning a Hawaii State court to enforce the trust and to order an accounting. Michael Boulware, as trustor, counterpetitioned the court in the trust case to remove Jin Sook Lee as trustee, to appoint a substitute trustee designated by him, and to order an accounting of all funds that he or HIE had transferred to Jin Sook Lee from September 8, 1987, through that time. Third, Jin Sook Lee, as trustee of the trust, commenced a shareholder derivative case (shareholder derivative case).

B.   JSL Litigation

1.   Complaint

On October 7, 1994, Jin Sook Lee sued HIE and Michael Boulware in the Circuit Court of the First Circuit of Hawaii. That case, the JSL litigation, was captioned by the court as Jin Sook Lee v. Michael Boulware and Hawaiian Isles Enterprises, Inc., and docketed as Civil No. 94-3799-10. At or about the time the complaint was filed in that court, Michael Boulware also was

a litigant in two other lawsuits ongoing in a Hawaii family court.  The first lawsuit was the uncontested divorce proceeding of Michael Boulware and Mal Sun Boulware.  The second lawsuit, <u>Michael Boulware v. Jin Sook Lee</u>, was a paternity action.

Jin Sook Lee's complaint in the JSL litigation alleged in part that:  (1) Michael Boulware individually and as an agent of HIE stole $840,000 from the safe in her house and wrongfully converted the cash to himself or to HIE, (2) Michael Boulware wrongfully acquired the Koloa house from her and transferred the house to HIE through a fraudulent conveyance by which he unlawfully forged her signature on the deed of conveyance from her to him, (3) payment was due and owing to her on the $1.2 million promissory note given to her by Michael Boulware to compensate her for the approximate value of the Koloa house wrongfully taken from her, and (4) Michael Boulware and HIE were unjustly enriched by their acquisition of the Koloa house and the $840,000 in cash.  The complaint alleged as relevant facts that Michael Boulware had written an $840,000 check on January 22, 1991, from HIE to Jin Sook Lee to compensate her for the loss, that he had asked her not to cash the check until he informed her that sufficient funds were available to pay the check, that he had not yet informed her that sufficient funds were in the account, and that she had yet to attempt to cash the check.  In

addition, the complaint alleged, Michael Boulware had made a single payment of $25,000 to Jin Sook Lee under the promissory note, had now defaulted on the note, and had refused her demand to make further payments on the note. The complaint sought a joint and several judgment against Michael Boulware and HIE for $840,000 plus interest, $1,200,000 (the value of the Koloa house) plus interest, consequential damages, punitive damages, attorney fees, and her other costs of litigation. The complaint also sought that Michael Boulware be held liable for the $1,175,000 unpaid portion of the promissory note, plus interest accrued thereon.

### 2. Counterclaim

On November 17, 1994, Michael Boulware and HIE made a counterclaim in the JSL litigation alleging in part that HIE was entitled to recover over $5 million in cash and real property (specifically, the Atkinson condominium, the Makaiwa house, and the Punahou condominium) held by Jin Sook Lee in constructive trust pursuant to her oral agreement to return the property on demand but which she refused to return after demand. The counterclaimants prayed in the counterclaim for a return of the transferred funds and real properties and for an award of punitive damages. The counterclaimants also prayed that the court declare void the $840,000 check payable by HIE to Jin Sook

Lee and the $1.2 million promissory note from Michael Boulware to Jin Sook Lee; the counterclaimants alleged that those instruments were procured by Jin Sook Lee through duress, fraud, and undue influence, and, alternatively, without adequate consideration. The counterclaimants alleged in the counterclaim as relevant facts that: (1) Michael Boulware had to accumulate substantial funds to buy out Mal Sun Boulware's marital interest in HIE and their other joint assets as part of their divorce agreement; (2) HIE had advanced funds to Michael Boulware with the understanding that he would repay HIE all amounts not used on its behalf; (3) Michael Boulware transferred or caused HIE to transfer approximately $5 million to Jin Sook Lee with the same understanding, with her knowledge that Michael Boulware needed the funds to finalize his divorce, and pursuant to her agreement that she would return the funds to Michael Boulware and HIE upon request; and (4) some of the funds transferred to Jin Sook Lee were used to purchase in the name of Jin Sook Lee, as an agent of Michael Boulware and HIE, the Atkinson condominium, the Koloa house, the Makaiwa house, and the Punahou condominium. The counterclaimants alleged in the counterclaim that Jin Sook Lee had breached her contract with Michael Boulware and HIE to return the transferred funds and properties upon demand (which had been made); that she had breached her fiduciary duty as a constructive

trustee to do the same; and that she had converted money and other assets belonging to Michael Boulware and HIE and was unjustly enriched.

C.    Trust Case

On April 21, 1995, Jin Sook Lee, as trustee of the Glenn Lee Boulware Trust, commenced the trust case by filing the petition referenced supra with the Circuit Court of the First Circuit of Hawaii.  The trust case was docketed by the court as T. No. 95-0029.  As relevant herein, the petition underlying the trust case sought:  (1) A judgment declaring that the Glenn Lee Boulware Trust was valid and enforceable or alternatively, if the trust was unenforceable, a judgment declaring and imposing a resulting trust and adjudging that Jin Sook Lee, as trustee, was entitled to receive 50 percent of the stock of HIE as of September 8, 1987, and all profits and earnings therefrom; (2) an accounting of the E&P of HIE from September 8, 1987, through that time; and (3) reimbursement of the costs of the lawsuit and an award of attorney's fees and other appropriate amounts.

On June 26, 1995, Michael Boulware, as trustor of the Glenn Lee Boulware Trust, responded to Jin Sook Lee's petition in the trust case and admitted that the trust was established, that the trust was funded with 50 percent of the shares of HIE, and that the trust was valid.  Contemporaneously, Michael Boulware, as

trustor, filed with the court a counterpetition to remove Jin Sook Lee as trustee of the Glenn Boulware Trust for breaches of fiduciary duty, conflicts of interest, and conversion of trust funds; to appoint a substitute trustee as designated by him; and to order an accounting of all funds received by Jin Sook Lee from HIE or Michael Boulware from September 8, 1987, through present.

The trust case and the JSL litigation were initially consolidated for all purposes because the counterclaims filed in those cases essentially mirrored each other. The cases were later severed on or about June 16, 1997, at which time the trial of the JSL litigation commenced before a jury.

D. Shareholder Derivative Case

On January 15, 1997, Jin Sook Lee, as trustee of the Glenn Lee Boulware Trust, commenced in the Circuit Court for the First Circuit of Hawaii a shareholder derivative case against HIE, its board of directors (Michael Boulware, Sidney Boulware, and Merwyn Manago), and its employee Mal Sun Boulware (shareholder derivative case). The shareholder derivative case was docketed by the court as Civil No. 97-0197-01. The shareholder derivative case primarily sought to enforce the rights of a shareholder (including access to corporate records) afforded to Jin Sook Lee, as trustee of the Glenn Lee Boulware Trust, to throw out the

existing board of directors, and to appoint a receiver to control and manage HIE.

On July 1, 2004, the court dismissed the shareholder derivative case for lack of any activity since June 7, 2002.

E.  HIE's Perception of Civil Litigation

HIE did not perceive Jin Sook Lee as posing an actual threat through her filing and prosecution of the aforementioned civil litigation.

F.  Actions Taken by HIE Board of Directors

1.  Resolution

As of June 30, 1995, HIE's board of directors (Michael Boulware, Sidney Boulware, and Merwyn Manago) resolved that only the persons listed as shareholders in the books of HIE would be permitted to exercise the rights of shareholders.  The board noted that Jin Sook Lee was claiming as trustee of the Glenn Lee Boulware Trust to own a legal or beneficial interest in the shares of HIE, that Jin Sook Lee was not then shown as a shareholder on the books of HIE, that judicial proceedings were ongoing to remove Jin Sook Lee as trustee of the Glenn Lee Boulware Trust, that the court in the judicial proceedings had not yet determined Jin Sook Lee's interest in the shares of HIE, and that the board had determined that under the circumstances it was neither proper nor in the best interests of HIE to recognize

Jin Sook Lee as a shareholder of HIE or to allow her to exercise any rights afforded to shareholders of HIE.

## 2. Payment of Legal Expenses

HIE's board of directors determined that it was proper to pay the legal expenses associated with the trust case and Michael Boulware's counterpetition in that case. HIE's board of directors determined that it was proper to pay for the legal expenses associated with the defense of Michael Boulware, Sidney Boulware, Merwyn Manago, and Mal Sun Boulware in the shareholder derivative case.

## XIV. Referral of Michael Boulware for Prosecution and Michael Boulware's Grand Jury Indictment

### A. Referral to DOJ for Prosecution

Sometime before June 10, 1996, Jerry Yamachika recommended to one of his superiors, the chief of the CID, Pacific-Northwest Division, that Michael Boulware and Jin Sook Lee be prosecuted for attempting to evade Federal income tax for 1989 through 1992 and 1990, respectively. Jerry Yamachika also recommended to the chief that Michael Boulware be prosecuted for filing false Federal corporate income tax returns for HIE for 199006 through 199206 and that Jin Sook Lee be prosecuted for aiding in the preparation of those corporate income tax returns. Jerry Yamachika also recommended to the chief that Michael Boulware and

Jin Sook Lee be prosecuted for conspiracy to defraud by filing or causing the filing of false corporate and individual Federal income tax returns. On June 10, 1996, the chief concurred in all of Jerry Yamachika's recommendations and forwarded Jerry Yamachika's final report to the District Counsel, Honolulu, Hawaii. The forwarded documents included the chief's approval (under the signature of the district director) of the recommendations set forth in Jerry Yamachika's final report.

By a writing dated June 10, 1996, the CID notified Michael Boulware (with copies to Martin Gelfand and Barney Shiotani) that it was recommending that Michael Boulware be prosecuted criminally in connection with the subject matter of the criminal investigation. The writing stated in part:

> The investigation conducted by the Criminal Investigation Division has developed evidence indicating you conspired to defraud the Internal Revenue Service by impeding and obstructing its lawful function of determining and assessing the relevant tax liabilities for yourself, as well as HAWAIIAN ISLES ENTERPRISES, INC. The evidence further indicates that you willfully subscribed to false Federal corporate tax returns for HAWAIIAN ISLES ENTERPRISES, INC., for the fiscal years 9006 through 9206; and that you willfully evaded your personal income tax liabilities by subscribing to false Federal individual income tax returns for the years 1989 through 1992. The violations alleged are Title 18, United States Code, Section 371; Title 26, Internal Revenue Code, Section 7206(1); and Title 26, Internal Revenue Code, Section 7201 * * *

On June 26, 1996, Martin Gelfand spoke with Carol Muranaka, an attorney in the Office of District Counsel, Western Region, and requested a conference with the Office of District Counsel to discuss the matter. In a letter dated June 27, 1996, Martin Gelfand was informed that the requested conference was set for July 10, 1996, and that Michael Boulware was entitled at that conference to present any information in his defense. Afterwards, the Office of District Counsel (through Carol Muranaka) concurred in Jerry Yamachika's recommendation of the prosecution of Michael Boulware but did not agree with Jerry Yamachika's recommendation of the prosecution of Jin Sook Lee. As to the latter, the Office of District Counsel did not believe that the case against Jin Sook Lee was strong enough because it believed that all amounts received by Jin Sook Lee could be viewed as gifts (and not taxable income) to her.

On September 11, 1996, respondent notified Martin Gelfand that the criminal investigation was being referred to the Department of Justice (DOJ) for its consideration of criminal prosecution of Michael Boulware. Subsequently, on November 18, 1996, in connection with a conference held with the DOJ, Martin Gelfand was given a breakdown of numbers related to alleged tax deficiencies of both Michael Boulware and HIE. The numbers included amounts that the United States could allege were false

on HIE's 199006, 199106, and 199206 Federal income tax returns and would directly affect Michael Boulware. Specifically, the DOJ informed Martin Gelfand that HIE had failed to report income of $1,518,579 in 199006, $403,578 in 199106, and $366,070 in 199206.

B. Referral to Grand Jury

After a criminal prosecution is approved by the DOJ, the case is usually returned to the local Office of the U.S. Attorney for criminal prosecution. At or about the beginning of August 1997, the recommended criminal prosecution of Michael Boulware was approved by the DOJ, his case was returned to the U.S. Attorney for Hawaii, and a grand jury proceeding was commenced to determine whether Michael Boulware should be indicted in connection with his diverting of HIE income. The United States did not seek an indictment of HIE in that the United States viewed HIE as the victim of criminal activities perpetrated by Michael Boulware. Applicable policy of the DOJ as set forth in sections 9-11.150 through 9-11.153 of the U.S. Attorneys' Manual (October 1, 1990) would have required that HIE be notified that it was a "target" in the grand jury phase if the United States had sought HIE's indictment by the grand jury.

C.  Grand Jury Indictment

On May 19, 1999, the grand jury returned a 10-count indictment against Michael Boulware.  The indictment charged Michael Boulware with four counts under section 7206(1) of filing false personal Federal income returns for 1989 through 1992, one count under 18 U.S.C. section 371 of conspiring to make a false statement to a federally insured financial institution (namely, GECC), and four counts under 18 U.S.C. section 1014 of making the referenced false statements.  The 10th count sought forfeiture of funds associated with the false statements.  The indictment alleged in part that Michael Boulware

> certified, as a representative of Hawaiian Isles
> Enterprises, Inc., that he had inspected and accepted
> delivery of arcade games, pool tables, and jukeboxes
> from Aloha Games and Automatic Coin Equipment, Inc.,
> and that the equipment was in good condition and
> repair, whereas defendant MICHAEL H. Boulware knew that
> the listed equipment had not been received from Aloha
> Games and Automatic Coin Equipment, Inc.

On April 6, 2000, and February 14, 2001, a superseding indictment and second superseding indictment, respectively, added five additional counts under section 7206(1) of filing false personal Federal income tax returns for 1993 through 1997 and four new counts under section 7201 of tax evasion for 1994 through 1997 and amended the factual allegations of the conspiracy count.  Although the referral for criminal prosecution

had been for tax evasion regarding both his personal and HIE's corporate tax returns, Michael Boulware was not indicted for false statements on HIE's corporate tax returns. Afterwards, during Michael Boulware's first criminal trial, the false tax return counts for 1994 through 1997 were severed, redacted from the indictment, and dismissed with prejudice.

The grand jury indictments against Michael Boulware centered on his diversion of HIE's income during 1989 through 1997.

## XV.  Resolution of JSL Litigation

### A.  Overview

The legal issues in the JSL litigation were the subject of an approximately 2-week jury trial in June and July 1997. By consent of the parties in the JSL litigation, the court reserved and later decided without a jury the equitable issues of unjust enrichment and the formation of a constructive trust regarding the cash and checks of HIE that were delivered by Michael Boulware to Jin Sook Lee. As to those equitable issues, the parties in the JSL litigation and the trust case stipulated that the court could consider all of the evidence presented in the trial of the JSL litigation as if such evidence had been

presented before the court sitting without a jury in the trust case.

B. Jury Verdict

By special verdict rendered on July 3, 1997, the jury in the JSL litigation found that Jin Sook Lee was holding $4,551,931 in constructive trust for HIE and ordered Jin Sook Lee to return that money to HIE. Most specifically, the jury found that: (1) None of the cash and checks that Michael Boulware and HIE transferred to Jin Sook Lee from March 1987 through May 1994 were gifts to her, that the moneys (listed as totaling $4,551,931) belonged to HIE, and that Jin Sook Lee owed HIE the $4,551,931; (2) HIE did not convert title to the Koloa house from Jin Sook Lee; (3) the $840,000 that Michael Boulware took from the safe did not belong to Jin Sook Lee; (4) Michael Boulware was obligated to pay Jin Sook Lee $250,000 pursuant to the $1.2 million promissory note that he had given her; and (5) Jin Sook Lee owned the Atkinson condominium, the Punahou condominium, and the Makaiwa house. The jury awarded Jin Sook Lee $250,000 on the promissory note and ownership of the three just-referenced real properties.

C. Equitable Issues Decided by State Court

As to the equitable issues reserved by the court for its decision, the court noted that the jury in the JSL litigation had

found that "$4,551,931 in cash and checks delivered to Plaintiff belonged to HIE and that Plaintiff should return that sum to HIE", and the court stated as a fact that "The Court agrees with the jury's verdict, and likewise finds that the $4,551,931 delivered to Plaintiff was not a gift and belongs to HIE."  In addition, the court found that Michael Boulware had given the $4,551,931 to Jin Sook Lee without receiving any consideration in return and that Jin Sook Lee would be unjustly enriched by retaining those moneys.  In relevant part, the court concluded:

> 3.   There was a binding agreement between Plaintiff [Jin Sook Lee], [Michael] Boulware and HIE for Plaintiff to hold monies belonging to HIE to pay Mal Sun Boulware for her marital interest in HIE. Pursuant to that agreement, monies belonging to HIE were entrusted to Plaintiff until such time the monies were needed to pay Mal Sun for her interest in HIE.
>
> 4.   The $4,551,931 held by Plaintiff belongs to HIE and Plaintiff wrongfully refused to return the sum to HIE.
>
> 5.   For Plaintiff to retain the $4,551,931 belonging to HIE for which she paid no consideration would be unjust.
>
> 6.   The Court said in Small v. Badenhop, 67 Haw. 626 (1985), "it is axiomatic that 'a person who has been unjustly enriched at the expense of another is required to make restitution to the other.'"  67 Haw. at 636.
>
> 7.   "A constructive trust will be imposed where the evidence is clear and convincing that one party will be unjustly enriched if allowed to retain the entire property." Maria v. Freitas, 73 Haw. 266 (1992).  Based upon the Court's finding that Plaintiff

would be unjustly enriched, a constructive trust is imposed on the $4,551,931 and Plaintiff is deemed to be holding those monies for HIE.

The court ordered, adjudged, and decreed that "Jin Sook Lee holds $4,551,931 in trust for HIE and should return such sums to HIE."

### D. Final Judgment Entered

On August 29, 1997, a final judgment was entered in the JSL litigation. Part of that judgment was against Jin Sook Lee in favor of HIE in the amount of $4,551,931.

### E. HIE Records Receivable From Jin Sook Lee

After the JSL litigation had concluded, Merwyn Manago set up a receivable from Jin Sook Lee on HIE's books. Merwyn Manago established that receivable, entitled "Due From Trustee, JSL", at the direction of Nathan Suzuki and Barney Shiotani. The receivable reported a balance due of $6,518,965 as of June 30, 1992.

## XVI. Bankruptcy Case of Jin Sook Lee

### A. Overview

In early September 1997, HIE sought to garnish assets of Jin Sook Lee and to levy against her personal and real property to collect the $4,551,931 judgment due it from the JSL litigation. On September 29, 1997, Jin Sook Lee filed a chapter 7 petition in the U.S. Bankruptcy Court for the District of Hawaii, commencing

the case of <u>In re Jin Sook Lee</u>, BK Case No. 97-03203.[38]  The
Internal Revenue Service was not initially listed as a creditor
but was added on October 2, 1997, in an amended list of
creditors.

Jerald Guben was a partner at the Hawaii law firm Reinwald
O'Connor & Playdon (Reinwald O'Connor) and specialized in
bankruptcy, reorganization, and insolvency.  In 1997, shortly
after the chapter 7 petition was filed on behalf of Jin Sook Lee,
Jerald Guben and Reinwald O'Connor were retained by HIE to
represent HIE in the bankruptcy case and, most specifically, to
collect from Jin Sook Lee's bankruptcy estate (or otherwise to
satisfy) the $4,551,931 judgment awarded HIE in the JSL
litigation.  Jerald Guben and Reinwald O'Connor continued to
represent HIE as to that matter through June 1999.

B.  <u>Property Transfers and Claims</u>

Paul Sakuda was the chapter 7 trustee in Jin Sook Lee's
bankruptcy case.[39]  On or about October 15, 1997, Jin Sook Lee
delivered to Paul Sakuda, as chapter 7 trustee, cash, cashier's
checks, and cash equivalents valued by Jin Sook Lee at the net
fair market value of $1,550,600.  Within 60 days of her filing of

---

[38]We use the term "chapter 7 petition" to refer to a
petition under ch. 7 of the Bankruptcy Code.

[39]We use the term "chapter 7 trustee" to refer to a trustee
under ch. 7 of the Bankruptcy Code.

her chapter 7 petition in the bankruptcy court, Jin Sook Lee moved that court to convert her case to one under chapter 11 of the Bankruptcy Code. In that Jin Sook Lee's bankruptcy case was then pending under chapter 7, Paul Sakuda, as chapter 7 trustee, held the assets of Jin Sook Lee in her bankruptcy estate. The motion, if granted, would have allowed Jin Sook Lee to continue to possess her assets as a "debtor in possession" under chapter 11 of the Bankruptcy Code. HIE, objecting to Jin Sook Lee's motion, asserted that Jin Sook Lee was not eligible to be such a debtor in possession because of her prepetition conduct.

On November 3, 1997, HIE filed in the bankruptcy court a "Complaint for Declaratory and Injunctive Relief that Property Be Turned over to Plaintiff Hawaiian Isle Enterprises, Inc." That filing named Paul Sakuda, as chapter 7 trustee, as a defendant and resulted under rule 7001(2) of the Federal Rules of Bankruptcy Procedure in an "adversary proceeding" docketed as Hawaiian Isles Enterprises, Inc., v. Paul Sakuda, Trustee of the Estate of Jin Sook Lee, Adv. Pro. No. 97-0142 (1997 adversary proceeding). The complaint alleged that Jin Sook Lee had no interest in the cash, cashier's checks, and cash equivalents held by Paul Sakuda, as chapter 7 trustee, in that those assets were subject to the prepetition constructive trust referenced in the judgment in the JSL litigation entered before the commencement of

Jin Sook Lee's bankruptcy case.  Thus, the complaint stated, those assets were not part of Jin Sook Lee's bankruptcy estate and should be turned over to HIE as payment of the $4,551,931 debt owed to HIE under the judgment.

On November 24, 1997, Jin Sook Lee's bankruptcy case was converted to one under chapter 11 of the Bankruptcy Code.  Eighty days later, on February 12, 1998, the Internal Revenue Service filed with the court a proof of claim asserting pursuant to 11 U.S.C. sec. 507(a)(8) an unsecured priority claim of $21,661 for unassessed 1990 Federal income tax.[40]  The only other claim filed in Jin Sook Lee's bankruptcy case was by HIE.

C.  Adversary Proceedings Commenced in 1998

On March 2, 1998, HIE commenced an adversary proceeding against Jin Sook Lee, Hawaiian Isles Enterprises, Inc. v. Lee, Adv. Pro. No. 98-0026, relating to a request that the bankruptcy court determine the dischargeability of Jin Sook Lee's debts to HIE and to the Glenn Lee Boulware Trust.  Four days later, the chapter 7 trustee and Michael Boulware each commenced a similar proceeding, Boulware v. Lee, Adv. Pro. No. 98-0029, and Boulware v. Lee, Adv. Pro. No. 98-0031, respectively.

---

[40]A proof of claim is a form that is filed with a bankruptcy court by a creditor listing the creditor's claim against the debtor and the debtor's bankruptcy estate.

D. <u>Settlement of 1997 Adversary Proceeding</u>

Paul Sakuda, as chapter 7 trustee, agreed with the relief requested by HIE in the 1997 adversary proceeding, i.e., that he turn over the disputed assets to HIE, and he moved the court on November 12, 1997, to order as much. Jin Sook Lee opposed that motion and succeeded Paul Sakuda, as chapter 7 trustee, as the defendant in the 1997 adversary proceeding. On May 8, 1998, the bankruptcy court called the motion for hearing. Present were counsel for HIE, counsel for Jin Sook Lee, counsel for Michael Boulware, and counsel for the Glenn Lee Boulware Trust. Jin Sook Lee then withdrew her opposition to the motion, and the parties in the 1997 adversary proceeding informed the bankruptcy court that they had settled their dispute underlying that proceeding.

The settlement agreement was executed by HIE and Jin Sook Lee and was reflected in a written document entered into on or about May 8, 1998 (May 1998 settlement agreement). The May 1998 settlement agreement included a specific reference to and provision for "IRS Claims", and oral notice of a hearing as to the settlement agreement was given to the United States and to the Internal Revenue Service. Neither the United States nor the Internal Revenue Service objected to the May 1998 settlement agreement. On May 11, 1998, the bankruptcy court entered an order granting the November 12, 1997, motion and incorporating

within its order the terms and conditions set forth in the settlement agreement.  That action resolved the relevant disputes of the parties in the 1997 adversary proceeding except to the extent that those disputes were at issue in the three adversary proceedings commenced in 1998.

E.  May 1998 Settlement Agreement

1.  Overview

The May 1998 settlement agreement stated that HIE would receive cash (inclusive of cash equivalents) and property valued at $2,611,062.

2.  Property Distributions

a.  Cash and Cash Equivalents

The May 1988 settlement agreement stated that all cash, cash equivalents, and accounts held by Paul Sakuda, as chapter 7 trustee, would be turned over to HIE.  Those amounts had an aggregate value of $1,546,662, plus accrued interest.

b.  Automobiles

The May 1988 settlement agreement stated that Jin Sook Lee would retain title to a Mercedes Benz but had to relinquish any claim to a Rolls Royce.  The Rolls Royce was valued at $100,000.

c.  Real Properties

The May 1998 settlement agreement stated that Jin Sook Lee would convey to HIE title to the Makaiwa house, with a

reservation of a life estate for her, and that she would convey to HIE fee title to the Atkinson condominium and to the Punahou condominium. The fee simple interest in the Makaiwa house was valued at $84,500. The values of the other two real properties were $115,000 and $310,000, respectively.

### d. Jewelry and Furs

The May 1998 settlement agreement stated that HIE would receive from Paul Sakuda, as chapter 7 trustee, title to jewelry and furs collectively valued at $204,900.

### e. Judgment Against Michael Boulware

The May 1998 settlement agreement stated that HIE would receive the $250,000 judgment against Michael Boulware received by Jin Sook Lee in the JSL litigation.

### f. Summary

In sum, the May 1998 settlement agreement stated that HIE would receive the following assets:

| | | |
|---|---:|---:|
| Cash and cash equivalents | | $1,546,662 |
| Automobile: | | |
|   Rolls Royce | | 100,000 |
| Real properties: | | |
|   Atkinson condominium | $115,000 | |
|   Makaiwa house | 84,500 | |
|   Punahou condominium | 310,000 | 509,500 |
| Jewelry and Furs | | 204,900 |
| Judgment against Michael Boulware | | 250,000 |
|   Total | | 2,611,062 |

### 3. Disbursements by HIE

HIE was required to make three disbursements from the assets turned over to it.  First, HIE was required to pay certain administrative expenses related to Jin Sook Lee's bankruptcy proceedings.  The amount of each of these expenses was relatively minimal.  Second, HIE was required to disburse $100,000 to Jin Sook Lee to "pay and satisfy any and all federal and State of Hawaii income tax liabilities for 1990 and all penalties and interest therein".  Once those liabilities were satisfied, the settlement agreement stated, Jin Sook Lee was required to provide HIE with proof of such satisfaction and could retain any portion of the $100,000 that was not needed to pay those liabilities.  Third, HIE was required to satisfy a judgment in the amount of $123,000 rendered against Jin Sook Lee in favor of the Glenn Lee Boulware Trust in the trust case; Jin Sook Lee in turn was required to relinquish her interest in that trust as a contingent beneficiary.

### F. Settlement of 1998 Adversary Proceedings

HIE, Michael Boulware, Jin Sook Lee (individually and as the former trustee of the Glenn Lee Boulware Trust), and Florence Boulware (as the then-current trustee of the Glenn Lee Boulware Trust) entered into a settlement (1999 settlement) of the subject matter of the three 1998 adversary proceedings.  Jin Sook Lee

filed an unopposed motion in the bankruptcy court, requesting that the 1999 settlement be approved.  The Internal Revenue Service did not object to the requested approval.  On June 9, 1999, the bankruptcy court approved the 1999 settlement through an Amended Order Granting Debtor Jin Sook Lee's Motion to Approve Settlement Agreement.  The 13-month delay between the 1999 settlement and the May 1998 settlement of the 1997 adversary proceeding was attributable to allowing the earlier filed case to remain open for the resolution and liquidation of the Internal Revenue Service's Federal income tax claim against Jin Sook Lee.

The 1999 settlement stated in part that HIE and Jin Sook Lee would execute a stipulated judgment in HIE's adversary proceeding in favor of HIE in the amount of $2 million and that the stipulated judgment would be good for 10 years.[41]  The 1999 settlement also stated that the parties thereto would dismiss the other two remaining adversary proceedings with prejudice.  The 1999 settlement also stated that upon the entry of the final order in Jin Sook Lee's bankruptcy case, on or about June 2000, none of the parties involved in the bankruptcy case could attempt to collect on a debt accrued before September 1997.

---

[41]The $2 million judgment to be entered for HIE supplemented the payment of $2,611,062 to be made under the earlier settlement agreement.

G. Claimed Bad Debt Deductions Related to Amounts
   Considered Due From Jin Sook Lee, Trustee

As discussed infra, HIE filed its Federal income tax returns for 199306 through 199506 in March or April 1997; HIE filed its Federal income tax return for 199706 in March 1998; and HIE filed its Federal income tax return for 199806 in October 1999. On those returns, HIE reported bad debt deductions in the following amounts in connection with its book writedown of the "Due From Trustee, JSL" account as uncollectible:

| Period Ended | Bad Debt Deduction |
|---|---|
| June 30, 1993 | $300,000 |
| June 30, 1994 | 1,000,000 |
| June 30, 1995 | 700,000 |
| June 30, 1997 | 700,000 |
| June 30, 1998 | 905,340 |

The reporting and amounts of these writeoffs came from Nathan Suzuki and Barney Shiotani. The claimed bad debts related to the portion of the $4,551,931 judgment in the JSL litigation that went unpaid.

XVII. NOL Adjustments

A. HIE's Filing of Its Federal Income Tax Returns for
   198906 Through 199906

HIE filed its Federal income tax returns for 198906 through 199906 on or about the following dates:

| Taxable Year | Filing Date |
|---|---|
| 198906 | 3/15/90 |
| 199006 | 3/24/91 |
| 199106 | 3/20/92 |
| 199206 | 3/20/93 |
| 199306 | 3/19/97 |
| 199406 | 4/8/97 |
| 199506 | 3/27/97 |
| 199606 | 3/21/97 |
| 199706 | 3/19/98 |
| 199806 | 10/1/99 |
| 199906 | 7/14/00 |

B.  Pre-199806 Reported NOLs and Applications

On its Federal income tax returns for 198906 through 199706, HIE reported the following amounts of taxable income or NOLs:

| Taxable Year | Taxable Income or NOL |
|---|---|
| 198906 | $711,246 |
| 199006 | 1,867,628 |
| 199106 | 146,663 |
| 199206 | 317,325 |
| 199306 | (30,604) |
| 199406 | 190,543 |
| 199506 | 2,013,243 |
| 199606 | (2,355,508) |
| 199706 | (439,557) |

HIE had a $788,939 NOL carryover from taxable years before 198906 and used the full amount of that carryover to offset income on its Federal income tax returns for 198906 and 199006.  HIE did not carry over any of the $30,604 NOL reported for 199306.  Of the $2,355,508 NOL reported for 199606, HIE carried back $190,543 to 199406 and $2,013,243 to 199506, leaving $151,722 of the $2,355,508 available for carryover.  With the $439,557 NOL

reported for 199706, HIE's NOL carryover from 199706 as reported on its Federal income tax returns totaled $591,279 (i.e., $151,772 from 199606 + $439,557 from 199706). HIE's Federal income tax return for 199706 did not explicitly report that HIE had any NOL carryover from prior years.

C. HIE Claims on Its Federal Income Tax Return for 199806 That Its NOL Carryover From Earlier Years Is Larger Than That Previously Reported

On its Federal income tax return for 199806, HIE reported $2,086,891 of taxable income before application of any NOL deduction, claimed a $5,718,663 NOL carryover to that year, and applied $2,086,891 of the carryover to reduce its reported taxable income for 199806 to zero. HIE did not claim NOLs on its Federal income tax returns for 198906 through 199706, as originally filed, that would generate or otherwise support the $5,718,663 NOL carryover claimed on its return for 199806. Nor did HIE file any amended Federal income tax return for the earlier years that would generate or support the claimed $5,718,663 NOL carryover. In or about June 1997, HIE amended its Federal income tax returns for 199406 and 199506 to reflect its carryback to those years of $190,543 and $2,013,243, respectively, of the originally reported $2,355,508 NOL for 199606. Those amended returns do not reflect any NOLs or other

items that would generate or support the claimed $5,718,663 NOL carryover.

The 199806 return included a statement that reported that the claimed $5,718,663 NOL carryover was attributable to the following:

| Taxable Year | Loss Sustained | Loss Previously Applied | Loss Remaining |
|---|---|---|---|
| 198906 | $1,082,577 | $1,082,577 | -0- |
| 199006 | 789,355 | 789,355 | -0- |
| 199106 | 401,319 | 401,319 | -0- |
| 199206 | 709,192 | 186,049 | $523,143 |
| 199306 | 2,056,262 | -0- | 2,056,262 |
| 199406 | 1,449,457 | -0- | 1,449,457 |
| 199606 | 1,689,801 | -0- | 1,689,801 |
| NOL carryover available this year | | | 5,718,663 |

Subsequently, HIE used the $5,718,663 NOL carryover (as modified in later years) to offset fully taxable income of $2,086,891, $541,268, $1,184,192, $324,767, and $145,145 that HIE reported for 199806 through 200206, respectively.

D.  Source of Larger NOL Carryover Reported for 199806

Merwyn Manago did not know about the specifics of the increase in the amount of the NOL carryover as calculated from HIE's Federal income tax return for taxable years before 199806 from that reported on HIE's Federal income tax return for 199806. The increase was calculated by Nathan Suzuki and Barney Shiotani during the criminal investigation of Michael Boulware and was given to HIE's tax preparer, Kobayashi Doi, to report on HIE's

tax returns.[42]  Nathan Suzuki worked for HIE, first as its
controller (immediately before Merwyn Manago) and then as an
independent contractor.  Nathan Suzuki was a classmate of Sidney
Boulware and a longtime friend of both Sidney Boulware and
Michael Boulware.  Nathan Suzuki prepared Michael Boulware's
Federal income tax returns from the 1980s through 1994 and during
1995 through 1997 worked with HIE's attorneys as a Kovel
accountant with respect to the criminal investigation.

    E.  HIE's 199906 Federal Income Tax Return

       1.  Overview

When HIE filed its Federal income tax return for 199906, it
again reported that its NOL carryover from 198906 to 199606 was
calculated on the basis of NOLs not reported on its previously
filed returns for those years.  HIE also reported on its 199906
return that its NOL carryover to 199906 was calculated using NOLs
in amounts different from those underlying the $5,718,663 NOL
carryover that it had calculated the previous year for 199806.

Specifically, HIE reported on its Federal income tax return
for 199906 that its NOL carryover to 199906 totaled $5,104,261.

_____

    [42]Kobayashi Doi was a mere pawn for Michael Boulware and the
subject corporations and accepted at face value (and without any
meaningful review) all information provided by or on behalf of
Michael Boulware and the subject corporations.

HIE included within its 199906 return a statement listing the calculation of that amount as follows:

| Taxable Year | Loss Sustained | Loss Previously Applied | Loss Remaining |
|---|---|---|---|
| 198906 | $1,408,949 | $1,408,949 | -0- |
| 199006 | 1,097,485 | 1,097,485 | -0- |
| 199106 | 511,610 | 511,610 | -0- |
| 199206 | 784,670 | 784,670 | -0- |
| 199306 | 2,642,615 | 416,083 | $2,226,532 |
| 199406 | 2,771,257 | -0- | 2,771,257 |
| 199606 | 67,207 | -0- | 67,207 |
| 199706 | 39,265 | -0- | 39,265 |
| NOL carryover available for 199906 | | | 5,104,261 |

HIE applied the reported $5,104,261 NOL carryover as follows: $541,268 to 199906; $1,184,192 to 200006; $324,767 to 200106; and $145,145 to 200206.

2. Exhibit 18-J

The record includes as Exhibit 18-J a one-page document that was prepared by Nathan Suzuki in consultation with Barney Shiotani. The document was prepared on one or more days during the period between the filings of HIE's Federal income tax returns for 199806 and 199906. The document purports to list for the relevant years the off-book activity income that respondent was claiming was unreported by HIE (as perceived by HIE's representatives through conversations with representatives of respondent), the actual income that was reported by HIE through the monthly adjustments and AJEs discussed infra, and HIE's

realization of NOLs greater than those reported on HIE's Federal income tax returns as originally filed. The amounts of the realized NOLs reported on this exhibit correspond to the amounts reported as "Loss Sustained" on the statement included in HIE's 199906 Federal income tax return.

HIE's recomputation of its NOLs is grouped into three main categories: Adjustments related to Michael Boulware's activities that were part of the evidence presented during his criminal trial (i.e., the income from the off-book activities), adjustments labeled "Cost of Sales Coffee", and adjustments relating to HIE's treatment of Hawaii tobacco tax refunds. The document shows that the reportable income and the reported income for 198906 through 200106 each total $28,471,824 and reflects HIE's view that all HIE income at issue in the criminal prosecution of Michael Boulware was actually reported by HIE. Petitioners assert that the document establishes that $21,625,236 of the $28,471,824 in monthly adjustments and AJEs was related to tobacco tax refunds and that the remaining $6,846,588 was related to HIE's reporting of income from the off-book activities ($21,625,236 + $6,846,588 = $28,471,824). Petitioners also make an alternative assertion as to HIE's reporting of income from the off-book activities. Specifically, petitioners assert, if the $6,846,588 was not included in the monthly adjustments and AJEs,

then the monthly adjustments and the amortization adjustments were overstated by $6,846,588, which was enough to cover respondent's determined unreported income from the off-book activities.

We consider Exhibit 18-J to be incredible and unreliable, and we give it no significant weight. Nor do we give any significant weight to Exhibit 2136-P, a purported updated version of Exhibit 18-J. The later exhibit states that HIE reported $3,440,904 of income greater than the amount of income that was actually reportable for 198906 through 200106. Upon our review of the credible evidence in the record, we conclude that both documents were prepared simply to attempt to support through a writing a position of Barney Shiotani that the United States could not prevail on any criminal or civil issue if Michael Boulware and HIE could make all of their income tax deficiencies "disappear".

### 3. Claim to Additional COGS

In computing the amounts reported as "Loss Sustained" on the statement included in HIE's Federal income tax return for 199906 (and on exhibit 18-J), HIE claimed an extra $1,963,973 in COGS for Kona coffee cash purchases. Petitioners have not substantiated that HIE is entitled to a larger amount of COGS than that reported as COGS on its filed returns.

F.  HIE's Position as to Its NOL Carryovers Reported for
    199806 and Later Years

    1.  Overview

HIE's NOL carryovers claimed on its Federal income tax returns for 199806 and later years are attributable to HIE's position that:  (1) HIE prematurely reported on its 198906 through 199506 Federal income tax returns approximately $21,440,000[43] of income from Hawaii tobacco tax refunds that was properly reported in, and now had to be shifted to, 199506 through 200106, and (2) "self-help" tobacco tax credits and net income from the off-book activities that were the bases of Michael Boulware's grand jury indictments were included in monthly adjustments reported on HIE's tax returns or, alternatively if the monthly adjustments did not include the referenced net income, the monthly adjustment were overreported on account of tobacco tax adjustments by an amount sufficient to cover that net income.[44]

_____

[43]We hereinafter consistently refer to the amount of refund income that HIE claims to have prematurely reported as totaling $21,440,000.  Petitioners have not been as consistent.  Our holdings herein would be the same regardless of the actual total amount of refund income that HIE claims to have prematurely reported.

[44]As discussed infra, we decline to find on the basis of the credible evidence in the record that HIE reported any of the referenced net income for Federal income tax purposes.  Merwyn Manago did not believe that the monthly adjustments included the
                                              (continued...)

### 2. HIE's Liability for Hawaii Tobacco Tax

HIE was required to pay tobacco tax to Hawaii with respect to HIE's tobacco/cigarette business, and HIE was required to file with Hawaii monthly tobacco tax returns with respect thereto. (We set forth in appendix A the relevant Hawaii statutory provisions underlying its tobacco tax.) HIE was required to report on those returns the amount of its tobacco tax liability for the month and to enclose with the return a payment of any reported liability. Before July 1, 1993, the tobacco tax liability of a wholesaler such as HIE equaled 40 percent of the total of its wholesale and retail tobacco sales for the month. After that date, the tobacco tax liability of a wholesaler such as HIE equaled at least 40 percent of that amount.

### 3. HIE's Purported Overpayment of Hawaii Tobacco Tax

Before 1989, HIE paid tobacco tax to Hawaii on the basis of the prices at which HIE sold its cigarettes to customers. In 1989, Thomas Okimoto informed Michael Boulware that some of HIE's competitors were instead computing that tax on the basis of the

---

[44](...continued)
off-book activities; he adjusted the tobacco tax returns by the full monthly adjustment amount and never tried to correct them. HIE's tax and accounting records could not have included the net income from the off-book activities; HIE's return preparer was unaware of those activities and of Michael Boulware's story that the monthly adjustments included those activities until 6 years after the start of the off-book activities.

lower cost that the competitors paid to purchase the cigarettes for resale. Michael Boulware asked Michael McCarthy for legal advice on the matter.

Later in 1989, Michael McCarthy advised Merwyn Manago and Michael Boulware that HIE had arguably miscalculated and overpaid its Hawaii tobacco tax liability in periods before 1989 (for the reasons referenced by Thomas Okimoto) and, if there was such an overpayment, that the overpayment was approximately $5 million.[45] If in fact HIE had overpaid its tobacco tax liability, Michael Boulware wanted to recover the overpayment sooner than later. Michael Boulware, however, was hesitant to notify Hawaii about his possible argument as to an overpayment (i.e., that HIE should have computed its tax on the basis of the cost that HIE paid to purchase the cigarettes for resale, rather than of the prices at which HIE sold its cigarettes to customers) because he thought that Hawaii would review the merits of the argument and disagree with it. Michael McCarthy told Michael Boulware and Merwyn Manago that over time HIE arguably could discreetly recover any perceived overpaid Hawaii tobacco tax through "self-help"; in

---

[45]The record contains no credible evidence establishing any specific amount of tobacco tax HIE purportedly overpaid before 1989 or the precise years of any such overpayment. Nor has HIE stated consistently the specific amount of tobacco tax it claims to have overpaid.

other words, by understating its tobacco tax liabilities for the then-current and future months without notifying Hawaii.  Michael McCarthy made no earnest attempt to discuss this issue with anyone working for Hawaii.  Nor did HIE or any of its other representatives make an earnest attempt to do so.

The self-help method described by Michael McCarthy was not an appropriate method to claim a refund of Hawaii tobacco taxes. From 1989, the recognized procedure to claim a refund of overpaid Hawaii tobacco tax was to file an amended return with the Hawaii Department of Taxation.  Hawaii did not have a specific form (such as a Form 1040-X, Amended Return), on which to file such an amended return.

### 4.  Tobacco Tax Liability Adjustment

Merwyn Manago prepared and filed HIE's monthly tobacco tax returns for February 1989 through at least June 1995.  Without notifying Hawaii, Michael Boulware caused each of those returns to underreport the amount of that month's tobacco sales (and thus HIE's Hawaii tobacco tax liability for that month) to take into account an adjustment to HIE's tobacco tax liability (tobacco tax liability adjustment).  Michael Boulware, who had no accounting background, gave the amounts of the tobacco tax liability adjustments to Merwyn Manago without any supporting documentation and instructed Merwyn Manago to incorporate those adjustments

into the returns by reducing the actual amounts of HIE's tobacco sales reported on those returns. For each of those months, Merwyn Manago reduced the amount of tobacco sales that HIE reported on its monthly tobacco tax return so as achieve the requested reduction in tobacco tax liability. HIE then reported to Hawaii that HIE's actual tobacco sales for the month was the amount of the tobacco sales as reduced by Merwyn Manago. HIE (through Merwyn Manago) included in its cost of sales the amount of tobacco tax owed to Hawaii as computed on the reduced sales. Merwyn Manago neither asked Michael Boulware about the specifics of the tobacco tax liability adjustments nor attempted on his own to verify or recalculate those adjustments. For 198906 through 199506, the tobacco tax liability adjustments totaled $1,400,000, $3,320,000, $1,960,000, $2,420,000, $4,280,000, $4,510,000, and $3,550,000, respectively, or $21,440,000 collectively. (We set forth in appendix B the amounts underlying these annual amounts.)

None of the referenced tobacco tax returns showed the actual gross tobacco sales for a month, showed the tobacco tax liability adjustment reported for the month, or indicated that HIE was offsetting its current tobacco tax liability by any perceived prior overpayment. The Hawaii monthly tobacco tax return, Form M-19 (rev. 1971), did not change between 1971 and June 1993 and had at the bottom a line entitled "Adjustments (Explain Fully)".

As to each of the referenced tobacco tax returns, HIE did not use this line to disclose to Hawaii that HIE was adjusting the amount of its actual tobacco tax sales or a reason why HIE was doing so. In other instances, HIE typed specific unrelated adjustments on the returns with explanations.

During some of the period HIE was underreporting its tobacco sales, HIE was on a payment plan to Hawaii as to tobacco taxes that were past due. The payment plan started sometime in the early 1990s.

### 5.  HIE's Monthly Book Adjustments

For each of the months from February 1989 through June 1995, HIE incorporated the corresponding tobacco tax liability adjustment into its books through monthly adjustments that reduced the actual amount of HIE's tobacco sales to the amount reported on that month's tobacco tax return and increased the amount of HIE's nontobacco sales by an amount corresponding to that of the reduction. Initially, Nathan Suzuki, the controller at the time, showed Sidney Boulware, who lacked an accounting background, how to compute the amount of tobacco sales that needed to be recharacterized as nontobacco sales in order to correspond to the tobacco tax liability adjustment supplied by Michael Boulware. Later, Merwyn Manago did the monthly

recharacterization calculation and reflected that calculation in HIE's books.

HIE's regular practice was to record the amount of tobacco taxes payable by HIE to Hawaii as a debit to HIE's purchase account (pertaining to tobacco) and a credit to HIE's tobacco taxes payable account.  In order to reflect the monthly adjustments, Merwyn Manago recorded the amounts in those accounts for each month as what otherwise would have been the proper amounts for that month less the monthly adjustment.  The amounts in the purchase and payable accounts, therefore, reflected the amount of tobacco tax that HIE would actually pay to Hawaii for each month.

      6.  HIE's AJEs

In 1997, Nathan Suzuki, with assistance by Barney Shiotani, devised and began preparing AJEs for HIE to make either to report additional income or to appear to report additional income. These AJEs were confusing on their face, and they were unintelligible in their descriptions as to their purpose.  Many of the AJEs were intended in part to attempt to persuade the jury in the JSL litigation that HIE viewed the funds at issue there as owed to HIE by Jin Sook Lee, without alerting the jury that the AJEs had just recently been recorded.  One group of the AJEs was designed in part to record as a loan to Michael Boulware the

unreported income uncovered by Jerry Yamachika. Another group of the AJEs was labeled by HIE "amortization adjustments". Similar to the monthly adjustments, these amortization adjustments reduced (debited) HIE's tobacco tax liability to Hawaii and did not include an offsetting credit to any income account of HIE. The effect of the amortization adjustments was that the adjustments reported HIE's tobacco tax expense to the amount of tobacco tax that was actually paid.

Beginning in or about 1997, Merwyn Manago began entering the AJEs into HIE's books at the direction of Nathan Suzuki and Barney Shiotani. Merwyn Manago did not independently verify the numbers in any of the AJEs, nor was he sure of their accuracy. Among other things, the AJEs reclassified some of the monthly adjustments that Merwyn Manago had previously recorded in HIE's books.

On its 200006 and 200106 Federal income tax returns, HIE reported amortization adjustments of $1,927,648 and $962,426, respectively, as "Forgiveness of Debt--Tobacco Taxes".

       7. Tobacco Tax Refund Income Claimed Reported and Reportable by HIE

          a. Income Claimed Reportable

Petitioners claim that the tobacco tax refund income was properly reportable by HIE in 198906 through 200106 as follows:

```
198906            -0-
199006            -0-
199106            -0-
199206            -0-
199306            -0-
199406            -0-
199506      $3,095,400
199606       2,773,800
199706       1,648,200
199806       3,638,100
199906       4,347,000
200006       4,055,600
200106       1,850,000
            21,408,100
```

b.  Income Claimed Reported Through Monthly Adjustments

Petitioners claim that HIE from 198906 through 199506 reported the following amounts of income from tobacco tax refunds:

```
198906      $1,420,939
199006       3,393,432
199106       1,890,360
199206       2,496,304
199306       4,364,201
199406       2,831,800
199506       2,050,000
            18,447,036
```

Petitioners claim that HIE reported those amounts as income through their posting of the $21,440,000 of monthly adjustments, which they later reduced to $18,447,036 by two AJEs in the amounts of $1.7 million and $1.5 million made for 199406 and 199506, respectively.

### c.  Income Claimed Reported Through AJEs

Petitioners claim that HIE from 199506 through 200106 reported through the AJEs the following amounts as "amortization adjustments" related to tobacco tax refunds income, on the basis of its view that this income was reportable as the Hawaii period of limitations (as to its tobacco tax) expired:

| | |
|---|---|
| 199406 | $230,000 |
| 199506 | 1,074,875 |
| 199606 | 1,294,293 |
| 199706 | 1,739,529 |
| 199806 | 4,276,360 |
| 199906 | 1,442,274 |
| 200006 | 1,927,648 |
| 200106 | 962,426 |
| | 12,947,405 |

### d.  Summary

In sum, petitioners' view as to the reported and reportable income from HIE's tobacco tax refund income is as follows:

| | Monthly Adjustments | AJEs | Reported Income | Reportable Income |
|---|---|---|---|---|
| 198906 | $1,420,939 | -0- | $1,420,939 | -0- |
| 199006 | 3,393,432 | -0- | 3,393,432 | -0- |
| 199106 | 1,890,360 | -0- | 1,890,360 | -0- |
| 199206 | 2,496,304 | -0- | 2,496,304 | -0- |
| 199306 | 4,364,201 | -0- | 4,364,201 | -0- |
| 199406 | 2,831,800 | $230,000 | 3,061,800 | -0- |
| 199506 | 2,050,000 | 1,074,875 | 3,124,875 | $3,095,400 |
| 199606 | -0- | 1,294,293 | 1,294,293 | 2,773,800 |
| 199706 | -0- | 1,739,529 | 1,739,529 | 1,648,200 |
| 199806 | -0- | 4,276,360 | 4,276,360 | 3,638,100 |
| 199906 | -0- | 1,442,274 | 1,442,274 | 4,347,000 |
| 200006 | -0- | 1,927,648 | 1,927,648 | 4,055,600 |
| 200106 | -0- | 962,426 | 962,426 | 1,850,000 |
| | 18,447,036 | 12,947,405 | 31,394,441 | 21,408,100 |

8. HIE's Purported Income Shift

HIE moved the purported tobacco tax self-help credits from earlier years (198906 thru 199506) to later years (199506 to 200106), thus generating the NOL carryover claimed in 199806. Respondent determined in the applicable NOD that HIE was not entitled to shift its tobacco tax credits from earlier to later years and thus disallowed the resulting NOL and reduced HIE's income for 200006 and 200106 (the non-NOL years) by $1,927,648 and $962,426, respectively. These are amounts HIE purports to have already reported for the non-NOL years above the amount it shows it was supposed to report even absent a timing shift. The NOD notes that HIE is entitled only to these $1,927,648 and $962,426 adjustments if respondent's disallowance of the NOL is sustained.

XVIII. Michael Boulware's Criminal Trials

A. First Trial

1. General Information

In November 2001, Michael Boulware was criminally tried for the first time as to the 11 remaining counts stemming from the subject matter of the criminal investigation.

2. Relevant Evidence and Arguments

At Michael Boulware's first trial, the United States presented evidence relevant to HIE's corporate taxes and

corporate activities.  Michael Boulware maintained that transfers of moneys from HIE, which the United States alleged were for Michael Boulware's benefit, were actually for corporate purposes. Michael Boulware maintained, as petitioners argue here, that all amounts charged as income to Michael Boulware were reported by HIE.

### 2. Jury Verdict

On November 29, 2001, following a 6-day trial by jury and 2-1/2 days of jury deliberation, the jury convicted Michael Boulware on all nine tax counts.  The jury also convicted Michael Boulware on the single count under 18 U.S.C. section 1014 of conspiring to make a false statement to influence a federally insured financial institution.  The jury acquitted Michael Boulware of the substantive false statement count.

The tax counts related in part to the funds that Michael Boulware diverted from HIE and failed to report on his personal Federal income tax returns or to pay taxes on.  The indictment alleged that the unreported income included over $1.7 million that Michael Boulware received from nominee entities and bank accounts located in the Kingdom of Tonga and Hong Kong.[46]

---

[46]Michael Boulware asserts that the $1.7 million was not income to him because he borrowed that money from Harold Okimoto. We find that assertion incredible and decline to find the

(continued...)

Michael Boulware's remaining convictions related to the fraudulent leasing scheme involving HIE and GECC.

B.   Sentencing Phase and First Appeal

1.   Positions as to Sentencing

At the sentencing phase, respondent prepared and caused to be included in the presentence report as relevant conduct an analysis wherein respondent asserted that HIE failed to report $9,281,970 of income in addition to the tax losses stemming from an underreporting of income by Michael Boulware.  The United States advocated this position.  Counsel for Michael Boulware tried to establish that HIE had fully reported all of the income that the United States alleged had been underreported.

Respondent also asserted and caused to be inserted in the presentence report as relevant conduct that the monthly adjustments by HIE caused a $21,402,640 tobacco tax loss to Hawaii.  The United States advocated this position.  Counsel for Michael Boulware tried to establish that HIE had not caused any tobacco tax loss to Hawaii.

2.   Sentence Imposed

The U.S. District Court sentenced Michael Boulware to a 36-month term of imprisonment on each of the false tax return

---

[46](...continued)
assertion as a fact.

counts, a 51-month term on each of the tax evasion counts, and a 51-month term on the conspiracy count, all terms to run concurrently. The court also imposed a 3-year term of supervised release, fines, and forfeiture of $495,814.

### 3. Appeal of Conviction

In May 2002, Michael Boulware appealed his criminal conviction to the U.S. Court of Appeals for the Ninth Circuit. On September 14, 2004, that court filed its opinion in United States v. Boulware, 384 F.3d 794 (9th Cir. 2004), which reversed and remanded Michael Boulware's conviction on all nine tax counts because certain evidence was improperly withheld from the jury. The withheld evidence consisted of the judgment in the JSL litigation wherein Jin Sook Lee was found to have received in constructive trust for HIE, and not as a gift, the money Michael Boulware had given her. The U.S. Court of Appeals for the Ninth Circuit affirmed the conspiracy conviction but remanded that count to the U.S. District Court for resentencing.

### C. Michael Boulware's Retrial

The United States retried Michael Boulware on the nine tax counts for which he had been convicted at his first trial; i.e., five counts of filing false Federal income tax returns for 1989 through 1993 and four counts of tax evasion for 1994 through 1997. On July 15, 2005, Michael Boulware was convicted a second

time on all of those counts following a 9-day trial and 2 days of deliberation. The U.S. District Court again sentenced Boulware to 36 months' imprisonment on the false return counts, but increased the sentence from 51 to 60 months on the tax evasion and conspiracy counts, all to run concurrently. The U.S. Court of Appeals for the Ninth Circuit later affirmed that second conviction upon appeal. See United States v. Boulware, 470 F.3d 931 (9th Cir. 2006), vacated and remanded 552 U.S. ___, 128 S. Ct. 1168 (2008). In so doing, the U.S. Court of Appeals for the Ninth Circuit held that a criminal defendant such as Michael Boulware could rely upon a return of capital defense as to the taxability of funds diverted from a corporation only if it was intended at the time of diversion that the funds be a return of capital. See id. at 933-935.

D. Criminal Case Heard by U.S. Supreme Court

On May 11, 2007, Michael Boulware petitioned the U.S. Supreme Court for a writ of certiorari to the U.S. Court of Appeals for the Ninth Circuit. The petition asked the U.S. Supreme Court to decide the following two questions:

> 1. What effect must a federal court give a final, non-collusive state court judgment adjudicating ownership of property in determining a taxpayer's federal income tax liability arising from that property?

2. "Whether a taxpayer who seeks to invoke the return of capital rule in a criminal tax case must show a contemporaneous intent to treat the corporate distribution as a return of capital?" * * *

On September 25, 2007, the U.S. Supreme Court granted Michael Boulware's petition limited to the following question:

Whether the diversion of corporate funds to a shareholder of a corporation without earnings and profits automatically qualifies as a non-taxable return of capital up to the shareholder's stock basis, see 26 U.S.C. § 301(c)(2), even if the diversion was not intended as a return of capital.

See Boulware v. United States, 552 U.S. ___, 128 S. Ct. 32 (2007).

On March 3, 2008, the U.S. Supreme Court decided in Boulware v. United States, 552 U.S. ___, 128 S. Ct. 1168 (2008), that a distributee accused of criminal tax evasion may claim return-of-capital treatment without producing evidence that either he or the corporation intended a capital return when the distribution occurred. On the basis of that opinion, the U.S. Supreme Court vacated the judgment of the U.S. Court of Appeals for the Ninth Circuit and remanded the case to the U.S. Court of Appeals for the Ninth Circuit for further proceedings consistent with the Supreme Court's opinion. Id.

E.   Remand From U.S. Supreme Court

Upon remand from the U.S. Supreme Court, the U.S. Court of Appeals for the Ninth Circuit filed its opinion in United States

v. Boulware, 558 F.3d 971 (9th Cir. 2009).  The court decided in that opinion whether Michael Boulware's offer of proof was sufficient to justify the presentation of a return of capital theory to the jury in his second criminal trial.  The court held it was not and affirmed the judgment of the U.S. District Court.

XIX.  Civil Examinations and Requests for Information

A.  Start of Civil Examinations

In July 2002, respondent began a civil Federal income tax examination of HIE for 199806 through 200206.  Three months later, in October 2002, respondent began a civil Federal income tax examination of Holdings and its subsidiaries for 199806 through 200206.  In or about May 2004, respondent began a civil Federal income tax examination of Michael Boulware's 1998 through 2002 taxable years.

B.  Requests for Information

1.  HIE

During the civil examination of HIE, respondent gave to HIE written requests for documents and related information.  The requests sought documents from HIE that would support its professional fees deductions for 199406 through 199706.  Subsequently, on December 11, 2003, after the written requests were not honored fully by HIE, respondent served a summons upon Sidney Boulware in his capacity as HIE's president.  The summons

requested documents that substantiated HIE's professional fees deductions for 199406 through 199706 and 200006 through 200206. The summons requested information regarding the bad debt deduction, the activities of Michael Boulware that were the subject of his criminal trial, the deductions for the salary payments to Mal Sun Boulware, and the reported businesses Paradise Roasting and Video Consultant. Shortly thereafter, before Michael Boulware or HIE had produced any of the documents referenced in the summons, Michael Boulware petitioned the U.S. District Court for the District of Hawaii to quash the summons. HIE joined in that petition. On January 30, 2004, the U.S. District Court dismissed that petition for lack of jurisdiction, holding that neither Michael Boulware nor HIE was authorized to petition the court to quash the summons.

On April 21, 2004, the United States petitioned the U.S. District Court to enforce the summons. Michael Boulware moved to intervene and requested an evidentiary hearing. Following a hearing on the matter, a magistrate judge found that the summons met the requirements established in United States v. Powell, 379 U.S. 48 (1964), and that HIE failed to show that the summons was issued in bad faith or as an abuse of process. The magistrate judge recommended that the petition to enforce the summons be

granted and that Michael Boulware's motion to intervene be denied.

Michael Boulware and HIE objected to the findings and recommendation of the magistrate judge. On September 20, 2004, the U.S. District Court for the District of Hawaii denied the objections and ordered that the summons be enforced. See United States v. Boulware, 350 F. Supp. 2d 837 (D. Haw. 2004), affd. 203 Fed. Appx. 170 (9th Cir. 2006). Michael Boulware appealed the judgments of the U.S. District Court to the U.S. Court of Appeals for the Ninth Circuit. Those judgments were affirmed by that court on October 19, 2006. See United States v. Boulware, 203 Fed. Appx. 170 (9th Cir. 2006); see also Boulware v. United States, 203 Fed. Appx. 172 (9th Cir. 2006). On or about February 22, 2006, after the NOD as to HIE was issued and the related case was commenced in this Court, petitioners produced to respondent invoices within the subject matter described in the summons.

### 2. Holdings

Holdings paid many of the legal fees deducted by HIE. On June 9, 2003, respondent issued Holdings an information document asking for a schedule of professional fees and certain professional fee invoices for 200006 through 200206, some of which were deducted by HIE. For each invoice for which the business reason for the fee was not clearly indicated on the

invoice, respondent requested an explanation of the purpose of the professional fee. Holdings did not produce the requested information at that time.

On December 11, 2003, respondent served a summons upon Sidney Boulware in his capacity as president of Holdings. The summons directed Sidney Boulware to appear, to give testimony, and to produce for examination certain books, papers, records, or other data described in the summons. Respondent requested in the summons, inter alia, a summary of the professional fees Holdings deducted during 19906 through 200206; all invoices, agreements, contracts, engagement letters, correspondence, memoranda, and schedules to support the professional fees; and documentation to substantiate the allocation to HIE of professional fees paid by Holdings. Holdings partially complied with the summons by supplying some substantiation for the professional fees that it deducted for 199906 through 200106. Holdings did not supply any substantiation for the professional fees expense that it deducted for 200206, and Holdings did not at that time supply any substantiation for the allocation of professional fees to HIE.

On April 21, 2004, the United States moved to enforce the summons. Two days later, the matter was set for an order to show cause hearing. On May 14, 2004, Holdings filed with the U.S. District Court a memorandum in opposition to the petition to

enforce the summons, and Michael Boulware filed with the U.S. District Court a cross-motion for intervention and for evidentiary hearing.  Michael Boulware at that time also filed with the U.S. District Court a memorandum in support of cross-motion and in opposition to order to show cause.  On June 1, 2004, a hearing on the order to show cause was held before a magistrate judge.  On day later, the magistrate judge issued his findings and recommendation that the petition to enforce the summons be granted.

On August 16, 2004, Michael Boulware filed an objection to the findings and recommendation of the magistrate judge.  On November 16, 2004, the U.S. District Court for the District of Hawaii affirmed those findings and recommendation and denied Michael Boulware's cross-motion.  Four weeks later, Michael Boulware appealed the judgments of the U.S. District Court to the U.S. Court of Appeals for the Ninth Circuit.  Those judgments were affirmed by that court on October 19, 2006.  See United States v. Boulware, 203 Fed. Appx. 168 (9th Cir. 2006); see also Boulware v. United States, 203 Fed. Appx. 172 (9th Cir. 2006). On or about February 22, 2006, after the NOD was issued to Holdings and the related case was commenced in this Court, petitioners produced to respondent invoices within the subject matter described in the summons.

### 3. Actions During This Proceeding

During this proceeding, petitioners have given respondent what petitioners claim are 10,000 invoices that substantiate the legal fees HIE and Holdings paid for 199806 through 200206.

## XX. Professional Fees

### A. Overview

Starting on or about June 30, 1996, the professional fees of the subject corporations and their subsidiaries were generally paid by Holdings, regardless of who actually incurred the fees. The subject corporations are separate entities that are located on the same premises and that share the same accounting offices and other overhead. Initially, Holdings also paid HIE's other administrative expenses.

On a yearly basis, Holdings allocated to HIE a portion of the total professional fees and administrative expenses that Holdings paid during the year. The specific percentage that was applied to allocate those expenses was ascertained by the management of the subject corporations. When the allocation was made, a receivable was booked in the same amount as owing by HIE to Holdings.

For 199906, 200006, and 200206, Holdings paid all of the professional fees for the subject corporations, and portions of those fees were allocated to HIE. The portion of the fees

allocated to HIE for each of those respective years was 76 percent, 81.5 percent, and 45 percent.  For 199806 and 200006 through 200206, the total amounts that HIE deducted as "professional fees" and "O/H allocations" and respondent's adjustments (in the NOD issued to HIE) to those amounts are set forth below:

| Taxable Year | Reported Deduction | Deduction Allowed | Adjustment |
|---|---|---|---|
| 199806 | $2,745,685 | $1,503,690 | $1,241,995 |
| 200006 | 3,356,440 | 2,196,805 | 1,159,635 |
| 200106 | 3,405,235 | 2,248,871 | 1,156,364 |
| 200206 | 2,208,588 | -0- | 2,208,588 |

For 199406 through 199706, the amounts that HIE deducted for professional services through its claimed NOL deductions and respondent's adjustments (in the NOD issued to HIE) are set forth below:

| Taxable Year | Reported Deduction | Deduction Allowed | Adjustment |
|---|---|---|---|
| 199406 | $599,644 | $77,954 | $521,690 |
| 199506 | 1,038,730 | 135,035 | 903,695 |
| 199606 | 1,490,009 | 193,701 | 1,296,308 |
| 199706 | 1,779,640 | 231,353 | 1,548,287 |

B.  Source of Professional Fees

1.  HIE

During 199306 through 199506, 199706, 199806, and 200006 through 200206, HIE deducted professional fees related to: (1) The criminal investigation, the grand jury proceedings, and

the first criminal trial of Michael Boulware; (2) Michael Boulware's uncontested divorce proceeding; (3) the JSL litigation; (4) the 1997 adversary proceeding; (5) the trust case; and (6) other matters.

### 2. Holdings

During 199906 through 200206, Holdings deducted professional fees related to: (1) The criminal investigation, the grand jury proceedings, and the first criminal trial of Michael Boulware; (2) Michael Boulware's uncontested divorce proceeding; (3) the JSL litigation; (4) the 1997 adversary proceeding; (5) the trust case; and (6) other matters.

## C. Categories of Disputed Professional Fees

### 1. Overview

The parties agree on six categories that the disputed professional fees may be grouped into. These categories are: (1) Fees related to the criminal investigation, (2) fees related to the grand jury proceedings, (3) fees related to Michael Boulware's first criminal trial, (4) fees involving the litigation initiated by Jin Sook Lee, (5) fees that are not included in any of the just-mentioned four categories and that respondent concedes are ordinary and necessary expenses of some entity, but not necessarily deductible, and (6) the remaining (other) fees.

## 2. Specifics of Expenses in Each Category

### a. Criminal Investigation

The expenses in this category are for the legal and other professional services related to the criminal investigation. These services include all such legal and other professional services provided from on or about June 16, 1993, up through the start of the grand jury proceedings in or about the beginning of August 1997. Respondent disallowed the deduction of these amounts. Petitioners argue primarily that these amounts are deductible in their entirety by either HIE or Holdings because both Michael Boulware and the subject corporations were potential targets of the criminal investigation and benefited from these services.

### b. Grand Jury Proceedings

The expenses in this category are for the legal and professional services related to the grand jury proceedings up though Michael Boulware's initial indictment on May 19, 1999 (and in some cases related to the grand jury proceedings afterwards up through the superseding indictment and through the second superseding indictment on April 6, 2000, and February 14, 2001, respectively). Respondent disallowed the deduction of these amounts. Petitioners argue primarily that these amounts are deductible in their entirety by either HIE or Holdings because

both Michael Boulware and the subject corporations were potential targets of the investigation and benefited from these services.

### c.   Michael Boulware's Criminal Trial

The expenses in this category are for the legal and professional services related to Michael Boulware's first criminal trial (including his sentencing and his appeal of his conviction in that trial) generally to the extent that the underlying expenses were incurred after Michael Boulware's indictment; the expenses also are for services provided before his indictment but related to matter to be used at his first trial.  Respondent disallowed the deduction of these amounts. Petitioners argue that these amounts are deductible in their entirety by either HIE or Holdings because the subject corporations were still potential targets and benefited from these services.  Petitioners also argue that these amounts were paid pursuant to the subject corporations' obligation to indemnify Michael Boulware.

### d.   Fees Involving Jin Sook Lee

The expenses in this category are for the legal and professional services related to the civil litigation initiated by Jin Sook Lee and to her bankruptcy proceedings.  Respondent disallowed some of these fees and required that the remaining fees be capitalized as incident to the acquisition of property

from Jin Sook Lee's bankruptcy estate.  Petitioners argue that these amounts are deductible in their entirety by HIE because HIE was the real party in interest in all of that litigation.

### e.  Fees Accepted as Ordinary and Necessary

The expenses in this category are for legal and professional services and are the ordinary and necessary business expenses of either HIE or Holdings, but respondent determined petitioners had not substantiated which entity incurred the expenses or which entity deducted the expenses.  Petitioners argue that these amounts are deductible in their entirety by the entity that claimed the deduction.

### f.  Other Fees

The expenses in this category are for the remaining legal and professional services that do not fit within any of the other categories.  Respondent disallowed deductions for these fees. Petitioners argue that these amounts are deductible in their entirety by either HIE or Holdings as ordinary and necessary business expenses.

### 3.  Amounts of Fees Attributable to Each Category

We set forth in appendix C the amounts that we attribute to each category.

D.  Providers of the Professional Services Underlying the Legal Costs

1.  Criminal Investigation

a.  Representation of HIE Employees

i.  Overview

In connection with the criminal investigation, HIE retained two attorneys to represent some of its employees as to matters arising from the investigation.

ii.  Peter Wolff

In December 1994, HIE retained and paid Peter Wolff, Jr. (Peter Wolff), a criminal defense attorney, to represent Merwyn Manago in his interview by Jerry Yamachika.  The interview was related to the criminal investigation.  Peter Wolff's sole client in the criminal investigation was Merwyn Manago.  Peter Wolff represented Merwyn Manago in the criminal investigation through no later than 1996.

iii.  Benjamin Cassidy

On October 17, 1995, Martin Gelfand advised Michael Boulware to cause HIE to hire and pay for an attorney to represent Stanley Hirai and two other HIE employees, Morris Miyasato and Milton Ikeda, as to their interviews by Jerry Yamachika in connection with the criminal investigation.  Martin Gelfand informed Michael Boulware and HIE that the employees were entitled to

representation and that it was customary for HIE, as their employer, to pay their legal fees. HIE's management also was informed that HIE and certain of its employees could become targets of the criminal investigation and that an employer in such a situation commonly hires counsel to represent the interests of its employees and not the interests of the company.

One or both of the subject corporations retained an attorney, Benjamin B. Cassidy III (Benjamin Cassidy), for that purpose. Benjamin Cassidy charged a flat $5,000 for his services, which was paid by Holdings on December 18, 1997. The clients to whom Benjamin Cassiday rendered his services were Morris Miyasota, Stanley Hirai, and Milton Ikeda.

b. <u>Damon Key</u>

Michael Yoshida, an attorney, and his law firm Damon Key were retained as an adviser to Michael Boulware as to the criminal investigation. For the most part, Michael Yoshida and Damon Key produced HIE's records in response to document requests and subpoenas and advised Michael Boulware as to his criminal defense and with respect to mail fraud. Michael Yoshida and Damon Key also discussed those issues with Barney Shiotani in order to present a solid defense for Michael Boulware. For July 1997, Damon Key charged $13,874.12 for services that it performed in connection with the criminal investigation. Damon Key

performed those services on behalf of its client, Michael Boulware. The charge for those services was paid by Holdings.

After Michael Boulware was indicted but before his criminal trial, Michael Boulware asked Michael Yoshida to offer to give legal work to Blake Okimoto. When Michael Yoshida appeared to testify in this proceeding, the Court sustained his claim to decline to answer certain questions related to Blake Okimoto on the basis of the Self-Incrimination Clause of the Fifth Amendment to the U.S. Constitution.

### c. Irell Manella

In 1993, Michael Boulware retained Martin Gelfand and his law firm Irell Manella to represent Michael Boulware in connection with the criminal investigation. For services that were provided in 199806 with respect to the criminal investigation, Martin Gelfand and his firm charged $15,279.94. Martin Gelfand's client as to those services was Michael Boulware. The charge for those services was paid by Holdings.

### d. Shiotani Inouye

Barney Shiotani and his firm Shiotani & Inouye (Shiotani Inouye) advised Michael Boulware and HIE on tax matters related to the criminal investigation. For 199806, Shiotani Inouye charged $356,826.59 for a range of services that it provided to

Michael Boulware or to Michael Boulware and HIE jointly.[47]  Those charges related to the criminal investigation and were paid by Holdings.  Of the $356,826.59, $25,073.13 related mainly to meetings, document preparation, and document review that Shiotani Inouye undertook solely on behalf of Michael Boulware.  The remaining $331,653.46 related to services that Shiotani Inouye (or its Kovel accountant Nathan Suzuki) provided to Michael Boulware and HIE jointly.  Of the $331,653.46, $259,355.24 related mainly to meetings, document preparation, and document review undertaken by Shiotani Inouye, and $72,298.22 consisted of accounting and consulting services provided by Nathan Suzuki.

### e.  Wachi Watanabe

During 199806, Stanley Wachi and his accounting firm, Wachi & Watanabe, CPA, Inc. (Wachi Watanabe), charged $3,986.95 for accounting services that it provided as to the criminal investigation.  The services were performed from July 3 through 18, 1997, and concerned the fictitious leasing transactions between HIE and GECC.  The charge for those services was paid by Holdings.  The clients on whose behalf those services were performed were Michael Boulware and HIE jointly.

---

[47]In some cases, such as here, a professional provided a service to one or more clients jointly.

## 2. Grand Jury Proceedings

### a. Birney Bervar

Birney Bervar was a criminal defense attorney who in March 2000 was retained by HIE (through one of its attorneys, Lyle Hosoda) to represent Stanley Hirai in interviews with the U.S. Attorney's Office and as to any subsequent testimony that Stanley Hirai could be subpoenaed to give before the grand jury during the grand jury proceeding. HIE agreed to pay for Birney Bervar's representation of Stanley Hirai. Birney Bervar clarified to Lyle Hosoda, on behalf of HIE, that this arrangement did not change the fact that Birney Bervar's sole client was Stanley Hirai. During 200106, Birney Bervar charged a flat fee of $5,000 for his services. His client as to that fee was Stanley Hirai. The fee was paid by Holdings.

### b. Brook Hart

Brook Hart was a criminal defense attorney who was retained by HIE to represent Merwyn Manago in 1998 in interviews with the U.S. Attorney's Office and with regard to his grand jury testimony. Brook Hart was retained after Peter Wolff was unable to continue that representation. During 199806, 199906, and 200006, Brook Hart charged $13,049.23, $7,712.85, and $4,532.77, respectively, for those services. Holdings paid those charges. Brook Hart's client was Merwyn Manago.

Brook Hart believed that HIE could or might be a target of the grand jury investigation, and he understood that there were several potential targets, including HIE (if in fact HIE was not already a target), Merwyn Manago, and possibly others.  As part of his representation of Merwyn Manago, Brook Hart negotiated an immunity agreement for Merwyn Manago.  At a meeting on April 27, 1998, Brook Hart made a proffer on behalf of Merwyn Manago, following which Merwyn Manago disclosed, for the first time, the monthly adjustments he made at the direction of Michael Boulware. Thereafter, Merwyn Manago provided the documents related to the monthly adjustments, was given immunity, and then was questioned in front of the grand jury regarding the monthly adjustments.

### c.  Chee Markham

During 200006, Kevin Chee of the law firm Chee & Markham (Chee Markham) represented Mal Sun Boulware as to her involvement in the grand jury proceedings.  Kevin Chee and his firm charged $2,806.88 for that representation.  Holdings paid that charge. Kevin Chee's and Chee Markham's client as to this charge was Mal Sun Boulware.

### d.  Damon Key

After the criminal investigation was referred to the grand jury, Damon Key continued to advise Michael Boulware as to the grand jury proceedings and began to a limited extent to represent

HIE as to those proceedings as well.  During 199806 and 199906, Damon Key charged $122,706.28 and $173,275.20 as to the grand jury proceedings.  Holdings paid those charges.  Of the $122,706.28, $121,214.19 related to services provided to Michael Boulware as the client of Damon Key.  The balance, $1,492.09, related to services provided to HIE as the client of Damon Key. The $173,275.20 related entirely to services provided to Michael Boulware as the client of Damon Key.

### e.  Graham James

In April 1997, William James, a business and tax attorney/litigator, and his law firm Graham & James LLP (Graham James) were contacted by Barney Shiotani and retained to represent HIE and Michael Boulware from April 1997 through April 2000.  William James and his firm were retained primarily to provide tax advice to Michael Boulware and to HIE as to the grand jury proceedings and subsequently as to Michael Boulware's first criminal trial.  William James met initially with Barney Shiotani.  During that meeting, Barney Shiotani expressed his view that the United States could not prevail on any criminal or civil issue if Michael Boulware and HIE could make all deficiencies "disappear".  Barney Shiotani explained a theory that, if established, he believed would make the deficiencies disappear.

William James generally did not meet with Michael Boulware but advised other attorneys working for Michael Boulware or for HIE as to tax issues that might affect Michael Boulware, as well as other issues that might affect Michael Boulware such as issues arising from his first criminal trial and sentencing. William James advised Michael Boulware on a proposed plea agreement between Michael Boulware and the U.S. Attorney's Office. William James advised Michael Boulware on sentencing enhancements. William James advised Michael Boulware on pretrial motions in his first criminal trial. William James advised Michael Boulware in his first trial on the disqualification of Dennis O'Connor, Sr. (Dennis O'Connor), and his law firm Reinwald O'Connor from representing Michael Boulware at that trial (discussed infra). William James provided Michael Boulware and HIE with legal advice concerning the civil and criminal tax implications of Michael Boulware's lawsuits against Jin Sook Lee.

The costs of the services of William James and his firm were $56,848.50, $65,403.96, and $53,977.76 during 199806, 199906, and 200006, respectively. The services underlying the $56,848.50 related to the grand jury proceeding, and the services underlying the $53,977.76 related to Michael Boulware's criminal trial. Of the $65,403.96, $41,371.59 related to the grand jury proceedings and the balance of $24,032.37 related to Michael Boulware's

criminal trial. Michael Boulware and HIE were joint clients as to the $56,848.50 and the $65,403.96, and Michael Boulware was the sole client as to the $53,977.76. Holdings paid all of the costs.

### f. Hochman Salkin

Steven Toscher was an attorney with the law firm Hochman, Salkin & DeRoy (Hochman Salkin), and he specialized in civil and criminal tax litigation and controversy. Steven Toscher was approached by Barney Shiotani and then retained in or about May 1998 to represent Michael Boulware by providing him support and consultation concerning criminal and potential civil tax matters arising out of the grand jury proceedings. Steven Toscher was not retained to provide any services to either subject corporation. During 199806 and 199906, Steven Toscher and Hochman Salkin charged $48,590.23 and $3,475.70, respectively, for services that they provided as to the grand jury proceedings. During 200006, Hochman Salkin issued a $10,000 refund as to those charges. The cost of the services provided by Hochman Salkin was paid by Holdings.

### g. Howard Chang

Howard Chang was a criminal defense attorney. During 199806 through 200006, Howard Chang represented Michael Boulware in the grand jury proceedings. During 199806 through 200006, Howard

Chang charged $42,853.42, $20,638.78, and $16,837.64, respectively, for those services. Holdings paid those charges.

### h. Irell Manella

Martin Gelfand and his firm Irell Manella continued to represent Michael Boulware after his case was referred to the grand jury. For services that were provided in 199806 from August 1, 1997, through March 31, 1998, Martin Gelfand and his firm charged $29,121.20. Martin Gelfand's client as to those services was Michael Boulware. The charge for those services was paid by Holdings.

### i. Lopeti Foliaki

Lopeti Foliaki was a law practitioner in the Kingdom of Tonga. During 200006, he provided legal services to his client, Nathan Suzuki, related to discovery conducted during the grand jury proceedings. The cost of the services, $13,579.50, was paid by Holdings.

### j. Perkin Hosoda

Lyle Hosoda was an attorney/civil litigator who worked first for the law firm Perkin & Hosoda (Perkin Hosoda) and then for the law firm Lyle Hosoda & Associates (Lyle Hosoda Associates). In December 1999, Lyle Hosoda and his firm were retained to represent the interests of the subject corporations for potential legal problems relating to the grand jury proceedings and charges

made against Michael Boulware. Primarily, Lyle Hosoda met with various employees of HIE who might be involved in the criminal investigation and the grand jury proceedings and explained the process to them. He also acted as the facilitator of communications between those employees and the various Government and private attorneys involved in the process. He also responded to various subpoenas issued to HIE for documents. Lyle Hosoda and his firm continued to represent the subject corporations through 2002.

During 200006, Perkin Hosoda charged $44,480.01 for services that it performed as to the grand jury proceedings. That charge was paid by Holdings. Perkin Hosoda's clients as to this charge were Michael Boulware and HIE jointly.

### k. Reinwald O'Connor

In 1996, Dennis O'Connor, an attorney/litigator, and his law firm Reinwald O'Connor were retained to represent HIE in the JSL litigation in an attempt to reclaim HIE assets from Jin Sook Lee. They did not represent Michael Boulware in that litigation. Dennis O'Connor was HIE's lead trial attorney, and he tried the case on its behalf.

Beginning in December 1997, Dennis O'Connor and Reinwald O'Connor began assisting in the representation of HIE in the grand jury proceedings. Dennis O'Connor was told by Jerry

Yamachika and members of the U.S. Attorney's Office that Michael Boulware was the target of the grand jury proceedings and that HIE and Merwyn Manago, among others, were potential targets. Dennis O'Connor was never subsequently informed that HIE was no longer a potential target.

At or after the end of 1997, the U.S. Attorney's Office in Hawaii began serving HIE employees and other individuals connected with HIE with subpoenas for grand jury testimony. Reinwald O'Connor helped those witnesses prepare for their testimony pursuant to its retention by HIE. Dennis O'Connor and Reinwald O'Connor also helped respond to numerous grand jury subpoenas for HIE records, e.g., by challenging those subpoenas and arguing those challenges in hearings before the U.S. District Court. The subpoenas focused on HIE records rather than on the individual records of Michael Boulware. Dennis O'Connor was assisted in the hearings by Howard Chang.

During 199806 and 199906, Reinwald O'Connor charged $353,348.98 and $307,988.61, respectively, for services that it performed in connection with the grand jury proceedings. Reinwald O'Connor's clients as to those charges were Michael Boulware and HIE jointly. Holdings paid those charges.

### l.  Shiotani Inouye

For 199906, Shiotani Inouye charged $285,228.94 for a range of services that it provided to Michael Boulware or to Michael Boulware and HIE jointly.  Those charges were related to the grand jury investigation and were paid by Holdings.  Of the $285,228.94, $40,647.25 related mainly to meetings, document preparation, and document review that Shiotani Inouye undertook solely on behalf of Michael Boulware.  The remaining $224,581.69 related to services that Shiotani Inouye (or its Kovel accountant Nathan Suzuki) provided to Michael Boulware and HIE jointly.  Of the $224,581.69, $200,124.48 related mainly to meetings, document preparation, and document review undertaken by Shiotani Inouye, and $44,457.21 consisted of accounting and consulting services provided by Nathan Suzuki.

### m.  Stephen Pingree

In connection with the grand jury proceedings, Stephen Pingree represented his client, Nathan Suzuki, from November 1998 until 2000.  During 199806, 199906, and 200006, Stephen Pingree charged $15,117.06, $8,111.50, and $24,749.15, respectively, for his services.  Holdings paid those charges.

### n.  Wachi Watanabe

During 199806, Wachi Watanabe provided services related to the grand jury proceedings.  Wachi Watanabe charged $17,486.87

for those services.  Holdings paid those charges.  Wachi

Watanabe's clients as to these charges were Michael Boulware and

HIE jointly.

    3.  Criminal Trial

      a.  Accucopy

In connection with Michael Boulware's first criminal trial,

documents were photocopied at Accucopy, Inc. (Accucopy).  The

costs of those services were $8,665.37 during 200006, $5,000.58

during 200106, and $7,016.57 during 200206.  Holdings paid those

costs.

      b.  Ayabe Chong

In 1999, after Michael Boulware was indicted, Sidney Ayabe,

an attorney, and his law firm Ayabe, Chong, Nishimoto, Sia &

Nakamura LLP (Ayabe Chong) were retained as local counsel to

represent Michael Boulware in his first criminal trial; as

discussed infra, Micheal Boulware also was represented in that

matter by Leonard Sharenow (and later Vincent Marella).  Sidney

Ayabe and his firm continued to represent Michael Boulware

through 2002.  Michael Boulware was the client of Sidney Ayabe

and his firm, and the costs of the services of Sidney Ayabe and

his firm totaled $201,741.42, $61,982.97, and $93,953.20 during

200006, 200106, and 200206, respectively.  Holdings paid those

costs.

### c. Bird Marella

In or about May 2000, Michael Boulware replaced Leonard Sharenow with Vincent Marella, a criminal defense attorney/litigator with the law firm Bird, Marella, Boxer & Wolpert (Bird Marella). Neither Vincent Marella nor his firm was retained to perform services for HIE or Holdings. Vincent Marella continued to represent Michael Boulware through his first criminal trial until April 2002. Michael Boulware was the client of Vincent Marella and his firm, and the costs of the services of Vincent Marella and his firm were $101,842.85, $1,018,262.37, and $1,170,735.31 during 200006, 200106, and 200206, respectively.[48] The cost of the services performed by Bird Marella was paid by Holdings.

### d. Bowen Hunsaker

Mark Hunsaker was a certified public accountant and a specialist in business valuation and litigation forensic accounting. Mark Hunsaker and his firm, Bowen Hunsaker Consulting (Bowen Hunsaker), were retained by Reinwald O'Connor in or about July 1999 to review accounting records of HIE with respect to the first criminal trial of Michael Boulware and to

---

[48]The cost for 200206 included invoices totaling $1,279,335.32 less credit adjustments totaling $108,600.01 ($1,279,335.32 - $108,600.01 = $1,170,735.31).

testify with respect thereto at that trial. The work of Mark Hunsaker and his firm ceased as to the case when Reinwald O'Connor was removed as counsel in the case. Michael Boulware was the client of Mark Hunsaker and his firm, and the cost of the services of Mark Hunsaker and his firm was $100,887.28 during 200006. Holdings paid this cost.

Mark Hunsaker and his firm were retained a second time by Reinwald O'Connor in the early part of 2000 or 2001 with respect to Michael Boulware's appeal, and then later the firm provided services as to Michael Boulware's second trial.

### e. Brook Hart

Brook Hart began representing Merwyn Manago in connection with the grand jury proceedings. During 200206, Brook Hart continued to represent Merwyn Manago. At that time, Brook Hart advised Merwyn Manago as to his testimony at Michael Boulware's first criminal trial and appeared at the trial to monitor Merwyn Manago's testimony. Brook Hart also advised Merwyn Manago as to his testimony during the sentencing phase of Michael Boulware's criminal trial. Brook Hart charged $4,864.74 for his services during 200206. Holdings paid these costs.

### f. Candon Consulting/John Candon

John Candon was a certified public accountant and a business appraiser. In 1998, John Candon and his firm Candon Consulting

Group LLC (Candon Consulting) were retained by Kobayashi Doi to ascertain the fair market value of a 100-percent interest in Royal Hawaiian Water as of June 30, 1997 and 1998. The engagement was later expanded to include an estimate of the potential investment value of Royal Hawaiian Water to HIE if acquired as of those two dates. John Candon gave his finished report to Kobayashi Doi on or about February 14, 2002.

Kobayashi Doi also retained John Candon and his firm to ascertain the value as of July 1, 1992, of a 100-percent interest in Michael Boulware's hypothetical coffee processing and wholesaling business operated as a sole proprietorship.[49] John Candon gave his finished report to Kobayashi Doi on or about March 12, 2002.

John Candon testified in Michael Boulware's first criminal trial as an expert appraiser of businesses. During that testimony, John Candon referred to the analysis in the aforementioned two reports.

The costs of the services of John Candon and his firm were $8,615, $5,002.28, and $11,761.55 during 200006, 200106, and 200206, respectively. As to the services underlying those cases,

---

[49]Michael Boulware acknowledged in this proceeding that he did not have a coffee business that was separate from HIE.

Michael Boulware was the client of John Candon and his firm. Holdings paid these costs.

### g. Chicoine Hallett

Bird Marella retained an attorney, Darrell Hallett, of the tax law firm Chicoine & Hallett P.S. (Chicoine Hallett) to testify as an expert in defense of Michael Boulware at his first criminal trial. Chicoine Hallett performed such services in 200206 and charged $34,784.24 for the services. Chicoine Hallett's client in that matter was Michael Boulware. Holdings paid these costs.

### h. Corniel

#### i. Overview

HIE retained private investigators, Corniel & Associates (Corniel) and Goodenow & Associates (Goodenow), to provide surveillance services as to Jin Sook Lee and to investigate background information and underlying facts regarding her. Reinwald O'Connor believed that this investigation was necessary because the Internal Revenue Service was doing a similar investigation, and Reinwald O'Connor believed that any information and facts that its investigators uncovered which were favorable to Michael Boulware could be used by him at his criminal trial were he to be indicted and prosecuted.

## ii. Specifics

Corniel performed its services during 199506 through 199806. The cost of those services (inclusive of clerical, investigative, and surveillance) for 199806 (specifically, for the period generally from July 1997 through January 1998) was $18,559.93. HIE issued checks to Corniel from 1994 through 1996. Holdings issued checks to Corniel from 1996 to 1998. Corniel's client as to these services was Michael Boulware.

### i. Damon Key

During 199906, 200006, 200106, and 200206, Damon Key provided services to its client, Michael Boulware, in connection with his first criminal trial. The costs of these services in the respective years were $25,864.59, $373,737.84, $47,055.32, and $4,486.71. Holdings paid these costs.

### j. Gaims Weil

The law firm of Gaims, Weil, West & Epstein, LLP (Gaims Weil) provided advice to Michael Boulware in connection with his first criminal trial and provided to him related services, e.g., Gaims Weil prepared a motion that full faith and credit be given to the State court judgment for purposes of the appeal of his conviction, and Gaims Weil reviewed an appellate brief as to an issue whether the trial court had improperly excluded reference to that judgment. For 200006, 200106, and 200206, Gaims Weil

charged $36,927.34, $548.64, and $395, respectively, for services that Gaims Weil provided to Michael Boulware incident to his first criminal trial. Holdings paid those charges.

### k. Goodenow

Goodenow was the second of the two firms discussed supra p. 203 that provided private investigation services to HIE. During 199806, specifically for the months of July, August, September, and November 1997, Goodenow provided the requested services for investigation and surveillance of Jin Sook Lee at a cost of $35,351.94. Holdings paid these costs. Goodenow's client as to these charges was Michael Boulware.

### l. Graham James

We discussed supra in the section on the grand jury proceedings that related to Graham James the facts related to the services provided by Graham James as to Michael Boulware's criminal trial.

### m. Hawaii National Bank

In connection with Michael Boulware's criminal trial, Holdings paid the travel and lodging expenses of some of the attorneys representing Michael Boulware. Holdings paid those expenses from the account of Hawaii National Bank. During 200106 and 200206, these expenses totaled $31,227.39 and $29,146.04, respectively.

### n. Leonard Sharenow

Following the disqualification of Dennis O'Connor and his firm, HIE (through a partner of Barney Shiotani) retained Leonard Sharenow, a criminal defense attorney/litigator, in or about September or October 1999 to represent Michael Boulware in his first criminal trial. Leonard Sharenow continued to represent Michael Boulware through May 2000. Leonard Sharenow never represented HIE as to the subject matter at hand. During 200006, Leonard Sharenow charged $758,111.97 for his services. Leonard Sharenow invoiced HIE for the cost of his services, and that cost was paid by Holdings.

### o. Lyle Hosoda Associates

Lyle Hosoda and his firm Lyle Hosoda Associates continued to provide services to Michael Boulware during his first criminal trial. During 200106 and 200206, Lyle Hosoda charged $665.29 and $15,667.22 for such services. Holdings paid those charges.

### p. McCorriston Miller

During 200106 and 200206, McCorriston Miller Mukai Mackinnon (McCorriston Miller) represented its client, Nathan Suzuki, in defense of his criminal prosecution by the United States. In those respective years, McCorriston Miller charged $25,154.47 and $9,343.61 as to those services. Holdings paid those charges.

### q. Michael McCarthy

During 200206, Michael McCarthy provided services to Michael Boulware incident to his first criminal trial. Michael McCarthy charged $3,646.54 for those services. That charge was paid by Holdings.

### r. Nathan Suzuki

During 200106, Holdings paid Nathan Suzuki $17,500 for services previously performed as a Kovel accountant.

### s. Perkin Hosoda

During 200106, Perkin Hosoda provided services to Michael Boulware in connection with his first criminal trial. Holdings paid the cost of those services, $136.55.

### t. PWC

During 200006, 200106, and 200206, PriceWaterhouseCoopers LLP (PWC) provided expert consultant services to its client, Michael Boulware, incident to his first criminal trial. For the respective years, PWC charged $60,225.24, $56,023.89, and $69,436.14. Holdings paid those charges.

Patrick Oki is a certified public accountant who worked for PWC in 2003. At that time, he performed work for Michael Boulware for his first criminal trial. The work involved a project regarding unclaimed potential deductions or costs of goods sold available to Michael Boulware. One of those potential

deductions involved determining the price of green coffee beans purchased by Michael Boulware, for the purpose of opining on whether Michael Boulware had taken into account all of the costs of goods sold attributable to coffee sales made to third parties.

### u. Professional Image

Professional Image is a photocopying company in Honolulu. During 200006, Professional Image provided photocopying services to Ayabe Chong on behalf of Michael Boulware with respect to his first criminal trial. The cost of those services, $5,763.36, was paid by Holdings.

### v. Reinwald O'Connor

Dennis O'Connor and Reinwald O'Connor were asked to continue to represent Michael Boulware and HIE after the grand jury indictment. The United States questioned whether such representation would present a conflict of interest. The United States noted as to a potential conflict between HIE and Michael Boulware that Dennis O'Connor was representing HIE and its employees, including Merwyn Manago, that Dennis O'Connor had acquired privileged information from that representation that he would not otherwise have acquired, and that Merwyn Manago would be called as a Government witness at Michael Boulware's criminal trial. At a hearing on August 30, 1999, in response to a direct question by then Chief U.S. District Court Judge David A. Ezra,

an attorney for the United States acknowledged that it was possible that HIE might become a defendant in the case. The court ruled that Dennis O'Connor and his firm were disqualified from representing Michael Boulware in his first criminal trial because of a conflict of interest that could not be waived.[50]

During 200006 and 200206, Reinwald O'Connor provided services to Michael Boulware incident to his first criminal trial. Holdings paid the respective costs of those services, $259,730.35 and $23,090.85.

### w. Robert Waters

Robert Waters was a sole practitioner attorney who specialized in sentencing and appeals. In January 2002, he was retained (at the request of Barney Shiotani) to represent Michael Boulware in an appeal of his first conviction and later, at the request of Vincent Marella, to represent Michael Boulware in the sentencing phase of his first criminal trial. Robert Waters did not provide any of his services on behalf of HIE, and he did not provide any services to either subject corporation. Robert Waters represented Michael Boulware until 2006.

---

[50] In or about April 2002, Reinwald O'Connor provided services to Michael Boulware as to his second criminal trial.

During 200206, Robert Waters charged $158,073 for his services.  That charge was paid by Holdings.  His client for those services was Michael Boulware.

### x.  Saranow Pagani

On or about March 3, 1996, Martin Gelfand and his firm retained a certified public accountant, Ronald Saranow, as a Kovel accountant to assist Martin Gelfand.  Most specifically, Ronald Saranow was retained as an expert consultant to help Martin Gelfand and his firm determine the taxable income of Michael Boulware and HIE for "all relevant years through and including 1995".  During 200006, 200106, and 200206, Saranow Pagani charged $31,345.34, $292,282.61, and $192,644.18 for its services.  Holdings paid those charges.

### y.  Sherman Sherman

Robert Waters recommended, and HIE retained, two criminal defense attorneys, Victor Sherman and his partner Janet Sherman, and their firm Sherman & Sherman (Sherman Sherman) to represent Michael Boulware with regard to sentencing.  Sherman Sherman represented its client, Michael Boulware, from February 2002 through May 2002, and the firm did not represent HIE.  During 200206, Sherman Sherman charged $91,179.04 for its services, and that charge was paid by Holdings.

### z.  Sheila Balkan

Robert Waters recommended, and HIE retained, Sheila Balkan as a sentencing consultant.  Sheila Balkan advised her client, Michael Boulware, as to his sentencing.  Sheila Balkan charged $32,430 for her services, and that charge was paid by Holdings.

### aa.  Shiotani Inouye

#### i.  200006

For 200006, Shiotani Inouye charged $199,130.37 for services that it provided to Michael Boulware or to Michael Boulware and HIE jointly.  Those charges related to Michael Boulware's first criminal trial and were paid by Holdings.  Of the $199,130.37, $96,458.27 related mainly to meetings, document preparation, document review, and research that Shiotani Inouye undertook solely on behalf of Michael Boulware.  The balance, $102,672.10, related to services that Shiotani Inouye (or its Kovel accountant Nathan Suzuki) provided to Michael Boulware and HIE jointly.  Of the $102,672.10, $83,353.98 related mainly to meetings, document preparation, document review, research, and pleadings undertaken by Shiotani Inouye, and $19,318.12 consisted of accounting and consulting services provided by Nathan Suzuki.

#### ii.  200106

For 200106, Shiotani Inouye charged $124,213.60 for services that it provided to Michael Boulware or to Michael Boulware and

HIE jointly. Those charges related to Michael Boulware's first criminal trial and were paid by Holdings. Of the $124,213.60, $42,109.94 related mainly to meetings, document preparation, document review, and research that Shiotani Inouye undertook solely on behalf of Michael Boulware. The balance, $82,103.66, related to services that Shiotani Inouye provided to Michael Boulware and HIE jointly. Those services consisted primarily of meetings, document preparation, document review, and research.

### iii. 200206

For 200206, Shiotani Inouye charged $56,266.17 for services that it provided to Michael Boulware or to Michael Boulware and HIE jointly. Those charges related to Michael Boulware's first criminal trial and were paid by Holdings. Of the $56,266.17, $43,662.14 related mainly to meetings, document preparation, and review that Shiotani Inouye undertook solely on behalf of Michael Boulware. The balance, $12,604.03, related to services that Shiotani Inouye provided to Michael Boulware and HIE jointly. Those services consisted primarily of meetings, document preparation, and review.

### bb. Squire Sanders

During 200106, the law firm of Squire, Sanders & Dempsey L.L.P. (Squire Sanders) provided $3,888.10 of services to Michael Boulware in connection with his first criminal trial. Those

services consisted of legal research and advice as to the Federal sentencing guidelines.

### cc.  Stephen Platt

Stephen Platt was the court reporter at the U.S. District Court who prepared the trial transcripts for Michael Boulware's first criminal trial.  During 200206, Holdings paid $13,102.18 for trial transcripts related to that proceeding.

### dd.  Wachi Watanabe

During 200006 and 200206, Wachi Watanabe provided expert consulting services to Michael Boulware incident to his first criminal trial.  For 199906, 20006, and 200206, Wachi Watanabe charged $10,000, $7,298.13, and $3,776.02, respectively, as to those services.  Holdings paid those charges.

### ee.  Wilmington Institute

Wilmington Institute was retained to assist in the defense of Michael Boulware at his first criminal trial.  Wilmington Institute helped Vincent Marella with respect to jury polling and preparing Michael Boulware for his testimony.  Wilmington Institute charged $67,225 for services performed in May and June 2001 and $26,853 for services performed in late June 2001 and in July and August 2001.  Holdings paid those charges.  Wilmington Institute's client as to these charges was Michael Boulware.

### 4. Fees Concerning Jin Sook Lee

#### a. Chee Markham

Kevin Chee and his firm Chee Markham were retained to represent Mal Sun Boulware from in or about March 1995 through July 1998 in the shareholder derivative case and as to her involvement as a witness in the JSL litigation and in the trust case. The costs of the services provided as to those matters by Kevin Chee and his firm were $2,207.94 and $2,046.86 during 199806 and 199906, respectively. Holdings paid those costs. Chee Markham's client as to these costs was Mal Sun Boulware.

#### b. Damon Key

Michael Yoshida and Damon Key first represented HIE and Michael Boulware in or about October 1994 in connection with the JSL litigation. They were the second counsel to be retained by the defendants in that case, retained as local counsel under a pro hac vice process to assist the primary counsel, John Gaims and Amy Rice of the law firm Gaims Weil. Michael Yoshida and Damon Key advised HIE with respect to reclaiming HIE's cash and property from Jin Sook Lee. Apart from the JSL litigation, Michael Yoshida and Damon Key also advised Holdings with respect to ownership of its stock by the trustee of the Glenn Lee Boulware Trust. During 199806, 199906, 200006, and 200106, Damon Key charged $227,005.66, $55,025.96, $5,762.90, and $438.25,

respectively, as to services provided incident to the civil matters related to Jin Sook Lee.  Holdings paid those charges. With the exception of the portion of the charges related to the referenced services provided to Holdings, the charges related to services provided jointly to HIE and Michael Boulware as clients of Damon Key.

### c.  Gaims Weil

In or about October 1994, HIE and Michael Boulware retained a business attorney/litigator, Amy Rice, and her law firm Gaims Weil to represent HIE and Michael Boulware in the JSL litigation, including pursuit of their counterclaim.  Reinwald O'Connor subsequently entered the case as associate counsel and in or about June 1996 replaced Gaims Weil as counsel of record for HIE; Gaims Weil remained as counsel of record for Michael Boulware.

In 1995, Michael Boulware retained Gaims Weil to represent him in the trust case.  Gaims Weil neither represented HIE in that case nor considered HIE to be a party to that case.

In 1997, the individual directors listed as defendants in the shareholder derivative case retained Gaims Weil to represent them in that case.  HIE paid Gaims Weil's bills regarding the individual HIE directors.

During 199806 and 199906, Gaims Weil charged $65,234.68 and $11,558, respectively, as to services provided incident to the

civil matters related to Jin Sook Lee.  Except for the portion of the charges related to the above-referenced services paid by HIE, the $65,234.68 and $11,558 were paid by Holdings.  Michael Boulware and HIE jointly were the clients connected to the services attributable to the portion of those charges paid by Holdings.

### d. Glenn Lee Boulware Trust

For 199906, petitioners seek a $35,000 deduction for amounts paid to the Glenn Lee Boulware Trust.  On March 15 and April 14, 1999, Holdings paid the trust $25,000 and $10,000, respectively, as a result of the JSL litigation and the resulting bankruptcy of Jin Sook Lee.

### e. Reinwald O'Connor

During 199806, 199906, 200006, and 200206, Kelvin Kaneshiro, an attorney, and his firm Reinwald O'Connor provided services related to the civil litigation involving Jin Sook Lee and to the bankruptcy of Jin Sook Lee.  Kelvin Kaneshiro and his firm represented HIE with respect to the shareholder derivative case, the trust case, and Jin Sook Lee's bankruptcy.  Kelvin Kaneshiro and his firm provided legal services with respect to the Glenn Boulware Trust.  Reinwald O'Connor did not represent Michael Boulware in any of the litigation related to Jin Sook Lee.

For the respective years, Reinwald O'Connor charged $180,142.72, $13,857.04, $534.10, and $452.64. Holdings paid those charges. Reinwald O'Connor's clients for these charges were Michael Boulware and HIE.

### 5. Fees Accepted as Ordinary and Necessary

#### a. Carlsmith Ball

Carlsmith Ball was a Honolulu law firm. During 199806 through 200206, it provided services to the subject corporations jointly at costs of $14,258.83, $8,401.97, $14,272.77, $2,478.22, and $5,026.03, respectively. The services involved general corporate matters that benefited both corporations. The subject corporations were the joint clients as to these services. The expenses were paid by Holdings or in some cases in 199806 and 200206 by Hawaiian Isles Kona Coffee.

#### b. Damon Key

During 199806, 200006, 200106, and 200206, Damon Key provided services generally to the subject corporations at costs of $2,831.89, $40,913.91, $6,792.73, and $1,977.36, respectively.[51] The services involved general corporate matters

---

[51]As a single exception, Damon Key provided to Royal Hawaiian Water $132.28 of the services included in the $40,913.91. The services provided to Royal Hawaiian Water related to general business matters.

that benefited one or both of the subject corporations.  Holdings paid these costs.

### c.  Marr Hipp

Marr Hipp Jones & Pepper (Marr Hipp) was a Honolulu law firm.  From 199806 through 200206, Marr Hipp provided general legal services to the subject corporations in connection with a sexual harassment lawsuit.  During the respective years from 199806 to 200206, Marr Hipp charged $825.26, $293.39, $771.14, $465.10, and $469.79 for those services.  Holdings paid those charges.  The clients for those charges were the subject corporations jointly.

### d.  Seyfarth Shaw

Seyfarth, Shaw, Fairweather & Geraldson (Seyfarth Shaw) was an Illinois law firm that was involved with a tobacco class action lawsuit that Hawaii commenced in the First Circuit Court of Hawaii against Brown & Williamson Tobacco Corp. and others. That lawsuit involved tobacco tax litigation brought by Hawaii against all tobacco manufacturers and distributors.  During 199806, Seyfarth Shaw provided to HIE legal services related to that lawsuit.  Seyfarth Shaw charged $122.50 for those services. That charge was paid by Holdings.

e.  Other Legal

For 199806 and 199906, petitioners claim deductions of $.23 and ($.16), respectively, related to "Other Legal".  The record contains no documentation for these claimed expenses.  Nor does the record indicate the identity of the client related to these expenses, the nature of the services purportedly provided, or whether the expenses were ever paid.

6.  Other Fees

a.  Accucopy

As discussed supra p. 199, documents were photocopied at Accucopy, and the cost of those services for 200006 was $8,665.37.  Holdings paid twice one of the underlying invoices included in the $8,665.37.  The invoice paid twice was in the amount of $893.25.

b.  Case Bigelow

For 200006, petitioners claim a $736.31 deduction related to "Case Bigelow Lombardi" (Case Bigelow).  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense, the nature of the services purportedly provided, or whether the expense was ever paid.

c.  Damon Key

Douglas Smith, an attorney, and his law firm Damon Key began representing HIE and Michael Boulware in 1994 or 1995 as to certain corporate and tax issues.  Douglas Smith advised Michael Boulware on estate planning, on stockholder's rights, on general legal matters concerning the theory of tobacco tax and coffee sales, on legal matters concerning Jin Sook Lee's bankruptcy, on tax matters, and on matters related to Michael Boulware's indictment.  Douglas Smith advised Michael Boulware on matters related to the JSL litigation, the trust case, and the shareholder derivative case.  Douglas Smith advised HIE on corporate tax matters, such as the restructuring, and on Hawaii tobacco tax matters.  Douglas Smith advised Holdings on corporate matters.

During 199806, 199906, 200006, 200106, and 200206, Damon Key billed $11,843.45, $58,569.60, $3,277.85, $9,604.45, and $16,598.25 for services provided to the subject corporations generally concerning general corporate matters.[52]  Holdings paid all of these costs for 199806 through 200106.  For 200206,

---

[52]As the single exception, Damon Key billed to its client, Michael Boulware, $712.49 of the referenced charges for 199806. The services underlying this exception involved personal estate planning for Michael Boulware.

Holdings paid $14,387.24 of the $16,598.25; Hawaiian Isles Kona Coffee paid the balance of $2,211.01.

### d. Foley Jones

Foley & Jones P.C. (Foley Jones) was a Las Vegas, Nevada, law firm. During 200006, Foley Jones performed services at a cost of $1,459.50. The client as to these services was Holdings. The services related to an unidentified legal proceeding occurring in June 1999.

### e. GMK Consulting

In 200206, Gary Kuba and his firm GMK Consulting charged HIE and Holdings $9,374.94 as an "interim billing" for services rendered in connection with valuation analyses of HIE and Holdings as of June 30, 2001. Approximately every 2 weeks from June 17 through August 12, 2002, Holdings issued a $2,000 check to Gary Kuba and GMK Consulting to pay the bill (in other words, $10,000 in total). Approximately every 2 weeks from August 26 through September 23, 2002, Holdings issued a $2,000 check to Gary Kuba and GMK Consulting, and on October 14, 2002, Holdings issued a $2,854.05 check to Gary Kuba and GMK Consulting (in other words, $8,854.05 in total). These latter checks were in final payment of the services just referenced. The total cost of the services was $18,854.05. Michael Boulware's accountants at

Kobayashi Doi retained Gary Kuba and his firm to perform these services on behalf of Michael Boulware personally.

### f. <u>King King</u>

For 200006, petitioners claim a $2,500 deduction related to "King & King" (King King). The record contains no documentation for this claimed expense. Nor does the record indicate the identity of the client related to this expense, the nature of the services purportedly provided, or whether the expense was ever paid.

### g. <u>Laird Christianson</u>

For 200006 and 200106, petitioners claim $252.20 deductions related to "Laird Christianson". The record contains no documentation for these claimed expenses. Nor does the record indicate the identity of the client related to these expenses, the nature of the services purportedly provided, or whether the expenses were ever paid.

### h. <u>Louis Wai</u>

Louis Wai, an attorney, charged $5,000 for services that he was asked to perform during 200006. Louis Wai's clients were the subject corporations and Michael Boulware. Holdings paid this charge.

### i.  Michael McCarthy

During 199806, 199906, 200006, 200106, and 200206, Michael McCarthy charged $21,747.02, $18,193.49, $14,914.59, $2,019.44, and $11,619.48, respectively, for services rendered to the subject corporations jointly concerning general corporate matters.  Holdings paid those costs.

### j.  Nathan Suzuki

During 200006, Holdings paid Nathan Suzuki $1,118 for services previously performed for the subject corporations as to general corporate matters.

### k.  Robert Holland

For 199806, petitioners claim a $925 deduction related to "Robert Holland".  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense, the nature of the services purportedly provided, or whether the expense was ever paid.

### l.  Yoshida, Inc.

For 199906, petitioners claim a $1,894.04 deduction related to "Yoshida, Inc."  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense, the nature of the services purportedly provided, or whether the expense was ever paid.

### m. Other Legal

For 200006, 200106, and 200206, petitioners claim deductions of $290.34, $298.77, and $270.51, respectively, related to "Other Legal". The record contains no documentation for these claimed expenses. Nor does the record indicate the identity of the client related to these expenses, the nature of the services purportedly provided, or whether the expenses were ever paid.

### E. Other Professional Fees

#### 1. Fees Related to Criminal Trial

Alan Kobayashi was a certified public accountant with Kobayashi Doi. During 200206, Alan Kobayashi and Kobayashi Doi provided accounting assistance to Michael Boulware with regard to his first criminal trial. Kobayashi Doi charged $2,195.28 for those services. That charge was paid by Holdings.

#### 2. Fees Accepted as Ordinary and Necessary

##### a. Antoneita DeWang-Seo

Antoneita DeWang-Seo was a computer consultant. During 199806, Antoneita provided $7,000 of computer services to HIE. Hawaiian Isles Kona Coffee paid that cost.

##### b. Applied Computer

Applied Computer Technologies (Applied Computer) was a company that provided support on computer software. During 199806 and 200206, respectively, Applied Computer provided $405

and $1,025 of such services to Royal Hawaiian Water. Royal Hawaiian Water paid those costs.

### c. ASI Food Safety

During 199906, Hawaiian Isles Kona Coffee received a manufacturing certification from "ASI Food Safety". The certification cost $150.

### d. Back to Basics Plus

During 200206, Back to Basics Plus charged Holdings $1,074 for sales training provided to Holdings.

### e. Brewer Environmental

During 199806, 199906, 200006, 200106, and 200206, Brewer Environmental charged Royal Hawaiian Water $145.83, $2,004.15, $1,899.98, $2,158.32, and $1,999.98, respectively, for "HIW testing". Royal Hawaiian Water paid those charges.

### f. Business Consulting

Business Consulting Resources (Business Consulting) charged the subject corporations jointly $19,999.93 during 199806 and $4,999.98 during 199906 for management consulting services provided to them. Holdings paid those charges.

### g. Ceridian Employer

During 200006, Ceridian Employer Services (Ceridian Employer) charged Holdings $520 for payroll services provided to Holding. Holdings paid those charges.

### h.  Charles Abraham

Petitioners claim a $675 deduction for 200206 for "advance price list services" provided by Charles Abraham.  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense or whether the expense was ever paid.

### i.  COLIFORM

Petitioners claim a $145.83 deduction for 199906 related to "COLIFORM".  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense, the nature of the services purportedly provided, or whether the expense was ever paid.

### j.  Commercial Plumbing

Petitioners claim a $125 deduction for 200006 for "HIW test backflow preventor" provided by Commercial Plumbing.  The record contains no documentation for this claimed expense.  Nor does the record indicate the identity of the client related to this expense or whether the expense was ever paid.

### k.  Communications Pacific

During 200206, Communications-Pacific, Inc. (Communications Pacific), provided $979.16 of public relations services to the subject corporations.  Hawaiian Isles Kona Coffee paid that charge.

### l. Datahouse

During 199806, 199906, and 200106, Datahouse provided computer consulting services to the subject corporations jointly at costs of $1,588.53, $8,234.22, and $6,054.64, respectively. The subject corporations paid those costs.

### m. Dataprofit Corp.

During 200006 and 200106, Dataprofit Corp. provided computer consulting services to Holdings at costs of $53,532.46 and $5,400, respectively. Holdings paid the cost for 200006, and the subject corporations paid the cost for 200106.

### n. Dunn Bradstreet

During 199806, Dunn & Bradstreet (Dunn Bradstreet) provided credit and collection services to the subject corporations at a cost of $158.22. Hawaiian Isles Kona Coffee paid that cost.

### o. Electra Form

Electra Form, Inc. (Electra Form), was an "HIW Blowmolding company". During 199906, Electra Form provided services to Holdings at a cost of $10,302.58. Royal Hawaiian Water paid that cost.

### p. EMS Solutions

EMS Solutions, Inc. (EMS Solutions), was a company that provided services related to the upgrade of software. During 199806 and 199906, EMS provided such services to HIE. During

200006, EMS provided such services to the subject corporations jointly. The costs of these services were ($90), $2,045, and $21,970 during 199806, 199906, and 200006, respectively. Holdings paid these costs.

### q. Fidelity Investments

Holdings had a section 401(k) profit sharing plan. During 200006, Fidelity Investments provided Holdings with services as to that plan. Holdings paid the cost of these services, $7,017.53.

### r. Foley Jones

Petitioners claim a $741 deduction for 199906 related to services provided by Foley Jones in collecting a "vending debt". The record contains no documentation for this claimed expense. Nor does the record indicate the identity of the client related to this expense or whether the expense was ever paid.

### s. Food Products

During 199806, Food Products Laboratory (Food Products) provided services to Royal Hawaiian Water related to an analysis of Japanese drinking water. Holdings paid the cost of those services, $2,345. During 199906 and 200006, Food Products provided services to Holdings related to "HIW testing". Holdings paid the respective costs of those services, $2,860 and $2,860. During 200106, Food Products provided services to the subject

corporations related to "HIW testing". Holdings paid the cost of those services, $2,660.

### t. GEM Communications

During 200006, GEM Communications provided public relations services to the subject corporations. Holdings paid the total cost of those services, $5,841.12.

### u. GT Service

During 200006, GT Service provided welding services to the subject corporations at a cost of $1,080.

### v. Hawaiian Hardware

During 200006, Hawaiian Hardware Co. (Hawaiian Hardware) provided the subject corporations with $324.76 of supplies.

### w. Intrastate

During 200006, Intrastate Communications (Intrastate) charged the subject corporations $86.46 to broadcast on June 7, 1999, Michael Boulware's plea of not guilty to the United States' charge that he had underreported income.

### x. IW

During 199906, iW dba Italia Wang (IW) charged the subject corporations $32,000 to produce a brochure. Holdings paid that charge.

### y. John Ching

Petitioners claim a $1,075 deduction for 200006 related to first aid classes provided by John Ching. The record contains no documentation for this claimed expense. Nor does the record indicate the identity of the client related to this expense or whether the expense was ever paid.

### z. Kimura International

During 200106 and 200206, Kimura International provided services to the subject corporations. The services consisted of the monitoring of groundwater proximate to the headquarters of the subject corporations. Holdings paid the charges for these services, $19,428.68 and $11,562.42, respectively.

### aa. KPMG

During 199806 and 200006, KPMG Peat Marwick LLP (KPMG) provided accounting services to the subject corporations jointly as to their pension plans. Holdings paid the costs of those services, $17,291 and $8,854.11, respectively.

### bb. L.C. Financial

Petitioners claim a $451 deduction for 199806 related to fees for collection services provided by L.C. Financial, Inc. (L.C. Financial). The record contains no documentation for this claimed expense. Nor does the record indicate the identity of

the client related to this expense or whether the expense was ever paid.

### cc.  Leung Pang

During 200006, Leung & Pang Associates (Leung Pang) provided engineering services to the subject corporations.  The cost of these services was $1,800.

### dd.  Melvin Kam

Melvin Kam was a risk management consultant.  During 199806, Melvin Kam provided insurance consulting services to the subject corporations jointly.  Holdings paid the cost of those services, $760.50.

### ee.  Michael Toigo

Michael Toigo, an attorney, provided services to Holdings during 199806 and 200006.  The services related to the collection of a vending debt.  For the respective years, Michael Toigo charged $246.75 and $1,291.60 for those services.

### ff.  Pension Services

Pension Services Corp. (Pension Services) provided actuary and administrator services for pension and profit sharing plans. During 20006, Pension Services provided $781.20 of such services to HIE as to its pension plan.  Holdings paid the cost of those services.

gg. <u>Procomm</u>

During 200006 and 200106, Procomm provided public relations services to the subject corporations. The costs of those services in the respective years were $751.60 and $1,734.92.

hh. <u>Professional Image</u>

During 200206, Professional Image provided $125.68 of photocopying services to the subject corporations. That cost was paid by Holdings.

ii. <u>Profit Concepts</u>

During 200006 and 200106, Profits Concepts International (Profits Concepts) provided computer consulting services to Holdings. Holdings paid the costs of those services in the respective years, $360 and $7,400.

jj. <u>Quadrel Labeling</u>

Petitioners claim a $14,142.33 deduction for 199806 for "Field Service" provided by Quadrel Labeling Systems (Quadrel Labeling). The record contains no documentation for this claimed expense. Nor does the record indicate the identity of the client related to this expense or whether the expense was ever paid.

kk. <u>Rhanda Kim</u>

During 200106 and 200206, Rhanda Kim, LLC (Rhanda Kim), provided computer consulting services to Holdings. Holdings paid

the costs of those services in the respective years, $7,127.56 and $7,658.81.

### ll.  Richard Kitagawa

Richard Kitagawa was an independent contractor.  For 200106 and 200206, petitioners claim deductions of $500 and ($1,000), respectively, for services performed by Richard Kitagawa.

### mm.  RJR Packaging

During 200206, RJR Packaging provided $745 of film to Holdings.

### nn.  Servend of Hawaii

Servend of Hawaii was a vending consultant.  During 199906, Servend of Hawaii charged $2,500 for services provided to Holdings.  Holdings paid that expense.

### oo.  Stewart Engineering

During 199906 and 200006, Stewart Engineering, Inc. (Stewart Engineering), provided engineering services to the subject corporations jointly.  Holdings paid the costs of these services for the respective years, $8,853.60 and $2,197.78.

### pp.  Tricia Young

In connection with an audit of HIE's cigarette cartoons, Tricia Young provided $613.60 of services to HIE during 200006.

qq. Wayne Arakaki

Wayne Arakaki, an engineer, provided engineering services to Holdings during 200106. Holdings paid the cost of those services, $353.60.

3. Other Fees

a. Henry Yokogawa

Henry Yokogawa, an independent contractor, provided services concerning the manufacturing and sale of coffee. For 200106 and 200206, petitioners claim deductions of $26,500 and $63,600, respectively, for monthly payments of $5,300 that Hawaiian Isles Kona Coffee made to Henry Yokogawa. Holdings made 5 such payments in 200106 and 12 such payments in 200206.

b. Kobayashi Doi

i. Overview

As to services provided by Kobayashi Doi, petitioners claim deductions of $65,837.29, $61,140.22, $57,966.64, $67,758.54, and $76,116.85 for 199806, 199906, 200006, 200106, and 200206, respectively. From 1993 through 2002, Kobayashi Doi provided accounting services to Michael Boulware and to the subject corporations. Those services included the compilation of financial statements, the preparation of tax returns, and litigation support as to accounting matters. As to the tax returns, Kobayashi Doi prepared Michael Boulware's amended 1994

through 2002 Federal income tax returns, HIE's Federal corporate income tax returns for 198906 through 200406, Holding's Federal corporate income tax returns for 199706 through 200206 and 200406, and Royal Hawaiian Water's Federal corporate income tax returns for 199506 through 199706. As to the litigation support, Kobayashi Doi provided accounting services to HIE in connection with the civil litigation initiated by Jin Sook Lee and in connection with the criminal investigation, the grand jury proceedings, and Michael Boulware's first criminal trial.

### ii. 199806

Of the $65,837.29 claimed for 199806, $63,268.56 related to services provided to the subject corporations jointly; Holdings paid those charges. The balance, $2,568.73, related to services provided to Royal Hawaiian Water; Royal Hawaiian Water paid that balance.

### iii. 199906

Of the $61,140.22 claimed for 199906, $47,687.22 related to services provided to the subject corporations jointly; Holdings paid those charges. The balance, $13,453, related to services provided to Royal Hawaiian Water; Royal Hawaiian Water paid that balance.

### iv.  200006

Of the $57,966.64 claimed for 200006, $57,611.14 related to services provided to the subject corporations jointly; Holdings paid those charges.  The balance, $355.50, related to services provided to Royal Hawaiian Water; Royal Hawaiian Water paid that balance.

### v.  200106

All of the $67,758.54 claimed for 200106 related to services provided to the subject corporations jointly.  Holdings paid those charges.

### vi.  200206

Of the $76,116.85 claimed for 200206, we set forth supra p. 224 our finding that $2,195.28 of the $76,116.85 was attributable to Michael Boulware's first criminal trial.  The balance, $73,921.57, related to services provided to the subject corporations jointly.

### c.  Lorin Kushiyama

For 199906, petitioners claim a deduction for a $20,000 payment that Holdings made to Lorin Kushiyama.

### d.  Richard Kitagawa

For 200006, petitioners claim a $4,500 deduction related to Richard Kitagawa.

### e. TRI Pac

For 199906, petitioners claim a $10,000 deduction for two $5,000 payments that Holdings made to TRI Pac Inquiries (Tri Pac). The subject corporations were joint clients of Tri Pac during 199906. The record contains no documentation for this claimed expense. Nor does the record indicate the nature of the services provided.

### f. Vending Consulting

For 200006 and 200106, petitioners claim deductions of $60,000 and $15,000, respectively, for monthly payments of $5,000 that Holdings made to Vending Consulting Co. (Vending Consulting). Holdings made 12 such payments in 200006 and 3 such payments in 200106.

### g. Watson Wyatt

The firm of Watson & Wyatt (Watson Wyatt) provided financial management consulting. For 199906, petitioners claim a $15,857 deduction for payments made by Holdings to Watson Wyatt. The record contains no documentation for this claimed expense. Nor does the record indicate the identity of the client related to this expense.

### h. Amortization

The subject corporations amortized certain professional fees over the period that those fees were estimated to have value and

deducted that amortization.  These fees included, for example, professional services related to consulting fees for technical and computer support, coffee art work, and other expenses related to coffee.  For 199806, 199906, 200006, 200106, and 200206, these amortization deductions totaled $30,643.54, $116,176.10, $38,387.03, $45,080.13, and $40,570.67, respectively.

XXI.  Kona Coffee

A.  Background

A Kona coffee plant grows fruit called cherries, and a coffee bean is the seed found inside the cherry.  When a cherry is removed from a coffee plant, the cherry is converted (milled) into a parchment.  The parchment contains a thin layer of skin.  When that thin skin is removed, the product is referred to as a green bean.  When the green bean is roasted, the result is roasted coffee.  The process that mills cherries into parchment, the process that makes parchment into green beans, and the process that makes green beans into roasted coffee are each separate stages that result in the coffee beans' weighing less at the end of the stage than at the start of the stage.  Five pounds of Kona cherries typically yield one pound of green Kona coffee beans.

B.  Season for Kona Coffee

The season for Kona coffee generally coincides with the period during which the Kona coffee cherries are harvested from the coffee plants and brought to market.  That season generally extends from July to March, with the main part of the season being from August to January.

C.  Shelia David

Kona farmers generally preferred to sell to relatives the coffee the farmers grew.  Shelia David, a.k.a. Shelia Baptista, was born in Kona, and she had family members in Kona who were Kona coffee farmers and millers (i.e., individuals who mill cherries into parchment).  In 1988, Marvin Fukumitsu worked for HIE, and he did not have a familial connection with the Kona farming community.  Marvin Fukumitsu approached Shelia David and asked her if she would buy coffee for HIE as an independent contractor of HIE.  Shelia David agreed to do so, and she bought Kona coffee for HIE as an independent contractor from 1988 through 1990 (in other words, during the 1988-89 and 1989-90 coffee seasons).  Shelia David operated this business under the name Kona Sunrise Farms.

Shelia David and Marvin Fukumitsu set up bank accounts in the name of Kona Sunrise Farms.  In order for Shelia David to buy coffee, Marvin Fukumitsu deposited into the Kona Sunrise Farms

account the proceeds of HIE checks. Marvin Fukumitsu got the checks from Michael Boulware. Michael Boulware also gave Marvin Fukumitsu cash of approximately $10,000 to $20,000 to deposit into that account. When the petitions were filed in these cases, copies of many of the bank records of Kona Sunrise Farms existed.

Shelia David and her family operated in Kona dropoff stations (i.e., places where farmers would bring their coffee cherries to be weighed and purchased) solely to buy coffee for HIE. The Kona coffee farmers who sold Kona coffee to Shelia David and her family accepted checks for the sales; no one refused to sell coffee because he was not paid in cash. During each of the 1988-89 and 1989-90 Kona coffee seasons, Shelia David and her family gave receipts to the farmers from whom they purchased Kona coffee. Shelia David retained copies of these receipts until Marvin Fukumitsu took the receipts to HIE. The receipts indicated the weight, the dollar amount, the date, the farmer, and "Kona Sunrise Farms".

During each of the 1988-89 and 1989-90 Kona coffee seasons, Shelia David and her family bought Kona coffee for HIE. After Shelia David purchased that coffee, she had the coffee milled into parchment and shipped the resulting product to Honolulu through a company called Young Brothers. Young Brothers gave to Shelia David bills of lading for the shipments. Marvin Fukumitsu

took those bills of lading back to Honolulu. During each of the 1988-89 and 1989-90 Kona coffee seasons, Young Brothers was the only company that shipped Kona coffee from the Island of Hawaii to Honolulu. Shelia David usually purchased coffee cherries for HIE. Shelia David wrote checks for parchment purchases at Marvin Fukumitsu's direction; no cash was used.

In the spring of 1990, Shelia David received a cease and desist letter from Kona Kai Farms telling her to stop purchasing Kona coffee from the Kona coffee farmers. Kona Kai Farms was owned by Robert Regli and Michael Norton, and Shelia David's operation was taking business away from Kona Kai Farms.

Marvin Fukumitsu worked for HIE from September 1982 to March 1991. On March 11, 1991, Marvin Fukumitsu stopped working for HIE and began working for Superior Coffee. Marvin Fukumitsu did not sell coffee to or purchase coffee for HIE or Michael Boulware when he worked at Superior Coffee. Marvin Fukumitsu left Superior Coffee in March of 1997, and he began selling coffee to HIE. Marvin Fukumitsu died on April 17, 2005.

OPINION

I. Perception of Witnesses

We observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and to assign weight to that testimony for the primary purpose of finding

disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on its or his behalf does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor. We will not accept a witness's testimony at face value if we find that our impression of the witness coupled with our review of the credible facts at hand conveys to us an understanding contrary to the spoken word. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84-87 (2000), affd. 299 F.3d 221 (3d Cir. 2002); cf. Gallick v. Balt. & Ohio R. R., 372 U.S. 108, 114-115 (1963); Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167-168 (1942); Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding T.C. Memo. 1957-129.

The parties called a total of 52 witnesses to testify at trial. We generally found the testimony of 34 of these witnesses to be reliable in our finding of the facts underlying the issues at hand. Those witnesses were Trinidette Abaya-Wright, Birney Bervar, Margery Bronster, James Chan, Shelia David, Martin

Gelfand, Anthony Guffanti, Jerald Guben, Brook Hart, Antoinette Hirai, Patty Hirai, Lyle Hosoda, Mark Hunsaker, Milton Ikeda, William James, Kelvin Kaneshiro, James Kunihiro, Harry Lyckman, Vincent Marella, Morris Miyasato, Dennis O'Connor, Blake Okimoto, Bruce Okimoto, Thomas Okimoto, Larry Olson, Amy Rice, Leonard Sharenow, Victor Sherman, Douglas Smith, Steven Toscher, Robert Waters, Peter Wolff, John Yamada, and Jerry Yamichika. We generally did not find the entire testimony of any of the other 18 witnesses to be reliable for that purpose.[53] As to 5 of those 18 witnesses, namely, Michael Boulware, Sidney Boulware, Nathan Suzuki, Lorin Kushiyama, and Barney Shiotani, we find almost none of their testimony to be reliable or helpful to petitioners' case. As to the remaining 13 of the 18 witnesses, including among others Jin Sook Lee and Mal Sun Boulware, we found only limited portions of their testimony to be helpful. To the extent that we disregarded or discounted any testimony given in these cases, we generally perceived the witnesses giving that testimony

---

[53]Nor do we rely heavily on the transcripts of testimony given by various witnesses in prior proceedings that were included in the record at hand through the parties' stipulations. We were unable to observe those witnesses during that testimony, and we decline in the setting at hand to accept that prior testimony merely on the basis of the written words. We have, however, given that testimony proper regard in finding the facts of these cases and do not simply reject that testimony out of hand.

to be untrustworthy during that testimony or considered the testimony self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence.  We also note that many of the witnesses in these cases testified previously in administrative and/or legal proceedings as to the subject matter at hand and that their testimony in these cases was in that sense somewhat rehearsed and versed, rather than given strictly on the basis of their memories.  We are not required to rely on testimony that we consider to be untrustworthy and/or unreliable, and we do not rely on any such testimony given in these cases to support either our findings of fact or our decisions with respect to the issues at hand.  See Ruark v. Commissioner, supra at 312; Clark v. Commissioner, supra at 708-709; Neonatology Associates, P.A. v. Commissioner, supra at 84-87; see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

## II.  Burden of Proof

### A.  Overview

Petitioners argue that section 7491(a)(1) places the burden of proof upon respondent with respect to the issues we decide herein.  Alternatively, petitioners argue, respondent has the burden of proof on all those issues because the NODs were arbitrary and unreasonable.  Respondent disagrees with

petitioners on both points. As respondent sees it, petitioners bear the burden of proof on all issues that we decide herein. We agree with respondent.

B. Applicability of Section 7491

Taxpayers generally bear the burden of proving by a preponderance of evidence that the Commissioner erred as to any determination in dispute. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rockwell v. Commissioner, 512 F.2d 885-887 (9th Cir. 1975), affg. T.C. Memo. 1972-133; see also Merkel v. Commissioner, 109 T.C. 463, 476 (1997) (citing 2 McCormick on Evidence, sec. 339, at 439 (4th ed. 1992), and stating that "the proponent must prove that the fact is more probable than not" in order to prove the fact by a preponderance of the evidence), affd. 192 F.3d 844 (9th Cir. 1999). In certain cases, the burden of proof may shift to the Commissioner with respect to a factual issue relevant to the taxpayer's liability for tax.[54] See sec. 7491(a)(1). Such a shift may occur when the record establishes

---

[54]Respondent determined that HIE is liable for an addition to tax under sec. 6651(a) for 199806. While sec. 7491(c) places a burden of production upon the Commissioner with respect to an individual's liability for an addition to tax under sec. 6651(a), sec. 7491(c) has no applicability where, as here, the taxpayer is a corporation. See NT, Inc. v. Commissioner, 126 T.C. 191 (2006); Beiner, Inc. v. Commissioner, T.C. Memo. 2004-219.

that the taxpayer produced credible evidence relating to the issue; that the taxpayer met the requisite substantiation requirements, maintained all requisite records, and cooperated with the Commissioner's reasonable requests for information, documents, interviews, witnesses, and meetings; and, in the case of a corporation, partnership, or trust, that such a taxpayer met the net worth requirement of 28 U.S.C. sec. 2412(d)(2)(B) (2000).[55]  See sec. 7491(a)(1) and (2); NT, Inc. v. Commissioner, 126 T.C. 191, 194-195 (2006); Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104; see also H. Conf. Rept. 105-599, at 240, 242 (1998), 1998-3 C.B. 747, 994, 996.  For this purpose, the term "credible evidence" connotes "'the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted'", Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H. Conf. Rept. 105-599, supra at 240, 1998-3 C.B. at 994), and the Court need not consider the testimony of a witness to be credible simply because it is

_____

[55]As to a proceeding in this Court, a petitioning taxpayer's net worth is determined as of the time that the taxpayer's petition was filed with the Court.  See Hubert Enters., Inc. & Subs. V. Commissioner, 125 T.C. 72, 91 n.6 (2005), affd. in part and remanded on another issue not relevant herein 230 Fed. Appx. 526 (6th Cir. 2007); Jondahl v. Commissioner, T.C. Memo. 2006-142.

unopposed, see <u>Blodgett v. Commissioner</u>, 394 F.3d 1030, 1035-1038 (8th Cir. 2005), affg. T.C. Memo. 2003-212; <u>Nichols v. Commissioner</u>, T.C. Memo. 2003-24, affd. 79 Fed. Appx. 282 (9th Cir. 2003); see also H. Conf. Rept. 105-599, <u>supra</u> at 240-241, 1998-3 C.B. at 994-995 (stating that "A taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions * * *.  The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief.").  Whether a taxpayer has cooperated with the Commissioner is a factual determination that turns on the unique facts and circumstances of the case.  See <u>Polone v. Commissioner</u>, T.C. Memo. 2003-339, affd. 505 F.3d 966 (9th Cir. 2007); see also H. Conf. Rept. 105-599, <u>supra</u> at 240, 1998-3 C.B. at 994 (explaining the requirements of "cooperation").

The record does not establish that petitioners met the credible evidence or cooperation requirements.[56]  As to the former

---

[56]Nor have petitioners established that they met the substantiation requirement or that either HIE or Holdings met the applicable net worth requirement.  On the latter point, petitioners rely upon consolidated financial statements for Holdings and its subsidiaries that were admitted into evidence as Exhibit 1123-P.  Those statements were prepared on Nov. 17, 2005, by Kobayashi Doi and purport to show the financial status of Holdings as of June 30, 2005.  The problems with the statements are twofold.  First, the statements state specifically that the

(continued...)

requirement, petitioners rely primarily upon the testimony of Barney Shiotani. As noted above, we find almost all of Barney Shiotani's testimony to be incredible and do not rely upon it. As to the latter requirement, although petitioners (through Kobayashi Doi) may have cooperated with respondent on some matters during the audit, petitioners acknowledge that respondent served them with various information document requests during the audit and that they failed to honor those requests because, petitioners state, they believed incorrectly that respondent was improperly communicating with the DOJ in the criminal prosecution of Michael Boulware. Petitioners attempt to rectify that lack of cooperation by stating that they ultimately gave the requested information and other information to respondent after the notices of deficiency were issued. We consider that attempt unavailing. Numerous court opinions detail petitioners' continual resistance to respondent's attempts to uncover relevant facts underlying the issues at hand. See Boulware v. United States, 203 Fed. Appx. 172 (9th Cir. 2006) (affirming decision denying Michael Boulware's motion to quash summons issued to HIE); United States

---

[56](...continued)
information set forth therein is based entirely on the representations of "the management" of Holdings and its subsidiaries. Second, the values of many of the assets included in the financial statements are reported at historic cost, rather than at fair market value.

v. Boulware, 203 Fed. Appx. 170 (9th Cir. 2006) (affirming decision enforcing summons issued to HIE and denying Michael Boulware's motion to intervene); United States v. Boulware, 203 Fed. Appx. 168 (9th Cir. 2006) (affirming decision enforcing summons issued to third party); United States v. Boulware, 350 F. Supp. 2d 837 (D. Haw. 2004).  Petitioners' lack of cooperation with respondent during the audit is not cured by their production of documents after the notices of deficiency were issued.  See, e.g., Polone v. Commissioner, supra; NHUSS Trust v. Commissioner, T.C. Memo. 2005-236.

C.  Claim That NODs Are Arbitrary

Petitioners also argue that respondent bears the burden of proof because the NODs are arbitrary or unreasonable.  We disagree.  In order to prevail as to this issue, petitioners must persuade us that the deficiencies determined in the respective NODs do not bear the requisite relationship to the petitioner's liability or are without a rational factual foundation.  See Zuhone v. Commissioner, 883 F.2d 1317, 1324-1326 (7th Cir. 1989), affg. T.C. Memo. 1988-142; Clapp v. Commissioner, 875 F.2d 1396, 1402-1403 (9th Cir. 1989); see also Helvering v. Taylor, 293 U.S. 507, 514-515 (1935) (holding that the burden of going forward with the evidence shifts to the Commissioner if the taxpayer

shows that the notice of deficiency underlying the proceeding is arbitrary).  Petitioners have failed to make this showing.

In an attempt to meet their burden as to this issue, petitioners stress that the total amount of disallowed professional fees in the NODs issued to the subject corporations for 200006 through 200206 is substantially greater than the total amount of professional fees the subject corporations deducted for those years.  Unlike petitioners, we do not consider that fact to be probative that the NODs issued to the subject corporations are arbitrary.  The tax returns of the subject corporations, even when viewed in the light of any additional information supplied by petitioners during the audits of the subject corporations, do not allow for a precise adjustment as to the professional fees deducted by each of those corporations.  Thus, respondent argues, and we agree, that respondent's determinations in the NODs with respect to deductible professional fees were made to foreclose a potential whipsaw.  We have previously held in a similar setting that the Commissioner may defend against an inconsistent result by holding both parties to a transaction liable for the entire deficiency resulting therefrom, until the claim of one of the parties is resolved.  See, e.g., <u>Maggie Mgmt. Co. v.</u>

Commissioner, 108 T.C. 430, 446 (1997).  We believe that this same principle applies here.[57]

III.    NOL Deduction

HIE claimed on its Federal income tax returns for 199806, 200006, 200106, and 200206 that it was entitled to deduct NOLs of $2,086,891, $1,184,192, $324,767, and $145,145, respectively. Respondent determined that HIE had established its entitlement only to an NOL deduction of $450,569 for 199806.  Petitioners argue that HIE established its entitlement to deduct NOLs in amounts greater than those claimed on the referenced tax returns (and thus in amounts greater than those allowed by respondent). To that end, petitioners assert, HIE made monthly adjustments that prematurely recognized $21,440,000 of tobacco tax income for 198906 through 199506 and is entitled to correct that mistake by shifting the referenced income to the proper reporting years of 199506 through 200106.  Petitioners assert that HIE also recorded AJEs recognizing $12,947,405 of additional income as to the tobacco tax refunds and the off-book activities of Michael Boulware.

---

[57]Petitioners also assert that respondent arbitrarily apportioned to each of Michael Boulware and HIE one-half of the professional fees attributable to the civil litigation initiated by Jin Sook Lee.  We disagree.  On the basis of the facts and circumstances of these cases, we believe that this allocation was neither arbitrary nor unreasonable.

Section 172 allows a taxpayer to deduct an NOL for a taxable year.  The amount of the NOL deduction equals the sum of the NOL carryovers plus NOL carrybacks to that year.  See sec. 172(a).  Absent an election to the contrary, an NOL for a taxable year must first be carried back 3 years and then may be carried forward up to 15 years.  See sec. 172(b)(1)(A), (2), and (3).[58]  HIE, as a taxpayer attempting to deduct an NOL, bears the burden of establishing both the existence of the NOL and the amount of any NOL that may be carried over to the subject years.  See Rule 142(a)(1); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955); Keith v. Commissioner, 115 T.C. 605, 621 (2000).  Such a deduction is a matter of legislative grace; it is not a matter of right.  United States v. Olympic Radio & Television, Inc., supra at 235; Deputy v. du Pont, 308 U.S. 488, 493 (1940).

HIE claimed on its return for 199806 that it was entitled to carry over to that year a $5,718,663 NOL arising in prior years.  HIE claimed on its previous year's return that its NOL for that year equaled $439,557 and indicated that its NOL carryover as of the end of 199806 totaled $591,279.  The increase in the amount

---

[58]In 1997, sec. 172(b)(1)(A) was amended to generally require a 2-year carryback and a 20-year carryover for NOLs for taxable years beginning after Aug. 5, 1997.  See Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1082, 111 Stat. 950.

of the NOL carryover reported for 199806 was purportedly attributable to Barney Shiotani advising HIE that it had prematurely reported Hawaii tobacco tax refunds as income for its taxable years ended in 1989 through 1995 and that the reported income for those years was required to be reduced by the amount of tobacco tax income included therein.  We consider to be unsupported by credible evidence petitioners' claim that HIE before the subject years prematurely reported $21,440,000 of self-help tobacco tax refunds as Federal taxable income.[59]  The Hawaii tobacco tax returns filed by HIE do not support the claim that HIE received any such refund income from Hawaii in that the returns report no "credits" or "offsets" for overpaid Hawaii tobacco tax, notwithstanding that the returns specifically contained a line for "Adjustments (Explain Fully)".  Nor can we reconcile petitioners' unbelievable assertion that HIE opted to recover millions of dollars in refunds through installments spread over many years with Michael Boulware's statement that he would have preferred a single lump-sum refund, if in fact HIE was entitled to one.  We also find that HIE never informed Hawaii of HIE's claimed situation and even went so far, purportedly, as to

---

[59]Nor are we persuaded as to petitioners' claim that HIE included an additional $12,947,405 of taxable income through amortization adjustments made in 199406 through 200106.

report surreptitiously false numbers on the later years' tobacco tax returns rather than to reveal to Hawaii that HIE was attempting to recoup refunds through HIE's self-help concept. We also find in part on the basis of the credible testimony of Margery Bronster, a former attorney general of Hawaii, that HIE's concept of self-help that it purportedly employed to recover its overpaid Hawaii tobacco taxes was not allowed under the applicable laws of Hawaii.[60] We do not find, on the other hand, any credible written legal advice concerning the situation or for that matter any credible contemporaneous documentation that we believe a reasonable person in the same claimed position as HIE would have caused to be prepared to document its belief (through its management) that HIE was entitled to such a large recovery of dollars. We set forth supra pp. 118-120 our findings that Michael Boulware learned in June 1993 that respondent was starting a criminal investigation of Michael Boulware and that Barney Shiotani subsequently advised Michael Boulware on theories

---

[60]Petitioners assert that HIE's self-help concept is authorized in Haw. Rev. Stat. Ann. sec. 245-7(c) (LexisNexis 2008). Petitioners also assert that Hawaii audited HIE's tobacco tax returns and did not challenge its self-help concept. As to the former assertion, we do not read the referenced section to authorize HIE's self-help concept. As to the latter assertion, we do not know the specifics of any such audit and on the basis of the record at hand consider that assertion to be of little value to our decisions herein.

to pursue to try to avoid a criminal conviction of Michael Boulware resulting from that investigation. The purported shifting of HIE's income from earlier to later years appears to us to reflect one of those theories.

Petitioners assert as a point of fact that HIE made the monthly adjustments in order to report the self-help tobacco refunds received by HIE as taxable income for Federal income tax purposes. We decline on the basis of the record at hand to make such a finding of fact. Those adjustments reclassified some of HIE's tobacco sales from HIE's account for taxable sales (i.e., sales subject to Hawaii tobacco tax) to HIE's account for nontaxable sales (i.e., sales not subject to Hawaii tobacco tax) and reduced the COGS as to tobacco products to reflect the amount of State tobacco tax that HIE actually paid as to its reported taxable sales. HIE did not report any "tobacco tax income" by means of those monthly adjustments or otherwise pay Federal income tax on the monthly adjustment amounts. HIE simply reported lower costs of goods sold attributable to lower State tobacco taxes.

We hold that petitioners have failed to establish that HIE prematurely reported tobacco tax refund income that could be shifted to later years so as to support petitioners' claim to the referenced NOLs, and we sustain respondent's primary

determination that HIE has failed to substantiate its claim to an NOL carryover greater than respondent determined. Petitioners argue that this holding means that HIE is entitled to receive refunds for years to which it had shifted its income. We disagree. The NOD issued to HIE reduced HIE's 200006 and 200106 taxable income by $1,927,648 and $962,426, respectively, with respect to this issue, and petitioners have not proven that they are entitled to any further related adjustments. We note once again that petitioners have failed to persuade us that HIE recognized the approximately $12.9 million of purported amortization adjustments as income for 199506 through 200206.

Before leaving this issue, we pause to set forth for completeness our disagreement with petitioners' position that the referenced shift of income would have been proper because of the all events test. As petitioners see it, the all events test was not met as to the refund income until the later years because before those years the appropriate taxing authority had not made its determination as to the appropriateness and accuracy of the refunds (or self-help credits) and the period of limitations remained open for such a determination. Thus, petitioners conclude, any taxable tax refund income that HIE had reported for 198906 through 199506 was properly reportable under the all events test in the later years and HIE was required to shift the

income reported in the earlier years to the later years.  We disagree with petitioners' application of the all events test in the setting of the issue at hand; in other words, even if we were to assume for purposes of discussion that HIE did report its self-help tobacco tax refunds as income, an assumption that we do not actually find as a fact, those amounts were not reportable in the years after 199506 as petitioners argue.

Unless a taxpayer's method of accounting dictates otherwise, income must usually be recognized in the year in which the income is actually or constructively received.  See sec. 451(a); sec. 1.451-1(a), Income Tax Regs.  HIE used an accrual method of accounting for Federal income tax purposes, and income is recognized under such a method when all the events have occurred which fix the right to receive the income and the amount of the income can be determined with reasonable accuracy.  See sec. 1.451-1(a), Income Tax Regs.  The all events test is met as to income, i.e., income must be recognized, when the income is paid, due, or earned, whichever occurs first.  See Schlude v. Commissioner, 372 U.S. 128, 133 n.6 (1963); see also Old Harbor Native Corp. v. Commissioner, 104 T.C. 191, 200 (1995) (stating that section 451(a) provides that "An item of income is generally included in a corporation's gross income for the year that is no

later than the year during which the item is received by the corporation").

In the case of State tax refunds, the Commissioner has ruled that section 451 requires that an accrual method taxpayer recognize State tax refunds for Federal income tax purposes upon receipt of payment, or if earlier, when the taxpayer learns that the State has approved the refund. See Rev. Rul. 2003-3, 2003-1 C.B. 252. If HIE had in fact been claiming Hawaii tobacco tax refunds on each of its monthly returns by reducing the liability that would otherwise have been reported thereon, HIE would have received its State tax refunds upon its filing of those returns. The mere possibility that Hawaii could ultimately learn that HIE was surreptiously employing a self-help concept to receive refunds and could compel the repayment of those refunded amounts does not mean that the refunds are not currently reportable as income under the all events test. As noted by the Court in Moritz v. Commissioner, 21 T.C. 622, 624 (1954):

> It has long been recognized that a taxpayer who keeps his books and reports his income on the accrual basis is subject to tax liability when the right to receive income becomes fixed. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). The Court said in North American Oil Consolidated v. Burnet, 286 U.S. 417, 424 (1932):

>> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he

is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

Petitioners cite primarily Doyle, Dane, Bernbach, Inc. v. Commissioner, 79 T.C. 101 (1982), for the proposition that "It is well established that all events fixing the right to a refund do not occur until the appropriate taxing authority has made its determination on the issue". Petitioners' reliance upon that and the other related cases is misplaced. In Doyle, Dane, Bernbach, Inc., the Commissioner had argued that the taxpayer should accrue refund income before receipt. Here, by contrast, respondent argues (and we agree) that HIE would have received its refund income when it filed its Hawaii tobacco tax returns using its self-help concept. We also disagree with petitioners' claim that any of their cited cases dealing with taxability of option payments supports their proposition. While a degree of uncertainty may be present about the character or taxability of option payments when received by a taxpayer, no such uncertainty is present here where Congress has specifically provided in section 111 that a taxpayer that deducts a State tax on a prior year's return must include in the year of receipt any refund to the extent that the deduction gave the taxpayer a tax benefit. See also Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370,

383-384 (1983); Frederick v. Commissioner, 101 T.C. 35, 41 (1993). In addition, we note a fallacy in petitioners' argument. Specifically, if a State such as Hawaii has a provision similar to the false or fraudulent return provision of section 6501(c)(1), that would allow the taxing authority to assess at any time a tax attributable to a false or fraudulent return, then pursuant to petitioners' argument the refunds would never have to be recognized absent a determination by the taxing authority. Such would be the case because the period of limitations would never expire to allow for an earlier recognition.

We also are mindful that HIE's claim to its change in the reporting of its tobacco tax refund income was impermissibly done without the consent of the Commissioner. Pursuant to section 446(e) and section 1.446-1(e)(2)(i), Income Tax Regs., taxpayers desiring to change a method of accounting, even an erroneous one, must first obtain the Commissioner's consent. See Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 164 (2008); see also Lord v. United States, 296 F.2d 333, 335 (9th Cir. 1961) (stating that prior consent is required because "If * * * [taxpayers] were allowed to report income in one manner and then freely change to some other manner, the resulting confusion would be exactly that which was to be alleviated by requiring permission to change accounting methods"). The Commissioner has wide discretion to

decide whether to consent to a taxpayer's request to change a method of accounting, see Sunoco, Inc. & Subs. v. Commissioner, T.C. Memo. 2004-29, and respondent has stated in these cases that he would not now grant any such request by HIE but would require HIE to continue accounting for its tobacco tax refund income in 1998 as it had done in prior years.  Given respondent's lack of consent to any such change in method of accounting by HIE, any NOL resulting from an unauthorized change by HIE would not result in a valid deduction of that NOL.

Petitioners ask the Court not to consider respondent's argument that section 446(e) applies to HIE's claim of its change in its reporting of its tobacco tax refunds.  Petitioners note in their reply brief that respondent first made this argument in his opening posttrial brief and assert that the Court should reject the argument as untimely because they "have been prejudiced as they have been denied the opportunity to present any evidence regarding whether §446 applies to the treatment of tobacco tax refunds."  Petitioners then spend approximately 5 pages of their 40-page reply brief arguing that HIE did not change its method of accounting as to tobacco tax refund income or if it did that the change either was impliedly consented to by respondent or did not require the consent of respondent.  We do not believe that petitioners are prejudiced by our consideration of respondent's

argument as we do.  A taxpayer changes its method of accounting when it changes either the "overall plan of accounting for gross income or deductions" or "the treatment of any material item used in such overall plan", and a "material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction."  Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.; see also Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989).  HIE's claim of its change in its reporting of its tobacco tax refunds would have been such a change in method of accounting requiring the prior consent of the Commissioner, see, e.g., Capital One Fin. Corp. v. Commissioner, supra; Bank One Corp. v. Commissioner, 120 T.C. 174, 282-283 (2003), affd. in part and vacated in part sub nom. J P Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006), and no additional evidence that petitioners may have included in the record as to this matter would have changed the fact that HIE never obtained the requisite consent for such a change.[61]  We also note that petitioners have not specifically set forth any reliable testimony or document that they would have introduced into evidence as to this matter or to support their assertion that

_____

[61]We disagree with petitioners' assertions that respondent impliedly consented to any such change or that such a change did not require the consent of respondent because of the criminal investigation.

they "have been prejudiced as they have been denied the opportunity to present any evidence regarding whether §446 applies to the treatment of tobacco tax refunds."

IV.  Bad Debt Deduction

HIE claimed on its 199806 Federal income tax return that it was entitled to deduct a bad debt of $905,340 with respect to an amount recorded in HIE's records as "Due From Trustee, JSL". Respondent determined in part that this deduction was improper because HIE did not have a debtor/creditor relationship with Jin Sook Lee.[62]  Respondent also determined that the deduction was improper because HIE did not substantiate the accuracy of the amount of the debt or the debt's worthlessness.

Petitioners argue that HIE is entitled to this deduction. As for the requisite debtor/creditor relationship, petitioners contend that Michael Boulware, on behalf of HIE, transferred the money to Jin Sook Lee in her capacity as trustee of the Glenn Lee Boulware Trust to hold in trust for HIE while HIE accumulated

_____

[62]Respondent also disallowed deductions for bad debts of $300,000, $1 million, $700,000 and $700,000 for 199306, 199406, 199506, and 199706, respectively, in reduction of NOLs.  HIE claimed these deductions on the basis of its position that it was unable to recover portions of approximately $6.7 million involved in the JSL litigation.  The $905,340 deduction at issue arose from the same purported debt after the parties in the various bankruptcy proceedings involving Jin Sook Lee settled those proceedings.

enough funds to redeem Mal Sun Boulware's marital interest in

HIE.  Petitioners point the Court to the State court's holding in

the JSL litigation that "There is a binding agreement between

Plaintiff [Jin Sook Lee], [Michael] Boulware and HIE for

Plaintiff to hold monies belonging to HIE to pay Mal Sun Boulware

for her marital interest in HIE" and contend that the decision in

that proceeding is binding on this Court, or at least the most

persuasive evidence of the status in which Jin Sook Lee held the

funds.  Petitioners also argue that respondent was a party to Jin

Sook Lee's bankruptcy proceeding and thus is bound by the

decision there.

We agree with petitioners that HIE is entitled to deduct a

$905,240 bad debt for 199806, but we do so for other reasons.

Section 166 allows a taxpayer to deduct a bad debt under that

section where the taxpayer establishes:  (1) A valid

debtor-creditor relationship, (2) a bona fide debt created or

acquired in connection with a trade or business, (3) the amount

of the debt, (4) the worthlessness of the debt, and (5) the year

in which the debt became worthless.  See sec. 1.166-1, Income Tax

Regs.; see also Franchise Tax Bd. v. MacFarlane, 83 F.3d 1041,

1045 (9th Cir. 1996).

HIE claims the bad debt deduction on the basis of the State

court's finding in the JSL litigation that Jin Sook Lee held

property belonging to HIE.  Contrary to petitioners' assertion, we do not consider ourselves bound by the decision in the State court proceeding as to the characterization of the disputed funds.  See United States v. Boulware, 384 F.3d at 805.[63]  Nor do we consider ourselves bound on this issue by anything that occurred during Jin Sook Lee's bankruptcy proceedings.  We find in the record no indication that the bankruptcy court inquired into either the specifics or the merits of Jin Sook Lee's Federal income tax liability in the process of confirmation, so as to give the United States any incentive to participate actively in the proceedings in that court.  See United States v. Berman, 884 F.2d 916, 922-923 (6th Cir. 1989) (noting that collateral estoppel may not apply to a party who lacked an incentive to litigate in the first trial).  In fact, the United States apparently lacked any incentive to challenge the proceedings in the bankruptcy court in that Jin Sook Lee's Federal income tax liability was set and secured.

As we view the credible evidence before us, Michael Boulware diverted the disputed funds from HIE for his personal benefit,

---

[63]We also note that neither respondent nor the United States was a party to (or effectively represented in) the JSL litigation.  See United States v. Mendoza, 464 U.S. 154, 158 (1984); Commissioner v. Estate of Bosch, 387 U.S. 456, 463 (1967); cf. Robinson v. Commissioner, 102 T.C. 116, 129-133 (1994), affd. on this issue 70 F.3d 34 (5th Cir. 1995).

and he did not transfer those funds to Jin Sook Lee to hold as a trustee for either him or HIE.  In fact, Michael Boulware's counsel, Michael McCarthy, had informed Michael Boulware before the times of any of the relevant transfers that it was inappropriate for Michael Boulware to transfer any HIE assets to Jin Sook Lee for her to hold for his divorce from Mal Sun Boulware, and Michael Boulware by his own admission clearly understood from his conversations with Michael McCarthy that it was neither proper nor wise for Michael Boulware to give HIE's property to Jin Sook Lee to hold for that purpose.  In addition, HIE's controller, Merwyn Manago, was unaware of any money that Jin Sook Lee owed HIE before June 30, 1992, and did not even know of Jin Sook Lee until more than a year after that date.

We consider incredible petitioners' story that Michael Boulware on behalf of HIE transferred the funds to Jin Sook Lee to safeguard the funds from dissipation for an ultimate return to HIE.  Why would Michael Boulware stealthily have to give the funds to his mistress for accumulation, let alone with no interest being earned on those funds?  Why would Michael Boulware have gone to such great lengths to establish the Glenn Lee Boulware Trust formally in order to protect assets transferred to the trust for the benefit of his oldest son, while not taking any similar formal action to protect a dissipation of the disputed

funds?  Why did Michael Boulware not allow HIE's controller to be aware of the transfers so that the funds were reported on HIE's books and records?[64]  Why would Michael Boulware through a promise collateralized by HIE's vending machines agree to repay Jin Sook Lee $1.2 million for inappropriately taking the Koloa house from her?  Why would Michael Boulware have given Jin Sook Lee an HIE check for $840,000 when she demanded from him that he return to her the money of hers that he had stolen from her safe?  Why would Michael Boulware have asked Jin Sook Lee to lend him $200,000 to use in his divorce from Mal Sun Boulware?  The jury in the criminal trials apparently rejected any characterization of the funds as loans between HIE and Jin Sook Lee, and we reject that characterization as well.  Michael Boulware and Jin Sook Lee, as they showed through both their words and actions, believed those funds to be hers.[65]

---

[64]As to this point, we do know that Merwyn Manago would not have approved of any transfer of HIE funds to Jin Sook Lee to hold and safeguard the funds for Michael Boulware's divorce from Mal Sun Boulware, had Merwyn Manago known about the transfer at the time of the transfer.

[65]In other words, as stated supra p. 69 in our findings of fact, we find that Michael Boulware diverted the disputed assets from HIE for his personal use in that he then gave the assets to Jin Sook Lee to use or spend the assets as she desired (but with his wish, but not his requirement, that she use or spend the assets for the common benefit of him, her, and their children). By diverting the money as he did, Michael Boulware stealthily reduced the apparent value of HIE for purposes of determining how

(continued...)

We are mindful, however, that the State court entered a judgment in the JSL litigation that required that Jin Sook Lee pay $4,551,931 to HIE. Respondent sets forth no persuasive argument that this judgment was invalid or unenforceable, and we find that Jin Sook Lee was required by the judgment to pay HIE $4,551,931. We also find that HIE and Jin Sook Lee during the latter's bankruptcy case settled her liability for the $4,551,931 by her promise to pay to HIE a lesser amount and that their settlement resulted in $905,340 of the $4,551,931 becoming worthless in 199806. The State court judgment establishes that HIE and Jin Sook Lee's relationship as to the $4,551,931 was that of a debtor and a creditor and that the debt was a bona fide business debt of HIE. Given that the record also demonstrates that $905,340 of the debt became worthless during 199806, we sustain HIE's deduction of that amount as a bad debt for 199806. See sec. 1.166-2(c)(2), Income Tax Regs.

---

[65](...continued)
much he would have to pay Mal Sun Boulware for her share of the corporation. Michael Boulware also disguised gifts to Jin Sook Lee for which he presumably would be liable for the payment of a significant amount of Federal gift tax. Federal gift tax is imposed on transfers of property by gift by any individual during a calendar year, whether the transfer is in trust or otherwise and whether the gift is direct or indirect. See secs. 2501(a), 2511(a).

V.    Professional Fees

    A.  Overview of Dispute

    In the NODs issued to Holdings and to HIE, respondent determined that the subject corporations are entitled to deduct only some of the professional fees they seek to deduct.  The parties dispute whether the subject corporations may deduct certain professional fees that respondent has declined to allow as deductions.  Respondent argues that the fees are not deductible for various reasons.  First, respondent argues that HIE has failed to establish that it incurred fees paid by Holdings.  Second, respondent argues that petitioners have not substantiated all of the fees.  Third, respondent argues that some fees were Michael Boulware's personal expenses and were not an ordinary and necessary business expense of either subject corporation.  Fourth, respondent argues that some fees related to Jin Sook Lee's bankruptcy proceedings are nondeductible because they are capital expenditures.  Petitioners argue that HIE has established that it incurred fees paid by Holdings, that all fees claimed deductible by the subject corporations are substantiated, that all of the fees were ordinary and necessary business expenses, and that none of the fees related to Jin Sook Lee's bankruptcy proceedings are capital expenditures.  Petitioners also argue that certain fees are deductible under certain

corporate and State statutory provisions.  Petitioners do not argue, nor do we find, that any of the fees were deductible by the corporations because at the time they were incurred they were intended to be compensation to Michael Boulware.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 92 (stating that payments are deductible as compensation only if the payor intends at the time that the payment is made to compensate the recipient for services performed; see also Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973).

B.  Applicable Law in General

1.  Deduction of Ordinary and Necessary Business Expenses

Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  The regulations prescribed under section 162 clarify that only those ordinary and necessary business expenses "directly connected with or pertaining to the taxpayer's trade or business" may be deducted.  Sec. 1.162-1(a), Income Tax Regs.

Professional fees may qualify as an ordinary and necessary expense of a business.  See Commissioner v. Tellier, 383 U.S. 687, 689-690 (1966); Bingham's Trust v. Commissioner, 325 U.S.

365, 374 (1945); Guill v. Commissioner, 112 T.C. 325, 328-329 (1999). Whether a professional fee qualifies as such is generally a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943). In order to be "necessary", the fee must be "appropriate and helpful" to the development of the taxpayer's business. See Commissioner v. Tellier, supra at 689; Welch v. Helvering, 290 U.S. at 113-115. In order to be "ordinary", the expense must be "normal, usual, or customary" in the type of business involved. See Deputy v. du Pont, 308 U.S. at 495-496; see also Welch v. Helvering, supra at 113-115.

2. Corporate Taxpayer's Burdens Underlying Deduction

A corporate taxpayer's deduction for professional fees is a matter of legislative grace, and the corporation bears the burden of proving its entitlement to the deduction. See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Boyd Gaming Corp. v. Commissioner, 177 F.3d 1096, 1098 (9th Cir. 1999), revg. on another issue T.C. Memo. 1997-445. That burden extends not only to the professional fees the corporation claims on its Federal income tax returns but also to any professional fee that the corporation first claims as a deduction after the Commissioner has issued to the corporation a notice of deficiency for the year of the claimed deduction. See

Lawler v. Commissioner, T.C. Memo. 1995-26.  In the case of a deduction for professional fees claimed by a corporate taxpayer such as HIE or Holdings, the corporation, like any other taxpayer, is required by the Internal Revenue Code to maintain sufficient records to substantiate that deduction.  See sec. 6001; New Colonial Ice Co. v. Helvering, supra at 440.

### 3. Payment of Another Taxpayer's Expense

A taxpayer generally may not deduct the payment of another person's expense.  See Deputy v. du Pont, 308 U.S. 488 (1940); Dietrick v. Commissioner, 881 F.2d 336 (6th Cir. 1989), affg. T.C. Memo. 1988-180; Lohrke v. Commissioner, 48 T.C. 679 (1967); cf. Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986) (shareholder's payment of corporate obligation is not ordinary and necessary under section 162(a)), affg. T.C. Memo. 1984-264. In limited cases, however, the taxpayer may be entitled to deduct the other person's expense upon the satisfaction of a two-prong test.  See Lohrke v. Commissioner, supra at 688.  The analysis as to whether a taxpayer may deduct the taxpayer's payment of the other person's expense is essentially the same whether the payor is an individual or a corporation.  See, e.g., Capital Video Corp. v. Commissioner, 311 F.3d 458 (1st Cir. 2002), affg. T.C. Memo. 2002-40; Hood v. Commissioner, 115 T.C. 172 (2000); Bemidji Distrib. Co. v. Commissioner, T.C. Memo. 2001-260, affd.

sub nom. <u>Langdon v. Commissioner</u>, 59 Fed. Appx. 168 (8th Cir. 2003); <u>Norman E. Duquette, Inc. v. Commissioner</u>, T.C. Memo. 2001-3.  Given our findings that the subject corporations paid the expenses of the attorneys and other professionals who represented those corporations' controlling shareholder, Michael Boulware, in his defense of criminal income tax and false statement charges brought against him (including the appeals of his ensuing convictions), in civil litigation, and in various other matters, we apply that two-prong test here to many of the fees in dispute.

### a.  First Prong of Two-Prong Test

Under the first prong of the two-prong test, the taxpayer must have paid the other person's expense primarily to benefit its business, with the receipt by the other person of any benefit from the payment being merely incidental.  See <u>Capital Video Corp. v. Commissioner</u>, <u>supra</u>.  Where, as here, the payor and the beneficiary of the payment are a corporation and a controlling shareholder, the corporation's payment of the shareholder's expense is closely scrutinized, and the showing of the primary benefit to the corporation must be strong.  See <u>Hood v. Commissioner</u>, <u>supra</u> at 179, 181.

Generally, the first prong is more likely to be satisfied if the shareholder is unable to pay the expense, thus requiring the

corporation to pay the expense in order to protect its own interests.  See Square D Co. v. Commissioner, 121 T.C. 168, 200 (2003); cf. Dietrick v. Commissioner, supra at 339 (stating that the first prong requires a finding of "'a clear proximate danger to the taxpayer and ... a payment made to protect an existing business from harm'" and "Where the taxpayer fails to demonstrate 'a direct nexus between the purpose of the payment and the taxpayer's business or income producing activities,' the deduction will not be allowed" (quoting Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 410 F.2d 1233, 1243 (1969) and Lettie Pate Whitehead Found., Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979)).  The potential harm for which a business is protected through the payment of the other person's expense must be direct and proximate.  See Hood v. Commissioner, supra at 181 (holding that corporation could not deduct the payment of its sole shareholder's legal fees where it did not appear that the corporation's failure to pay the legal fees would have caused it to go out of business);[66] see also AMW Invs., Inc.

---

[66]In Hood v. Commissioner, 115 T.C. 172 (2000), the corporation had paid the legal expenses of its sole shareholder who had been indicted for tax evasion.  Although the shareholder was "indispensable" to the corporation's business, the Court held that the expenses were not deductible by the corporation.  The Court stated that the record failed to establish that the shareholder was unable to pay his legal expenses or that the
(continued...)

<u>v. Commissioner</u>, T.C. Memo. 1996-235 (holding that the corporate taxpayer could not deduct legal fees incurred as to the sole shareholder's criminal tax violations where the corporation was not a defendant in the criminal proceeding and was not under the threat of prosecution or forfeiture).

### b. Second Prong of Two-Prong Test

Under the second prong of the two-prong test, the expense must be an ordinary and necessary expense of the payor's trade or business. See <u>Capital Video Corp. v. Commissioner</u>, <u>supra</u> at 464. Whether the legal expenses of a controlling shareholder/employee are such an ordinary and necessary expense may bring into play the well established "origin and character of the claim" test of <u>United States v. Gilmore</u>, 372 U.S. 39, 49 (1963).[67] There, the U.S. Supreme Court stated that "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether it is deductible or not". <u>Id.</u> at

---

[66](...continued)
corporation "would have ceased operations if it did not pay the legal fees"; thus, the shareholder was deemed the primary beneficiary of the payment of his legal fees. <u>Id.</u> at 178, 181.

[67]Petitioners argue that the origin of the claim test has no applicability where, as here, the payors are corporations as opposed to individuals. We disagree with such a narrow interpretation.

49. Thus, if the origin of the legal action is not in the business activity of the taxpayer, the taxpayer may not deduct the taxpayer's payment of legal fees. See id. Nor are legal expenses deductible under the origin and the character of the claim test simply because the payor faces liability or acts to prevent such liability. As noted by the U.S. Supreme Court in United States v. Gilmore, supra at 46-47 (quoting Lykes v. United States, 343 U.S. 118, 125-126 (1952)):

> "Legal expenses do not become deductible merely because they are paid for services which relieve a taxpayer of liability. That argument would carry us too far. It would mean that the expense of defending almost any claim would be deductible by a taxpayer on the ground that such defense was made to help him keep clear of liens whatever income-producing property he might have. For example, it suggests that the expense of defending an action based upon personal injuries caused by a taxpayer's negligence while driving an automobile for pleasure should be deductible. * * *
>
>     *     *     *     *     *     *     *
>
> * * * It is not a ground for . . . [deduction] that the claim, if justified, will consume income-producing property of the defendant." * * *

A taxpayer's payment of legal fees to defend criminal charges may be deductible under section 162 if the charges found their source in the taxpayer's business activities; i.e., the crime is directly connected to the taxpayer's business. In Commissioner v. Tellier, 383 U.S. 687 (1966), for example, the U.S. Supreme Court held that legal fees paid to defend the

taxpayer from criminal charges for securities fraud were deductible where the taxpayer was a securities dealer. Likewise, in Commissioner v. Heininger, 320 U.S. 467 (1943), the U.S. Supreme Court held that legal fees paid to defend the taxpayer from mail fraud could be a business expense of the taxpayer's mail-order business. Accord O'Malley v. Commissioner, 91 T.C. 352, 363, 366 (1988) (direct connection between the crime (bribery of a politician concerning deregulation of the trucking industry) and the individual taxpayer's business (trucking)); Johnson v. Commissioner, 72 T.C. 340, 348 (1979) (direct connection between crime of conspiracy to defraud the Government and business of illegal tax refund schemes).

Where the crime is not directly connected with a corporation's business, e.g., the crime arose out of the shareholder's activities and not out of the corporation's profit-making activities, the corporation may not deduct its payment of legal fees to defend criminal charges brought against its shareholder. See Deputy v. du Pont, 308 U.S. at 497 (holding that expenses were not "ordinary and necessary" business expense although the expenses benefited the business). For example, in Nw. Ind. Tel. Co. v. Commissioner, 127 F.3d 643 (7th Cir. 1997), affg. T.C. Memo. 1996-168, the corporate taxpayer paid the costs of litigation to defend against an FCC action in which the

corporation was named. The courts held that the corporation could not deduct the costs because the claim originated not in the corporation's profit-making activities but in the nonbusiness actions of the corporation undertaken for the benefit of its controlling shareholder. See O'Malley v. Commissioner, supra at 358-361; AMW Invs., Inc. v. Commissioner; T.C. Memo. 1996-235; see also Jack's Maint. Contractors, Inc. v. Commissioner, 703 F.2d 154, 156 (5th Cir. 1983) (holding that corporate taxpayer could not deduct sole shareholder's legal fees for tax evasion because the fees were a "personal" and not business expense), revg. T.C. Memo. 1981-349;[68] Peters, Gamm, West & Vincent, Inc. v. Commissioner, T.C. Memo. 1996-186 (holding that securities firm corporation could not deduct criminal legal fees of principal indicted for insider trading because the legal expenses were incurred defending a claim which had its origin in a transaction that was not part of the corporation's business).

C. Whether HIE Incurred Any of the Disputed Expenses

Respondent argues that HIE may not deduct many of the professional fees at issue because it failed to establish that it

---

[68]Following the reversal of this Court's decision in Jack's Maint. Contractors, Inc. v. Commissioner, T.C. Memo. 1981-349, revd. 703 F.2d 154 (5th Cir. 1983), we decided to adopt the logic espoused by the U.S. Court of Appeals for the Fifth Circuit in reversing us. See Hood v. Commissioner, 115 T.C. 172 (2000).

incurred these fees. To that end, respondent asserts, Holdings paid most of the fees and HIE has not shown that it was indebted to Holdings as to any of those payments. We disagree. We are satisfied on the record before us that Holdings and HIE had a firm understanding that Holdings would pay the fees and then seek reimbursement from HIE to the extent that the fees were paid on behalf of HIE. While Holdings may not have sought from HIE the exact amount of professional fees that benefited HIE, we are satisfied that the allocation method designed and employed by the management of the corporations generally reached that end, and we decline respondent's invitation to second-guess or otherwise to disturb that method. See Boyd Gaming Corp. v. Commissioner, 177 F.3d 1096 (9th Cir. 1999); Californians Helping to Alleviate Med. Problems, Inc. v. Commissioner, 128 T.C. 173, 185-186 (2007); Metrocorp, Inc. v. Commissioner, 116 T.C. 211, 224-225 (2001). Thus, with the exception of the specific expenses that we state infra were not incurred by HIE, we conclude that the expenses that petitioners claim are deductible by HIE were in fact incurred by HIE.

In seeking a contrary conclusion, respondent stresses the fact that each of the subject corporations is a distinct entity that files a separate tax return. Although such is so, the fact of the matter is that the corporations were controlled by a

common shareholder and he and the rest of the management decided from a business point of view that it was best to have Holdings pay all of the costs and then seek reimbursement from HIE. We also note that respondent did not invoke his power under section 482 to reallocate such expenses, nor does he suggest an alternate allocation that would more fairly apportion the expenses between HIE and Holdings. See Maxwell Hardware Co. v. Commissioner, 343 F.2d 713 (9th Cir. 1965), revg. Beckett v. Commissioner, 41 T.C. 386 (1963).

D. Whether All Expenses Were Substantiated

Respondent also determined that some of the professional fees were nondeductible because they were unsubstantiated. For the most part, we disagree.[69] The record includes voluminous documentary and testimonial evidence that substantiates to our satisfaction most of the professional fees petitioners claimed as deductible. The documentary evidence includes invoices, ledgers, and checks. The testimonial evidence includes the testimony of many of the professionals themselves.

Moreover, both parties agree that the subject corporations hired attorneys, accountants, and other professionals in

---

[69]We agree with respondent that petitioners have failed to substantiate certain fees included in the "other fees" category. Those expenses are specifically identified infra p. 282.

connection with several ongoing and legitimate business matters and that some of those expenses are "ordinary and necessary business expenses by some entity".  The services underlying those expenses include the preparation of tax returns, lease issues, tax advice and consultation (including HIE's tobacco tax liability), corporate resolutions and minutes, a corporate reorganization, labor and employment issues, pension fund issues, class action tobacco lawsuit filed by Hawaii, and general business and corporate advice.  While respondent has reservations as to which of the two corporate petitioners is entitled to be treated as having incurred the specific portions of the expenses, we do not have similar reservations.  As just mentioned, we believe that the allocations advocated by petitioners are bona fide and valid.

E.   "Fees Accepted as Ordinary and Necessary" and "Other Fees"

Given our disagreement with respondent's arguments that HIE failed to establish that it incurred any professional fees and that petitioners failed to substantiate various professional fees, we proceed to analyze further the deductibility of the expenses listed in appendix C as "Fees Accepted as Ordinary and Necessary" and "Other Fees".  We conclude that all of the fees listed in the former category are deductible as petitioners

asserted.  As to the latter category, we conclude that petitioners have failed to substantiate and otherwise establish their entitlement to deduct any of the expenses for the following professionals:  Accucopy, Case Bigelow, GMK Consulting, King King, Laird Christianson, Robert Holland, Yoshida, Inc., Other Legal, Lorin Kushiyama, Richard Kitagawa, TRI Pac, Vending Consulting, and Watson Wyatt.[70]  On the other hand, we conclude that the expenses in the "Other Fees" category for the following professionals are deductible as petitioners asserted (and as modified by statements infra note 71):  Amortization, Damon Key, Foley Jones, Louis Wai, Michael McCarthy, Nathan Suzuki, Henry Yokogawa, and Kobayashi Doi.[71]

F.  Expenses of Michael Boulware's Criminal Defense

1.  Background

With respect to the professional fees listed in appendix C in the categories of "Criminal Investigation", "Grand Jury

---

[70]The subject corporations may not deduct the expenses corresponding to GMK Consulting because we find that those expenses are solely the personal expenses of Michael Boulware.

[71]The subject corporations may not deduct $712.49 for Damon Key because we find that this expense is solely the personal expense of Michael Boulware.  (The $712.49 related to the personal estate planning services that Damon Key provided to Michael Boulware.)  The subject corporations may deduct two-thirds of the expense for Louis Wai; the remaining one-third is not deductible by those corporations because it is the personal expense of Michael Boulware.

Proceedings" and "Criminal Trial", respondent determined that neither HIE nor Holdings may deduct those fees because the fees were personal to Michael Boulware.  In support of this determination, respondent asserts as a factual matter that neither HIE nor Holdings was a target of the criminal investigation or the grand jury proceedings.  We disagree with this assertion.  The record persuades us, and we find as a fact, that both corporations, through their management and counsel, reasonably believed (and were so informed by the Government) that while Michael Boulware (and not either subject corporation) was the focus of the criminal and grand jury investigations, they (HIE and Holdings) could eventually become targets of the criminal investigation and grand jury proceedings.  Moreover, the criminal investigation and grand jury proceedings entailed examination and scrutiny of HIE's tax returns, and in addition to the risk of criminal liability, HIE faced civil tax exposure from the investigations and criminal trial.  The possibility that HIE or Holdings could become a target of those criminal investigations even continued after the indictment of Michael Boulware, e.g., the Government informed the U.S. District Court hearing the criminal case that HIE could still be indicted in the matter as a codefendant.

## 2. Expenses Stemmed From Personal Pursuits

The fact that these fees may have benefited both Michael Boulware and the corporations, however, does not mean that the fees are deductible by the corporations. To the contrary, we find that petitioners have generally failed to establish that the corporations paid the referenced legal expenses of Michael Boulware for the primary benefit of the corporations.[72] In fact, we find that the subject corporations incurred most of the professional fees deducted by the corporate petitioners for the primary benefit of their controlling shareholder, Michael Boulware, and that those fees were Michael Boulware's personal expenses.[73]

---

[72]As we have indicated in our findings supra, the subject corporations retained professionals in connection with collateral matters attendant to Michael Boulware's criminal proceedings as they affected the corporations, e.g., responding to subpoenas and moving to quash the subpoenas; representing and assisting employees and directors of HIE who were called as witnesses; tax advice concerning the implications of the criminal trial. As discussed infra, we conclude that the subject corporations are entitled to deduct those portions of the professional fees attributable to Michael Boulware's criminal proceedings.

[73]Petitioners argue that respondent is judicially estopped from asserting that none of the fees of Reinwald O'Connor are business expenses of HIE. To that end, petitioners state, respondent moved in Michael Boulware's criminal case to disqualify Reinwald O'Connor because it also represented HIE. We disagree with petitioners' argument. To say the least, Reinwald O'Connor was disqualified in the criminal case because Dennis O'Connor, as HIE's attorney, represented Merwyn Manago, a key Government witness.

We consider the origin and character of the applicable claim to be respondent's investigation of crimes that Michael Boulware may have committed with respect to his personal income taxes. That investigation centered on whether Michael Boulware, as a result of his failure to file timely personal Federal income tax returns, failed to report and pay Federal income tax on large amounts of gross income realized by and taxable to him. The professionals were hired primarily to serve Michael Boulware and his personal interest in staying out of prison. The origin of the criminal investigation is thus traced most directly to the personal pursuits of Michael Boulware, independent of HIE's operation of a trade or business. In addition, HIE had no need to pay Michael Boulware's professional fees in order to stay in its business. On the basis of the record at hand, we find that Michael Boulware could have paid those expenses himself.

As stated supra, the subject corporations are entitled to deduct expenses that are attributable to collateral matters attendant to Michael Boulware's criminal proceedings as they affected the corporations. We list those expenses as follows:

1. All of the $5,000 paid to Benjamin Cassidy in 199806.

2. One-half of the $331,653.46 for services in 199806 that Shiotani Inouye (or its Kovel accountant Nathan Suzuki) provided

to Michael Boulware and HIE jointly in connection with the criminal investigation.

3.  One-half of the $3,986.95 for services in 199806 that Wachi Watanabe provided to Michael Boulware and HIE jointly in connection with the criminal investigation.

4.  All of the $5,000 paid to Birney Bervar for 200106.

5.  All of the $13,049.23, $7,712.85, and $4,532.77 paid to Brook Hart during 199806, 199906, and 200006, respectively.

6.  All of the $2,806.88 paid to Kevin Chee and Chee Markham for their services in 200006.

7.  All of the $1,492.09 for services in 199806 that Damon Key provided to HIE in connection with the grand jury proceedings.

8.  One-half of the $56,848.50 and $65,403.96 for services in 199806 and 199906 that Graham James provided to Michael Boulware and HIE jointly in connection with the grand jury proceedings.

9.  All of the $13,579.50 for services in 200006 that Lopeti Foliaki provided to Nathan Suzuki in connection with the grand jury proceedings.

10.  One-half of the $44,480.01 for services in 200006 that Perkin Hosoda provided to Michael Boulware and HIE jointly in connection with the grand jury proceedings.

11. One-half of the $353,348.98 and $307,988.61 for services in 199806 and 199906 that Reinwald O'Connor provided to Michael Boulware and HIE jointly in connection with the grand jury proceedings.

12. One-half of the $224,581.69 for services in 199906 that Shiotani Inouye (or its Kovel accountant Nathan Suzuki) provided to Michael Boulware and HIE jointly in connection with the grand jury proceedings.

13. All of the $15,117.06, $8,111.50, and $24,749.15 for services in 199806, 199906, and 200006, respectively, that Stephen Pingree provided to Nathan Suzuki in connection with the grand jury proceedings.

14. One-half of the $17,486.87 for services in 199806 that Wachi Watanabe provided to Michael Boulware and HIE jointly in connection with the grand jury proceedings.

15. All of the $4,864.74 for services in 200206 that Brook Hart provided to Merwyn Manago in connection with Michael Boulware's first criminal trial.

16. All of the $25,154.47 and $9,343.61 for services in 200106 and 200206, respectively, that McCorriston Miller provided to Nathan Suzuki in connection with his criminal prosecution by the United States.

17. One-half of the $17,500 for services performed by Nathan Suzuki as a <u>Kovel</u> accountant.

18. One-half of the $102,672.10 for services in 200006 that Shiotani Inouye (or its <u>Kovel</u> accountant Nathan Suzuki) provided to Michael Boulware and HIE jointly in connection with Michael Boulware's first criminal trial.

19. One-half of the $82,103.66 for services in 200106 that Shiotani Inouye provided to Michael Boulware and HIE jointly in connection with Michael Boulware's first criminal trial.

20. One-half of the $12,604.03 for services in 200206 that Shiotani Inouye provided to Michael Boulware and HIE jointly in connection with Michael Boulware's first criminal trial.

G. <u>Professional Fees Related to Civil Litigation Initiated by Jin Sook Lee</u>

1. <u>Overview</u>

In the NOD issued to HIE, respondent determined that a portion of the professional fees relating to the civil litigation initiated by Jin Sook Lee was nondeductible capital expenditures because that portion of the fees was incurred to recover certain assets from Jin Sook Lee's bankruptcy estate. Those assets were identified as the Punahou condominium, the Atkinson condominium, an interest in the Makaiwa house, a Rolls Royce, and jewelry and furs. Respondent also determined in that NOD that HIE could

deduct 50 percent of the substantiated, noncapital professional fees as valid business expenses but could not deduct the remaining 50 percent of these expenditures in that they were the personal expenses of Michael Boulware. Respondent argues that the latter 50 percent of professional fees were the personal expenses of Michael Boulware because they primarily benefited him.

We disagree with respondent that the professional fees determined to be capital expenditures are in fact nondeductible capital expenditures. We agree with respondent, however, that the fees benefited Michael Boulware to the extent of 50-percent and to that extent are nondeductible by HIE.

2. Analysis

a. Fees Determined To Be Capital Expenditures

The cost of defending or perfecting title to property is a capital expenditure that is not deductible as an ordinary and necessary business expense under section 162(a). See sec. 1.263(a)-2(c), Income Tax Regs. Respondent determined that the subject fees fall within this category because they were incurred in connection with recovering the referenced assets from Jin Sook Lee's bankruptcy estate. We disagree with this determination. From a factual point of view, we find that HIE incurred these fees not to defend or perfect HIE's title in the referenced

assets but to collect the monetary judgment that the State court had awarded to HIE in the JSL litigation. To be sure, the jury in the JSL litigation found that the Atkinson condominium, the Punahou condominium, and the Makaiwa house were not in fact owned by HIE. On the basis of our finding, we conclude that the referenced fees are deductible as the ordinary and necessary expenses of HIE's business. See MacMillan v. Commissioner, 14 B.T.A. 1367 (1929); see also Vincent v. Commissioner, 219 F.2d 228, 231 (9th Cir. 1955) (legal expenses incurred to recover assets from faithless fiduciary are deductible), revg. 18 T.C. 339 (1952); Nelson v. Commissioner, T.C. Memo. 2000-212 (taxpayer's raising issue over his ostensible title to assets to leverage settlement with true owners thereof did not render the litigation fees a capital expenditure).

b. Fees Determined To Be Michael Boulware's Personal Expenses

The usual and expected response of a corporate taxpayer that is sued or otherwise comes under legal attack is to hire legal counsel to defend corporate assets and interests. Thus, such expenses of representation are generally characterized as ordinary and necessary business expenses deductible under section 162. Where as here, however, the expenses are incurred for the equal benefit of a corporation and its sole shareholder, the

expenses are not deductible entirely by the corporate payor but must be apportioned between the corporation and its shareholder to reflect the reality of the situation.

Respondent determined that the expenses related to the litigation initiated by Jin Sook Lee benefited HIE and Michael Boulware in equal amounts. We agree that an equal allocation of those expenses to HIE and Michael Boulware is appropriate under the facts of these cases. As to HIE, Jin Sook Lee was seeking through that litigation to obtain a monetary judgment against HIE, the removal of members of HIE's board of directors, and the appointment of a receiver to operate HIE. As to Michael Boulware, Jin Sook Lee was seeking an award of 50 percent of the stock in HIE and a judgment ordering him to repay personally to her the $1.2 million reflected in the note that he had given her; she also alleged that he alone stole the cash and Koloa house from her. In addition, Jin Sook Lee commenced the JSL litigation against both Michael Boulware and HIE, she sought an award against each of them jointly, and both Michael Boulware and HIE joined in the countercomplaint filed against her. While HIE's board of directors formally decided that HIE should pay for the legal expenses associated with the trust case (including Michael Boulware's counterpetition therein) and the shareholder derivative case (to the extent of the defense of Michael

Boulware, Sidney Boulware, Merwyn Manago, and Mal Sun Boulware),
any such decision does not change the fact that the expenses
related to the litigation commenced by Jin Sook Lee were incurred
for the benefit of HIE and Michael Boulware alike.  Nor does it
make those expenses deductible entirely by HIE.  In fact, HIE did
not even perceive Jin Sook Lee as posing an actual threat to it
through her filing and prosecution of any of the civil
litigation.  We find that HIE is entitled to deduct no more than
50 percent of these expenses.

H.  Applicability of Indemnification Agreement

1.  Overview

The general practice and policy of each subject corporation
was to pay for the professional representation of current or
former employees who were named, targeted, subpoenaed, or
otherwise involved in legal proceedings by reason of their
position with the company.  Each subject corporation also had
included in its incorporation documents indemnification
provisions to that effect.  Although the indemnity provisions in
HIE's (but not Holdings') incorporation documents were limited to
directors and officers, petitioners extended indemnity rights to
all employees.

## 2.  Arrangements Under Section 62(a)(2)(A)

Petitioners argue that the corporate petitioners' indemnity policy is an "employee reimbursement or other expense allowance arrangement" under section 62(a)(2)(A).  We decide this argument (and petitioners' other indemnification arguments discussed infra) with respect to the still disputed professional fees.[74]  A plan is an employee reimbursement or other expense allowance arrangement if expenses under the plan are substantiated, the employee is not permitted to keep excess funds, and there is the requisite connection to the employee's employment.  See Shotgun Delivery, Inc. v. United States, 269 F.3d 969, 972 (9th Cir. 2001); Trucks, Inc. v. United States, 234 F.3d 1340, 1342 (3d Cir. 2000).  The just-mentioned third requirement mandates that an expenses be "paid or incurred by the employee in connection with the performance of services as an employee of the employer." Sec. 1.62-2(d)(1), Income Tax Regs.  The costs of a plan that meets all three requirements are deductible by the employer and excludable from the employee's gross income as an above-the-line adjustment.

---

[74]We use the term "still-disputed professional fees" to refer to those fees which we hold herein are not deductible by the subject corporations.

Petitioners argue that all three requirements were met in these cases. To this end, petitioners state, substantiation is present because legal fees were not paid, or if paid were booked as a loan to Michael Boulware, until an invoice was provided to HIE; employees could not keep excess funds because the invoices were paid directly to the attorneys; and the indemnity arrangement assured a business connection because indemnity occurred only with respect to legal proceedings that the employee became involved in "by reason of" his or her current or former status as an employee, officer, or director of the corporation. We disagree with petitioners' argument that they have satisfied all three requirements with respect to the professional fees related to Michael Boulware. Petitioners have not established the requisite connection between the performance of services by Michael Boulware as an employee of either HIE or Holdings and the payment of the fees by one or both of those corporations. Indeed, the record leads us to find to the contrary, specifically, that the fees were incurred for the primary benefit of Michael Boulware to defend him against criminal income tax charges investigated and brought against him personally; tax and civil suits resulting from his diverting money from HIE to himself and Jin Sook Lee; and charges of conspiracy to defraud a lending institution. None of those actions, we find, was "in

connection with" his employment.  See <u>Biehl v. Commissioner</u>, 118 T.C. 467 (2002), affd. 351 F.3d 982 (9th Cir. 2003).

### 3.  <u>Mandatory Indemnity</u>

#### a.  <u>Overview</u>

Petitioners argue that the relevant incorporation documents provided Michael Boulware with mandatory indemnification as to certain of the professional fees that were paid on his behalf. Petitioners also argue that two State statutes, specifically Haw. Rev. Stat. sec. 416-35(d) (1985 & Supp. 1992), and its successor Haw. Rev. Stat. 415-5 (1985 and Supp. 1992), also provided Michael Boulware with mandatory indemnification as to those fees.[75]  In connection with these arguments, petitioners assert

---

[75]Haw. Rev. Stat. sec. 416-35 (Supp. 1982) was enacted in 1977 as a part of Act 71.  See 1977 Hawaii Sess. Laws 121; see also <u>Lussier v. Mau-Van Development, Inc.</u>, 667 P.2d 830, 833 (Hi. Ct. App. 1983).  Haw. Rev. Stat. sec. 416-35(d), <u>supra</u>, provides: "To the extent that an agent has been successful on the merits or otherwise in defense of any * * * [derivative action or nonderivative action], or in defense of any claim, issue or matter therein, the agent shall be indemnified by the corporation against expenses actually and reasonably incurred by the agent in connection therewith."  See also Haw. Rev. Stat. sec. 416-35(a)(1) and (2), <u>supra</u> (providing that an "agent" includes "a director, officer, employee or other agent of the corporation" and that "expenses" include "attorneys' fees"); <u>Lussier v. Mau-Van Development, Inc.</u>, <u>supra</u> at 832.  In 1987, Haw. Rev. Stat. sec. 416-35(d), <u>supra</u>, was replaced by Haw. Rev. Stat. sec. 415-5(d) (1985 and Supp. 1992), the text of which was similar to that of its predecessor.  While Haw. Rev. Stat. sec. 416-35(d), <u>supra</u>, was then replaced by Haw. Rev. Stat. sec. 414-243 (LexisNexis 2008), effective July 1, 2001, see Haw. Rev. Stat.

(continued...)

that Michael Boulware was acquitted of the substantive bank fraud counts; he was investigated and referred to a grand jury for filing false corporate tax returns as the president of HIE, but that count was not the subject of an indictment; Jin Sook Lee's shareholder derivative suit against HIE's board of directors was dismissed; and Michael Boulware defeated Jin Sook Lee's claims as to the owner of the Koloa house and the $840,000 in the safe. Petitioners conclude that the referenced documents and State statute obligated HIE to indemnify Michael Boulware with respect to those actions and that HIE will be further obligated under the statute to indemnify Michael Boulware as to all actions if he eventually prevails on the charges underlying his criminal convictions.

b.  Analysis

We disagree with petitioners that the so-called mandatory indemnification provisions in the incorporation documents and Hawaiian statute make any of the still disputed professional fees deductible under section 162(a).  First, even if Michael Boulware was entitled to the claimed mandatory indemnification, the compulsory character of a payment does not ensure that it is

_____

[75](...continued)
sec. 414-483, supra, petitioners limit their arguments to the earlier two provisions stating that the latest provision does not govern these cases.

deductible under section 162(a).  See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 359 (1971); Dolese v. United States, 605 F.2d 1146 (10th Cir. 1979).  Second, from a factual point of view, we disagree with petitioners' assertion that Michael Boulware was entitled to mandatory indemnification under those provisions as to any of the still-disputed professional fees.  In the setting of the incorporation documents, the criminal investigation of Michael Boulware and related trials were not "by reason of his being or having been a director or officer" of HIE; they grew out of his personal liability to pay Federal income taxes and allegations that he diverted money from HIE.

Nor do we believe that Michael Boulware was acting as an agent of one or both of the subject corporations in connection with the subject matter underlying the professional fees that were paid for his benefit.  An agent has a fiduciary duty to "act solely for the benefit of the principal in all matters connected with his agency", 2 Restatement, Agency 2d sec. 387 (1958), and we decline to find that the criminal proceedings against Michael Boulware, in which he is accused of diverting funds from HIE and delivering those funds to his mistress Jin Sook Lee, arose from conduct undertaken by him for the benefit of or as an agent of HIE.  See Commissioner v. Bollinger, 485 U.S. 340, 349 (1988).

### 4. Permissive Indemnity

Petitioners also argue that even if the subject corporations were not required to indemnify Michael Boulware as to his professional representation, the subject corporations were permitted to do so (and in no way precluded from doing so) as an ordinary and necessary expense of their businesses. Petitioners add that the boards of HIE and Holdings decided to indemnify Michael Boulware and other current or former employees of the corporations as a matter of business judgment and conclude that the professional fees are therefore deductible by the subject corporations as ordinary and necessary business expenses.

We disagree with petitioners' conclusion as to the deductibility of the professional fees. As we find supra, the subject corporations did not pay those fees primarily to benefit their business but did so primarily to benefit Michael Boulware. In addition, the mere fact that a corporate taxpayer pays an expense on the basis of business judgment does not necessarily mean that it is deductible as an ordinary and necessary expense under section 162(a). See, e.g., Inland Asphalt Co. v. Commissioner, 756 F.2d 1425 (9th Cir. 1985), affg. T.C. Memo. 1982-463.

### 5. Repayment Obligation

Petitioners assert that HIE has been paying Michael Boulware's legal expenses with an understanding (between HIE and Michael Boulware) that he will repay HIE the amount of any of those expenses that are proven not to have been required to be paid by HIE. Petitioners argue that the deductions therefore should stand as claimed even if HIE was not required to make the payment and that HIE will be required to include in its income any repayment made in future years. See Kanne v. Am. Factors, Ltd., 190 F.2d 155, 161 (9th Cir. 1951); cf. O'Malley v. Commissioner, 91 T.C. at 363 (allowing a taxpayer's sec. 162(a) deduction after this Court ruled that trust's payment of the taxpayer's legal expenses constituted income to him).

We disagree with this argument. HIE's payments of the professional fees are most properly viewed as distributions to Michael Boulware rather than as payments of business expenses under section 162. Therefore, those payments are nondeductible by HIE irrespective of whether Michael Boulware transfers cash or other assets of his to HIE to reimburse those payments. In addition, as noted infra, we do not find that HIE (or for that matter Holdings) intended its payments of the professional fees to be reimbursed by Michael Boulware.

VI.   Constructive Dividends

A.   Overview

Respondent determined that the professional fees, to the extent nondeductible by either subject corporation, are taxable to Michael Boulware as constructive dividends.  To that end, respondent determined, the payment of those fees by the subject corporations primarily benefited Michael Boulware.  We agree with respondent that the amounts of these fees paid by the subject corporations are considered to be cash distributions to Michael Boulware.[76]  We hold that the total amount of the distributions in each subject year is taxable to Michael Boulware as dividend income to the extent that the amount does not exceed the relevant amounts of E&P for that year.  We hold that any remaining amount of each year's total distribution is taxable to Michael Boulware as a long-term capital gain to the extent that the distribution exceeds Michael Boulware's corresponding adjusted basis.  For purposes of entering decisions in these cases, we shall order the parties to prepare the requisite computations under Rule 155 in accordance with our opinion herein.  The parties shall address in

_____

[76]Petitioners assert that Michael Boulware during each subject year returned to HIE more money than he received from HIE.  The credible evidence in the record does not support that assertion as to any of the subject years, and we decline to find it as a fact.

those computations the applicable amounts of E&P and the portions
of the distributions that are treated as dividend income and
long-term capital gain.

B.  Rules Applicable to Distributions

Under section 301, funds (or other property) distributed by
a corporation to a shareholder with respect to its stock are
taxed under section 301(c).  Under sections 301(c) and 316, a
constructive distribution is taxable to the shareholder as a
dividend to the extent of the corporation's E&P.  Any excess is
considered to be a nontaxable return of capital to the extent of
the shareholder's basis in the corporation, and any remaining
amount is then taxable to the shareholder as a gain from the sale
or exchange of property.  See sec. 301(c)(2) and (3); Truesdell
v. Commissioner, 89 T.C. 1280, 1295-1298 (1987).  Section 301
characterizes a distribution as a dividend regardless of whether
the distribution is formally declared to be a dividend.  See
Truesdell v. Commissoner, supra at 1295; see also Noble v.
Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo.
1965-84.

A corporation's payment of its shareholder's expense is a
constructive distribution to the shareholder if the payment
primarily benefits the shareholder and was made without
expectation of repayment.  See Hood v. Commissioner, 115 T.C. at

180; see also <u>Noble v. Commissioner</u>, <u>supra</u> at 443. The subject corporations' payments of Michael Boulware's legal expenses primarily benefited him, and we are not persuaded by the record before us that either subject corporation (or Michael Boulware for that matter) intended at the time of the payment that Michael Boulware was to repay those amounts to the corporations. We conclude that the amount of the legal and professional fees of Michael Boulware paid by the corporations are corporate distributions to him for purposes of sections 301(c) and 316.

C. <u>E&P</u>

1. <u>Background</u>

As discussed <u>supra</u>, the distributions to Michael Boulware are deemed to be dividends to him to the extent of each distributor's E&P. Respondent determined that each corporation had enough E&P to characterize all of the distributions by that corporation to Michael Boulware as dividends. That determination is presumed to be correct. See <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 884 (1991), affd. 959 F.2d 16 (2d Cir. 1992); see also Rule 142(a)(1).

2. <u>Lack of Comprehensive Definition</u>

In the setting of these cases, Congress has not defined the meaning of the statutory term "earnings and profit", see sec. 312, and the meaning of the term does not equate exactly to the

tax definition of the term "taxable income" (or to the accounting definition of the term "retained earnings").  See Commissioner v. Wheeler, 324 U.S. 542, 546 (1945); Stark v. Commissioner, 29 T.C. 122, 128 (1957).  While Congress designed taxable income as a measure of the income tax and related taxes which are assessed against a taxpayer, Congress designed E&P differently as a broader measure of economic income that reflects a corporation's capacity to pass along tax consequences to its shareholders through distributions in excess of their investments in the corporation.  See GPD, Inc. v. Commissioner, 508 F.2d 1076, 1082-1083 (6th Cir. 1974), revg. and remanding on another issue 60 T.C. 480 (1973).

### 3.  Calculation

#### a.  Overview

In general, a corporate taxpayer calculates its E&P for each taxable year by making various adjustments to its taxable income for that year.  See DiLeo v. Commissioner, supra at 888; see also sec. 1.312-6, Income Tax Regs.  We summarize these adjustments as follows.

##### i.  ATI

The taxpayer must first adjust its reported taxable income by any administrative and/or judicial adjustments to arrive at its adjusted taxable income (ATI).  Initially, the taxpayer's ATI

equals the amount of its reported taxable income, plus or minus (as the case may be) each adjustment to that reported income subsequently made or allowed by the Commissioner.  If the taxable year in question then becomes subject to litigation, the taxpayer's ATI would further reflect any additional adjustments to its income resulting from that litigation.

### ii.  Increases and Decreases to ATI

The taxpayer's ATI must be adjusted further by certain items that increase or decrease E&P.  These items generally fall within one of five categories.  See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.03, at 8-18 (7th ed. 2006).  The first category consists of certain items that are excluded from the computation of taxable income but are included in the computation of E&P.  See generally id. par. 8.03[3], at 8-22.  The second category consists of certain items that are deducted in the computation of taxable income but are not deducted in the computation of E&P.  See generally id. par. 8.03[4], at 8-26.  The third category consists of certain items that are not deducted in the computation of taxable income but are deducted in the computation of E&P.  See generally id. par. 8.03[6], at 8-29.  The fourth category consists of certain items that create timing differences, e.g., on account of deferred income or an accelerated deduction.  See generally id.

par. 8.03[5], at 8-27.  The fifth category consists of certain items related to corporate distributions or changes in corporate structure.  See generally id. par. 8.03[7], at 8-32.

Examples of adjustments that fall within one of these five categories and that increase E&P are the current year's deductions under sections 179, 179B, 179C, and 179D (to the extent of 80 percent of the deductions); certain intangible drilling costs deducted under section 263(c); certain mineral exploration and development costs deducted under section 616(a) or 617; a charitable contribution carryover deducted in the current year; circulation expenditures; construction period carrying charges; the dividends received deduction; the domestic production activities deduction; the excess of accelerated depreciation over straight-line depreciation; the excess of percentage-of-completion profits over completed-contract profits; the excess of percentage depletion deducted over cost depletion; the excess of realized gains on installment sales over the currently recognized gains; Federal income tax refunds; income from tax-exempt bonds; the increase in a LIFO recapture amount; life insurance proceeds in excess of the policy's cash surrender value; the NOL carryover deducted in the current year; organizational expenditures; and tax-free income from other than from tax-exempt bonds.

Examples of adjustments that fall within one of the five categories and that decrease E&P are 12 months' amortization for prior years' intangible drilling costs; 12 months' amortization for prior years' mineral exploration and development costs; 20 percent of prior years' deductions under sections 179, 179A, 179B, and 179C; charitable contributions paid in excess of the 10-percent limit; the current-year net capital loss; a decrease in the LIFO recapture amount; the excess of completed-contract profits over percentage-of-completion profits; the excess of E&P depreciation over tax depreciation; the excess of taxable gains over E&P gains on depreciable and depletable property; expenses and losses in transactions with related taxpayers; Federal income tax payments; life insurance premiums in excess of current increase in cash surrender value (including term life insurance); nondeductible interest paid to carry tax-exempt bonds; penalties; and the recognized gain from prior years' installment sales.

b.   Current E&P

Initially, a corporate taxpayer's current E&P for a taxable year equals the amount of its ATI as adjusted by the increases and decreases listed above (and similar items not listed above). The total amount of any distributions that the corporation makes during that year are then subtracted from and to the extent of the initial current E&P.

### c. Accumulated E&P

The amount of the total distributions that exceeds the amount of the initial current E&P is then compared with the amount of the taxpayer's accumulated E&P as of the beginning of the year. That beginning balance may have to be adjusted in certain situations, such as where, as here, there was a change in corporate structure; i.e., HIE's nontaxable spinoff of Holdings. The taxpayer's ending accumulated E&P for a taxable year then equals the accumulated E&P (as adjusted) as of the beginning of that year, plus that year's current E&P (as reduced by any distributions out of current E&P for that year), less any distributions out of accumulated E&P for that year.

### d. Summary of Calculation

We summarize the computation of E&P as follows:

Taxable income as reported
    Administrative and/or judicial adjustments
      Adjusted taxable income (ATI)

Increases to ATI:
    80-percent of current year's deductions under sections
      179, 179B, 179C, and 179D
    Certain intangible drilling costs deducted under section
      263(c)
    Certain mineral exploration and development costs
      deducted under section 616(a) or 617
    Charitable contribution carryover deducted in current
      year
    Circulation expenditures
    Construction period carrying charges
    Dividends received deduction
    Domestic production activities deduction

Excess of accelerated depreciation over straight-line
   depreciation
Excess of percentage-of-completion profits over
   completed-contract profits
Excess of percentage depletion deducted over cost
   depletion
Excess of realized gains on installment sales over
   currently recognized gains
Federal income tax refunds
Income from tax-exempt bonds
Increase in LIFO recapture amount
Life insurance proceeds in excess of cash surrender
   value
NOL carryover deducted in current year
Organizational expenditures
Tax-free income other than from tax-exempt bonds
Other unspecified items
   Total increases to ATI

Decreases to ATI:
  12-months' amortization for prior years' IDC
  12-months' amortization for prior years' mineral
     exploration and development costs
  20 percent of prior years' deductions under sections
     179, 179A, 179B, and 179C
  Charitable contributions paid in excess of the
     10-percent limit
  Current-year net capital loss
  Decrease in LIFO recapture amount
  Excess of completed-contract profits over percentage-of-
     completion profits
  Excess of E&P depreciation over tax depreciation
  Excess of taxable gains over E&P gains on depreciable
     and depletable property
  Expenses and losses in transactions with related
     taxpayers
  Federal income tax payments
  Life insurance premiums in excess of current increase in
     cash surrender value (including term life insurance
  Nondeductible interest paid to carry tax-exempt bonds
  Penalties

Recognized gain from prior years' installment sales
Other unspecified items
  Total decreases to ATI

  Current E&P

Distributions
Distributions from current E&P
Remaining current E&P after distributions
Distributions in excess of current E&P

Accumulated E&P at beginning of year
Adjustments to beginning accumulated E&P; e.g., spinoff
  Adjusted beginning E&P
Taxable distributions from accumulated E&P
Ending accumulated E&P

D.  Adjustments Applicable to These Cases

    1.  Overview

At least five of these adjustments are relevant to the cases

at hand and deserve further explanation.

    2.  First Adjustment

The E&P of each subject corporation must be adjusted to take

into account each adjustment to reported taxable income resulting

from these cases, e.g., E&P must be increased for unreported

income and disallowed deductions.  See sec. 1.312-6, Income Tax

Regs.; see also sec. 6214(b).

    3.  Second Adjustment

Each subject corporation's unpaid taxes, whether contested

or not, will reduce its E&P in the year for which the tax is due.

See DiLeo v. Commissioner, supra at 888; Estate of Stein v.

Commissioner, 25 T.C. 940, 965-966 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). Such is so regardless of whether the corporation is aware of, or agrees to its liability for those taxes. See DiLeo v. Commissioner, supra at 888; Estate of Stein v. Commissioner, supra at 965-966.

### 4. Third Adjustment

The interest that applies to the unpaid taxes will reduce E&P each year as the interest accrues; i.e., E&P is reduced for interest accrued on unpaid tax, beginning in the year the interest first arises, and accrued over the years the tax remains unpaid. See Stark v. Commissioner, supra at 127-128; Group Admin. Premium Servs., Inc. v. Commissioner, T.C. Memo. 1996-451; Kenner v. Commissioner, T.C. Memo. 1975-118; Fairmount Park Raceway, Inc. v. Commissioner, T.C. Memo. 1962-14, affd. 327 F.2d 780 (7th Cir. 1964). Because interest on a tax deficiency begins to accrue on the date the tax return was due, the interest does not reduce E&P until the year after the taxable year of the deficiency. See Group Admin. Premium Servs., Inc. v. Commissioner, supra (citing Stark v. Commissioner, supra at 128).

### 5. Fourth Adjustment

In the case of HIE, which is an accrual basis taxpayer that we state infra is liable for the addition to tax respondent determined under section 6651(a), the amount of that addition to

tax is accrued and deducted from HIE's taxable income to arrive at its E&P in the year in which the return to which the addition to tax relates was due to be filed. See Kenner v. Commissioner, supra (citing Estate of Stein v. Commissioner, supra at 965-967).

6. Fifth Adjustment

In order to reflect HIE's nontaxable spinoff of Holdings at the beginning of 199706, the E&P of the distributing corporation immediately before the transaction must be allocated between the distributing corporation and the controlled corporation. See sec. 1.312-10, Income Tax Regs. The Treasury regulations allow that allocation to be made on the basis of one of three methods set forth in the regulations. See sec. 1.312-10(a), Income Tax Regs. Those methods in the order of preference as stated in the regulations are: (1) In proportion to the fair market value of the business retained and the business that was spun off; (2) in proportion to the net basis of the assets retained and the assets that were spun off; or (3) by such other method as may be appropriate under the facts and circumstances of the case. See id.

E. Conclusion

As stated supra pp. 300-301, we otherwise leave it to the parties to address in their Rule 155 computations the applicable

amounts of E&P and the portions of the distributions that are treated as dividend income and long-term capital gain.

VII.  Addition to Tax

Respondent determined that HIE is liable for an addition to tax under section 6651(a)(1) for 199806.  Section 6651(a)(1) imposes an addition to tax for failure to file a return timely unless the taxpayer shows that the failure was due to reasonable cause and not to willful neglect.  See Kotmair v. Commissioner, 86 T.C. 1253, 1263 (1986).  A failure to file a return timely is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and, nevertheless, was unable to file the return within the prescribed time.  See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect means a conscious, intentional failure or reckless indifference.  See United States v. Boyle, 469 U.S. 241, 245 (1985).

HIE did not timely file its Federal income tax return for 199806, and petitioners have not argued (let alone established) that HIE had reasonable cause for this untimely filing.  We sustain respondent's determination on this issue.

VIII.  <u>Epilog</u>

We have considered all arguments made by the parties in this proceeding and find that those arguments not discussed herein lack merit or need not be reached.  To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

APPENDIX A

For the relevant period before July 1, 1993, Haw. Rev. Stat.

(1985 & Supp. 1992) provided in relevant part as follows:

§ 245-3 Tax; limitations.  Every wholesaler or dealer
shall, in addition to any other taxes provided by law,
pay an excise tax, which is hereby imposed upon the
sale or use of tobacco products, equal to forty per
cent of the wholesale price of each article or item of
tobacco products sold by the wholesaler or dealer,
whether or not sold at wholesale, or if not sold then
at the same rate upon the use by the wholesaler or
dealer.  The tax, however, is subject to the following
limitations:

    (1) It shall not apply to any tobacco products
exempted, and so long as the same are exempted, from
the imposition of the tax by the Constitution or laws
of the United States, and

    (2) The tax shall be paid only once upon the same
tobacco product.

§ 245-4 Wholesaler or dealer to state tax separately;
collection of tax from purchaser; penalty.  Upon each
sale of tobacco products by a wholesaler or dealer the
tax collectible in respect to such sale shall be stated
and charged separately from the sales price and shown
separately on the record thereof kept by the wholesaler
or dealer, and he shall deliver a duplicate of the
record of such transaction, showing the sale price and
tax, to the purchaser, and shall be liable for the
payment of the tax.  The wholesaler or dealer or any
other person who acquires tobacco products upon which
the tobacco tax has been paid shall have the same right
in respect to collecting the tax and thereby
reimbursing himself for the same from any purchaser
from him, as if the tax were a part of the purchase
price.  Every wholesaler or dealer who fails to state
and charge the tax to be collected, separately from the
sales price as provided in this section, shall be fined
not less than $10 nor more than $50 for each offense.

§ 245-5 Returns. Every licensee shall, on or before the last day of each month, file with the department of taxation a return of the tobacco products sold or used by the licensee during the preceding calendar month and of the tax payable thereon.  The form of the return shall be prescribed by the department and shall contain such information as it may deem necessary for the proper administration of this chapter.

§ 245-6 Payment of taxes; penalties. At the time of the filing of the return required under section 245-5 and within the time prescribed therefor, each licensee shall pay to the department of taxation the tax imposed by this chapter, required to be shown by the return.

Penalties and interest shall be added to and become a part of the tax, when and as provided by section 231-39.

§ 245-7 Determination of tax; additional assessments, credits, and refunds. (a) As soon as practicable after each return shall have been filed, the department of taxation shall cause it to be examined and shall compute and determine the amount of the tax payable thereon.

(b) If it should appear upon such examination or thereafter within five years after the filing of the return, or at any time if no return has been filed, as a result of such examination or as a result of any examination of the records of the licensee or of any other inquiry or investigation, that the correct amount of the tax is greater than that shown on the return, or that any tax imposed by this chapter has not been paid, an assessment of such tax may be made, in the manner provided in section 235-108(b).  The amount of the tax for the period covered by the assessment shall not be reduced below the amount determined by an assessment so made, except upon appeal or in a proceeding brought pursuant to section 40-35.

(c) If the licensee has paid or returned with respect to any month more than the amount determined to be the correct amount of tax for such month, the amount of the tax so returned and any assessment of tax made

pursuant to the return may be reduced, and any overpayment of tax may be credited upon the tax imposed by this chapter, or at the election of the licensee, the licensee not being delinquent in the payment of any taxes owing to the State, may be refunded in the manner provided in section 231-23(d), provided that no reduction of tax may be made when forbidden by subsection (b), or more than five years after the filing of the return.

§ 245-8 Records to be kept.  (a) Every wholesaler and dealer shall keep a record of every sale or use of tobacco products by the wholesaler or dealer, and of the tax payable thereon, if any, in such form as the department of taxation may prescribe.  The records shall be offered for inspection and examination at any time upon demand by the department and shall be preserved for a period of five years, except that the department may, in writing, consent to their destruction within such period or may require that they be kept longer.  The department may by regulation require the licensee to keep such other records as it may deem necessary for the proper enforcement of this chapter.

     (b) If any wholesaler or dealer fails to keep records from which a proper determination of the tax due under this chapter may be made, the department may fix the amount of the tax for any period from the best information obtainable by it and assess the tax as hereinbefore provided.

§ 245-9 Inspection.  The department of taxation may examine all records required to be kept under this chapter, and books, papers, and records of any person engaged in the sale of tobacco products, to verify the accuracy of the payment of the tax imposed by this chapter.  Every person in possession of such books, papers, and records, and the person's agents and employees, are hereby directed and required to give to the department the means, facilities, and opportunities for such examinations.

§ 245-10 Appeals.  Any person aggrieved by any assessment of the tax imposed by this chapter may

appeal from the assessment in the manner and within the time and in all other respects as provided in the case of income tax appeals by section 235-114, provided the tax so assessed shall have been paid.  The hearing and disposition of such appeal, including the distribution of costs and of taxes paid pending the appeal shall be as provided in chapter 232.

Effective July 1, 1993, Haw. Rev. Stat. secs. 245-3, 245-5, and 245-7 provide:

§ 245-3 Taxes; limitations. (a) Every wholesaler or dealer, in addition to any other taxes provided by law, shall pay for the privilege of conducting business and other activities in the State an:

(1) Excise tax equal to 3.00 cents for each cigarette sold by the wholesaler or dealer, after June 30, 1993, whether or not sold at wholesale, or if not sold then at the same rate upon the use by the wholesaler or dealer; such excise tax to increase to 3.50 cents per cigarette on the first day of the month one hundred eighty days after a United States congressional act is signed into law which requires military installations to purchase cigarettes in Hawaii in a manner similar to that required of alcoholic beverages under 10 United States Code, section 2488 (nonappropriated fund instrumentalities, purchase of alcoholic beverages); and

(2) Excise tax equal to forty per cent of the wholesale price of each article or item of tobacco products sold by the wholesaler or dealer, whether or not sold at wholesale, or if not sold then at the same rate upon the use by the wholesaler or dealer.

(b) The taxes, however, are subject to the following limitations:

(1) The measure of the taxes shall not include any cigarettes or tobacco products exempted, and so long as the same are exempted, from the imposition of taxes by the Constitution or laws of the United States; and

(2) The taxes shall be paid only once in respect of the same cigarettes or tobacco product. This limitation shall not prohibit the imposition of the excise tax on receipts from sales of tobacco products under subsection (a)(2); provided that the amount subject to the tax on each sale shall not include amounts previously taxed under this chapter.

§ 245-5 Returns.  Every licensee, on or before the last day of each month, shall file with the department of taxation a return showing the cigarettes and tobacco products sold or used by the licensee during the preceding calendar month and of the taxes chargeable against the taxpayer in accordance with this chapter. The form of the return shall be prescribed by the department and shall contain such information, including a separate statement of the number and wholesale price of cigarettes, and the wholesale price of tobacco products, sold or used, as it may deem necessary for the proper administration of this chapter.

§ 245-7 Determination of taxes; additional assessments, credits, and refunds.  (a) As soon as practicable after each return shall have been filed, the department of taxation shall cause it to be examined and shall compute and determine the amount of the taxes payable thereon.

(b) If it should appear upon such examination or thereafter within five years after the filing of the return, or at any time if no return has been filed, as a result of the examination or as a result of any examination of the records of the licensee or of any other inquiry or investigation, that the correct amount of the taxes is greater than that shown on the return, or that any taxes imposed by this chapter have not been paid, an assessment of such taxes may be made, in the manner provided in section 235-108(b).  The amount of the taxes for the period covered by the assessment shall not be reduced below the amount determined by an assessment so made, except upon appeal or in a proceeding brought pursuant to section 40-35.

(c) If the licensee has paid or returned with respect to any month more than the amount determined to be the correct amount of taxes for the month, the amount of the taxes so returned and any assessment of taxes made pursuant to the return may be reduced, and any overpayment of taxes may be credited upon the taxes imposed by this chapter, or at the election of the licensee, the licensee not being delinquent in the payment of any taxes owing to the State, may be refunded in the manner provided in section 231-23(d); provided that no reduction of taxes may be made when forbidden by subsection (b) or more than five years after the filing of the return.

1993 Haw. Sess. Laws ch. 220, secs. 9, 10, 12; see also id. sec. 19 (effective date provision).

Haw. Rev. Stat. sec. 245-7, as effective June 19, 2000, through June 30, 2006, provides:[77]

§ 245-7. Determination of taxes; additional assessments, credits, and refunds

(a) As soon as practicable after each return shall have been filed, the department of taxation shall cause it to be examined and shall compute and determine the amount of the taxes payable thereon.

(b) If it should appear upon the examination or within five years after the filing of the return, or at any time if no return has been filed, as a result of the examination, or as a result of any examination of the records of the wholesaler or dealer, or of any other inquiry or investigation, that the correct amount of the taxes is greater than that shown on the return, or that any taxes imposed by this chapter have not been paid, an assessment of the taxes may be made in the manner provided in section 235-108(b). The amount of the taxes for the period covered by the assessment shall not be reduced below the amount determined by an

---

[77]As of June 30, 2006, the predecessor statute again became effective. See 2000 Haw. Sess. Laws ch. 249, secs. 7, 20(2).

assessment so made, except upon appeal or in a proceeding brought pursuant to section 40-35.

(c) If the wholesaler or dealer has paid or returned with respect to any month more than the amount determined to be the correct amount of taxes for the month, the amount of the taxes so returned and any assessment of taxes made pursuant to the return may be reduced, and any overpayment of taxes may be credited upon the taxes imposed by this chapter, or at the election of the wholesaler or dealer, the wholesaler or dealer not being delinquent in the payment of any taxes owing to the State, may be refunded in the manner provided in section 231-23(c); provided that no reduction of taxes may be made when forbidden by subsection (b) or more than five years after the filing of the return.

2000 Haw. Sess. Laws ch. 249, secs. 7, 20(2); see also id. sec. 20.

APPENDIX B

Tobacco Tax Liability Adjustments

| Taxable Year | July | August | September | October | November | December | January | February | March | April | May | June | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 198906 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | $280,000 | $280,000 | $280,000 | $280,000 | $280,000 | $1,400,000 |
| 199006 | $280,000 | $280,000 | $280,000 | $280,000 | $280,000 | $280,000 | $280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 240,000 | 3,320,000 |
| 199106 | 200,000 | 200,000 | 200,000 | 160,000 | 200,000 | 160,000 | 160,000 | 120,000 | 120,000 | 120,000 | 120,000 | 200,000 | 1,960,000 |
| 199206 | 120,000 | 120,000 | 120,000 | 160,000 | 200,000 | 200,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 300,000 | 2,420,000 |
| 199306 | 300,000 | 300,000 | 400,000 | 400,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 4,280,000 |
| 199406 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 430,000 | 400,000 | 400,000 | 400,000 | 4,510,000 |
| 199506 | 400,000 | 400,000 | 200,000 | 200,000 | 250,000 | 250,000 | 200,000 | 250,000 | 350,000 | 350,000 | 350,000 | 350,000 | 3,550,000 |
| | | | | | | | | | | | | | 21,440,000 |

## APPENDIX C

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **Legal Fees** | | | | | | | |
| **Accucopy, Inc.** | | | | | | | |
| 200006 | 9,558.62 | -0- | -0- | 8,665.37 | -0- | -0- | 893.25 |
| 200106 | 5,000.58 | -0- | -0- | 5,000.58 | -0- | -0- | -0- |
| 200206 | 7,016.57 | -0- | -0- | 7,016.57 | -0- | -0- | -0- |
| **Ayabe Chong** | | | | | | | |
| 200006 | 201,741.42 | -0- | -0- | 201,741.42 | -0- | -0- | -0- |
| 200106 | 61,982.97 | -0- | -0- | 61,982.97 | -0- | -0- | -0- |
| 200206 | 93,953.20 | -0- | -0- | 93,953.20 | -0- | -0- | -0- |
| **Benjamin Cassidy** | | | | | | | |
| 199806 | 5,000.00 | 5,000.00 | -0- | -0- | -0- | -0- | -0- |
| **Bird Marella** | | | | | | | |
| 200006 | 101,842.85 | -0- | -0- | 101,842.85 | -0- | -0- | -0- |
| 200106 | 1,018,262.37 | -0- | -0- | 1,018,262.37 | -0- | -0- | -0- |
| 200206 | 1,170,735.31 | -0- | -0- | 1,170,735.31 | -0- | -0- | -0- |
| **Birney Bervar** | | | | | | | |
| 200106 | 5,000.00 | -0- | 5,000.00 | -0- | -0- | -0- | -0- |
| **Bowen Hunsaker** | | | | | | | |
| 200006 | 100,887.28 | -0- | -0- | 100,887.28 | -0- | -0- | -0- |
| **Brook Hart** | | | | | | | |
| 199806 | 13,049.23 | -0- | 13,049.23 | -0- | -0- | -0- | -0- |
| 199906 | 7,712.85 | -0- | 7,712.85 | -0- | -0- | -0- | -0- |
| 200006 | 4,532.77 | -0- | 4,532.77 | -0- | -0- | -0- | -0- |
| 200206 | 4,864.74 | -0- | -0- | 4,864.74 | -0- | -0- | -0- |
| **Candon Consulting/ John Candon** | | | | | | | |
| 200006 | 8,615.00 | -0- | -0- | 8,615.00 | -0- | -0- | -0- |
| 200106 | 5,002.28 | -0- | -0- | 5,002.28 | -0- | -0- | -0- |
| 200206 | 11,761.55 | -0- | -0- | 11,761.55 | -0- | -0- | -0- |
| **Carlsmith Ball** | | | | | | | |
| 199806 | 14,258.83 | -0- | -0- | -0- | -0- | 14,258.83 | -0- |
| 199906 | 8,401.97 | -0- | -0- | -0- | -0- | 8,401.97 | -0- |
| 200006 | 14,272.77 | -0- | -0- | -0- | -0- | 14,272.77 | -0- |
| 200106 | 2,478.22 | -0- | -0- | -0- | -0- | 2,478.22 | -0- |
| 200206 | [1]5,026.03 | -0- | -0- | -0- | -0- | 5,026.03 | -0- |
| **Case Bigelow** | | | | | | | |
| 200006 | 736.31 | -0- | -0- | -0- | -0- | -0- | 736.31 |
| **Chee Markham** | | | | | | | |
| 199806 | 2,207.94 | -0- | -0- | -0- | 2,207.94 | -0- | -0- |
| 199906 | 2,046.86 | -0- | -0- | -0- | 2,046.86 | -0- | -0- |
| 200006 | 2,806.88 | -0- | 2,806.88 | -0- | -0- | -0- | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **Chicoine Hallet** | | | | | | | |
| 200206 | 34,784.24 | -0- | -0- | 34,784.24 | -0- | -0- | -0- |
| **Corniel** | | | | | | | |
| 199806 | 18,559.93 | -0- | -0- | 18,559.93 | -0- | -0- | -0- |
| **Damon Key** | | | | | | | |
| 199806 | 378,261.40 | 13,874.12 | 122,706.28 | -0- | 227,005.66 | 2,831.89 | 11,843.45 |
| 199906 | 312,735.35 | -0- | 173,275.20 | 25,864.59 | 55,025.96 | -0- | 58,569.60 |
| 200006 | 423,692.50 | -0- | -0- | 373,737.84 | 5,762.90 | 40,913.91 | 3,277.85 |
| 200106 | 63,890.75 | -0- | -0- | 47,055.32 | 438.25 | 6,792.73 | 9,604.45 |
| 200206 | 23,062.32 | -0- | -0- | 4,486.71 | -0- | 1,977.36 | 16,598.25 |
| **Foley Jones** | | | | | | | |
| 200006 | 1,459.50 | -0- | -0- | -0- | -0- | -0- | 1,459.50 |
| **Gaims Weil** | | | | | | | |
| 199806 | 65,234.68 | -0- | -0- | -0- | 65,234.68 | -0- | -0- |
| 199906 | 11,558.00 | -0- | -0- | -0- | 11,558.00 | -0- | -0- |
| 200006 | 36,927.34 | -0- | -0- | 36,927.34 | -0- | -0- | -0- |
| 200106 | 548.64 | -0- | -0- | 548.64 | -0- | -0- | -0- |
| 200206 | 395.00 | -0- | -0- | 395.00 | -0- | -0- | -0- |
| **Glenn Lee Boulware Trust** | | | | | | | |
| 199906 | 35,000.00 | -0- | -0- | -0- | 35,000.00 | -0- | -0- |
| **GMK Consulting** | | | | | | | |
| 200206 | 18,854.05 | -0- | -0- | -0- | -0- | -0- | 18,854.05 |
| **Goodenow** | | | | | | | |
| 199806 | 35,351.94 | -0- | -0- | 35,351.94 | -0- | -0- | -0- |
| **Graham James** | | | | | | | |
| 199806 | 56,848.50 | | 56,848.50 | -0- | -0- | -0- | -0- |
| 199906 | 65,403.96 | -0- | 41,371.59 | 24,032.37 | -0- | -0- | -0- |
| 200006 | 53,977.76 | -0- | -0- | 53,977.76 | -0- | -0- | -0- |
| **Hawaii National Bank** | | | | | | | |
| 200106 | 31,227.39 | -0- | -0- | 31,227.39 | -0- | -0- | -0- |
| 200206 | 29,146.04 | -0- | -0- | 29,146.04 | -0- | -0- | -0- |
| **Hochman Salkin** | | | | | | | |
| 199806 | 48,590.23 | -0- | 48,590.23 | -0- | -0- | -0- | -0- |
| 199906 | 3,475.70 | -0- | 3,475.70 | -0- | -0- | -0- | -0- |
| 200006 | (10,000.00) | -0- | (10,000.00) | -0- | -0- | -0- | -0- |
| **Howard Chang** | | | | | | | |
| 199806 | [2]42,853.42 | -0- | 42,853.42 | -0- | -0- | -0- | -0- |
| 199906 | 20,638.78 | -0- | 20,638.78 | -0- | -0- | -0- | -0- |
| 200006 | 16,837.64 | -0- | 16,837.64 | -0- | -0- | -0- | -0- |
| **Irell Manella** | | | | | | | |
| 199806 | 44,401.14 | 15,279.94 | 29,121.20 | -0- | -0- | -0- | -0- |

|  | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **King King** | | | | | | | |
| 200006 | 2,500.00 | -0- | -0- | -0- | -0- | -0- | 2,500.00 |
| **Laird Christianson** | | | | | | | |
| 200006 | 252.20 | -0- | -0- | -0- | -0- | -0- | 252.20 |
| 200106 | 252.20 | -0- | -0- | -0- | -0- | -0- | 252.20 |
| **Leonard Sharenow** | | | | | | | |
| 200006 | 758,111.97 | -0- | -0- | 758,111.97 | -0- | -0- | -0- |
| **Lopeti Foliaki** | | | | | | | |
| 200006 | 13,579.50 | -0- | 13,579.50 | -0- | -0- | -0- | -0- |
| **Louis Wai** | | | | | | | |
| 200006 | 5,000.00 | -0- | -0- | -0- | -0- | -0- | 5,000.00 |
| **Lyle Hosoda Associates** | | | | | | | |
| 200106 | 665.29 | -0- | -0- | 665.29 | -0- | -0- | -0- |
| 200206 | 15,667.22 | -0- | -0- | 15,667.22 | -0- | -0- | -0- |
| **Marr Hipp** | | | | | | | |
| 199806 | 825.26 | -0- | -0- | -0- | -0- | 825.26 | -0- |
| 199906 | 293.39 | -0- | -0- | -0- | -0- | 293.39 | -0- |
| 200006 | 771.14 | -0- | -0- | -0- | -0- | 771.14 | -0- |
| 200106 | 465.10 | -0- | -0- | -0- | -0- | 465.10 | -0- |
| 200206 | 469.79 | -0- | -0- | -0- | -0- | 469.79 | -0- |
| **McCorriston Miller** | | | | | | | |
| 200106 | 25,154.47 | -0- | -0- | 25,154.47 | -0- | -0- | -0- |
| 200206 | 9,343.61 | -0- | -0- | 9,343.61 | -0- | -0- | -0- |
| **Michael McCarthy** | | | | | | | |
| 199806 | 21,747.02 | -0- | -0- | -0- | -0- | -0- | 21,747.02 |
| 199906 | 18,193.49 | -0- | -0- | -0- | -0- | -0- | 18,193.49 |
| 200006 | 14,914.59 | -0- | -0- | -0- | -0- | -0- | 14,914.59 |
| 200106 | 2,019.44 | -0- | -0- | -0- | -0- | -0- | 2,019.44 |
| 200206 | 15,266.02 | -0- | -0- | 3,646.54 | -0- | -0- | 11,619.48 |
| **Nathan Suzuki** | | | | | | | |
| 200006 | 1,118.00 | -0- | -0- | -0- | -0- | -0- | 1,118.00 |
| 200106 | 17,500.00 | -0- | -0- | 17,500.00 | -0- | -0- | -0- |
| **Perkin Hosoda** | | | | | | | |
| 200006 | 44,480.01 | -0- | 44,480.01 | -0- | -0- | -0- | -0- |
| 200106 | 136.55 | -0- | -0- | 136.55 | -0- | -0- | -0- |
| **PWC** | | | | | | | |
| 200006 | 60,225.24 | -0- | -0- | 60,225.24 | -0- | -0- | -0- |
| 200106 | 56,023.89 | -0- | -0- | 56,023.89 | -0- | -0- | -0- |
| 200206 | 69,436.14 | -0- | -0- | 69,436.14 | -0- | -0- | -0- |
| **Professional Image** | | | | | | | |
| 200006 | 5,763.36 | -0- | -0- | 5,763.36 | -0- | -0- | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **Reinwald O'Connor** | | | | | | | |
| 199806 | 533,491.70 | -0- | 353,348.98 | -0- | 180,142.72 | -0- | -0- |
| 199906 | 321,845.65 | -0- | 307,988.61 | -0- | 13,857.04 | -0- | -0- |
| 200006 | 260,264.45 | -0- | -0- | 259,730.35 | 534.10 | -0- | -0- |
| 200206 | 23,543.49 | -0- | -0- | 23,090.85 | 452.64 | -0- | -0- |
| **Robert Waters** | | | | | | | |
| 200206 | 158,073.00 | -0- | -0- | 158,073.00 | -0- | -0- | -0- |
| **Robert Holland** | | | | | | | |
| 199806 | 925.00 | -0- | -0- | -0- | -0- | -0- | 925.00 |
| **Saranow Pagani** | | | | | | | |
| 200006 | 31,345.34 | -0- | -0- | 31,345.34 | -0- | -0- | -0- |
| 200106 | 292,282.61 | -0- | -0- | 292,282.61 | -0- | -0- | -0- |
| 200206 | 192,644.18 | -0- | -0- | 192,644.18 | -0- | -0- | -0- |
| **Seyfarth Shaw** | | | | | | | |
| 199806 | 122.50 | -0- | -0- | -0- | -0- | 122.50 | -0- |
| **Sherman Sherman** | | | | | | | |
| 200206 | 91,179.04 | -0- | -0- | 91,179.04 | -0- | -0- | -0- |
| **Sheila Balkan** | | | | | | | |
| 200206 | 32,430.00 | -0- | -0- | 32,430.00 | -0- | -0- | -0- |
| **Shiotani Inouye** | | | | | | | |
| 199806 | 356,826.59 | 356,826.59 | -0- | -0- | -0- | -0- | -0- |
| 199906 | 285,228.94 | -0- | 285,228.94 | -0- | -0- | -0- | -0- |
| 200006 | 199,130.37 | -0- | -0- | 199,130.37 | -0- | -0- | -0- |
| 200106 | 124,213.60 | -0- | -0- | 124,213.60 | -0- | -0- | -0- |
| 200206 | 56,266.17 | -0- | -0- | 56,266.17 | -0- | -0- | -0- |
| **Squire Sanders** | | | | | | | |
| 200106 | 3,888.10 | -0- | -0- | 3,888.10 | -0- | -0- | -0- |
| **Stephen Platt** | | | | | | | |
| 200206 | 13,102.18 | -0- | -0- | 13,102.18 | -0- | -0- | -0- |
| **Stephen Pingree** | | | | | | | |
| 199806 | 15,117.06 | -0- | 15,117.06 | -0- | -0- | -0- | -0- |
| 199906 | 8,111.50 | -0- | 8,111.50 | -0- | -0- | -0- | -0- |
| 200006 | 24,749.15 | -0- | 24,749.15 | -0- | -0- | -0- | -0- |
| **Wachi Watanabe** | | | | | | | |
| 199806 | 21,473.82 | 3,986.95 | 17,486.87 | -0- | -0- | -0- | -0- |
| 199906 | 10,000.00 | -0- | -0- | 10,000.00 | -0- | -0- | -0- |
| 200006 | 7,298.13 | -0- | -0- | 7,298.13 | -0- | -0- | -0- |
| 200206 | 3,776.02 | -0- | -0- | 3,776.02 | -0- | -0- | -0- |
| **Wilmington Institute** | | | | | | | |
| 200106 | 67,225.00 | -0- | -0- | 67,225.00 | -0- | -0- | -0- |
| 200206 | 26,853.00 | -0- | -0- | 26,853.00 | -0- | -0- | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **Yoshida, Inc.** | | | | | | | |
| 199906 | 1,894.04 | -0- | -0- | -0- | -0- | -0- | 1,894.04 |
| **Other Legal** | | | | | | | |
| 199806 | .23 | -0- | -0- | -0- | -0- | .23 | -0- |
| 199906 | (.16) | -0- | -0- | -0- | -0- | (.16) | -0- |
| 200006 | 290.34 | -0- | -0- | -0- | -0- | -0- | 290.34 |
| 200106 | 298.77 | -0- | -0- | -0- | -0- | -0- | 298.77 |
| 200206 | 270.51 | -0- | -0- | -0- | -0- | -0- | 270.51 |
| | | | | | | | |
| **Total Legal Fees** | | | | | | | |
| 199806 | 1,675,146.42 | 394,967.60 | 699,121.77 | 53,911.87 | 474,591.00 | 18,038.71 | 34,515.47 |
| 199906 | 1,112,540.32 | -0- | 847,803.17 | 59,896.96 | 117,487.86 | 8,695.20 | 78,657.13 |
| 200006 | 2,397,682.43 | -0- | 96,985.95 | 2,207,999.62 | 6,297.00 | 55,957.82 | 30,442.04 |
| 200106 | 1,783,518.22 | -0- | 5,000.00 | 1,756,169.06 | 438.25 | 9,736.05 | 12,174.86 |
| 200206 | 2,107,919.42 | -0- | -0- | 2,052,651.31 | 452.64 | 7,473.18 | 47,342.29 |
| **Other Professional Fees** | | | | | | | |
| | | | | | | | |
| **Antoneita DeWang-Seo** | | | | | | | |
| 199806 | 7,000.00 | -0- | -0- | -0- | -0- | 7.000.00 | -0- |
| **Applied Computer** | | | | | | | |
| 199806 | 405.00 | -0- | -0- | -0- | -0- | 405.00 | -0- |
| 200206 | 1,025.00 | -0- | -0- | -0- | -0- | 1,025.00 | -0- |
| **ASI Food Safety** | | | | | | | |
| 199906 | 150.00 | -0- | -0- | -0- | -0- | 150.00 | -0- |
| **Back to Basics Plus** | | | | | | | |
| 200206 | 1,074.00 | -0- | -0- | -0- | -0- | 1,074.00 | -0- |
| **Brewer Environmental** | | | | | | | |
| 199806 | 145.83 | -0- | -0- | -0- | -0- | 145.83 | -0- |
| 199906 | 2,004.15 | -0- | -0- | -0- | -0- | 2,004.15 | -0- |
| 200006 | 1,899.98 | -0- | -0- | -0- | -0- | 1,899.98 | -0- |
| 200106 | 2,158.32 | -0- | -0- | -0- | -0- | 2,158.32 | -0- |
| 200206 | 1,999.98 | -0- | -0- | -0- | -0- | 1,999.98 | -0- |
| **Business Consulting** | | | | | | | |
| 199806 | 19,999.93 | -0- | -0- | -0- | -0- | 19,999.93 | -0- |
| 199906 | 4,999.98 | -0- | -0- | -0- | -0- | 4,999.98 | -0- |
| **Ceridian Employer** | | | | | | | |
| 200006 | 520.00 | -0- | -0- | -0- | -0- | 520.00 | -0- |
| **Charles Abraham** | | | | | | | |
| 200206 | 675.00 | -0- | -0- | -0- | -0- | 675.00 | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **Commercial Plumbing** | | | | | | | |
| 200006 | 125.00 | -0- | -0- | -0- | -0- | 125.00 | -0- |
| **Communications--Pacific** | | | | | | | |
| 200206 | 979.16 | -0- | -0- | -0- | -0- | 979.16 | -0- |
| **COLIFORM** | | | | | | | |
| 199906 | 145.83 | -0- | -0- | -0- | -0- | 145.83 | -0- |
| **Datahouse** | | | | | | | |
| 199806 | 1,588.53 | -0- | -0- | -0- | -0- | 1,588.53 | -0- |
| 199906 | 8,234.22 | -0- | -0- | -0- | -0- | 8,234.22 | -0- |
| 200106 | 6,054.64 | -0- | -0- | -0- | -0- | 6,054.64 | -0- |
| **Dataprofit Corp.** | | | | | | | |
| 200006 | 53,532.46 | -0- | -0- | -0- | -0- | 53,532.46 | -0- |
| 200106 | 5,400.00 | -0- | -0- | -0- | -0- | 5,400.00 | -0- |
| **Dunn Bradstreet** | | | | | | | |
| 199806 | 158.22 | -0- | -0- | -0- | -0- | 158.22 | -0- |
| **Electra Form** | | | | | | | |
| 199906 | 10,302.58 | -0- | -0- | -0- | -0- | 10,302.58 | -0- |
| **EMS Solutions** | | | | | | | |
| 199806 | (90.00) | -0- | -0- | -0- | -0- | (90.00) | -0- |
| 199906 | 2,045.00 | -0- | -0- | -0- | -0- | 2,045.00 | -0- |
| 200006 | 21,970.00 | -0- | -0- | -0- | -0- | 21,970.00 | -0- |
| **Fidelity Investments** | | | | | | | |
| 200006 | 7,017.53 | -0- | -0- | -0- | -0- | 7,017.53 | -0- |
| **Foley Jones** | | | | | | | |
| 199906 | 741.00 | -0- | -0- | -0- | -0- | 741.00 | -0- |
| **Food Products** | | | | | | | |
| 199806 | 2,345.00 | -0- | -0- | -0- | -0- | 2,345.00 | -0- |
| 199906 | 2,860.00 | -0- | -0- | -0- | -0- | 2,860.00 | -0- |
| 200006 | 2,860.00 | -0- | -0- | -0- | -0- | 2,860.00 | -0- |
| 200106 | 2,660.00 | -0- | -0- | -0- | -0- | 2,660.00 | -0- |
| **GEM Comm** | | | | | | | |
| 200006 | 5,841.12 | -0- | -0- | -0- | -0- | 5,841.12 | -0- |
| **GT Service** | | | | | | | |
| 200006 | 1,080.00 | -0- | -0- | -0- | -0- | 1,080.00 | -0- |
| **Hawaiian Hardware** | | | | | | | |
| 200006 | 324.76 | -0- | -0- | -0- | -0- | 324.76 | -0- |
| **Henry Yokogawa** | | | | | | | |
| 200106 | 26,500.00 | -0- | -0- | -0- | -0- | -0- | 26,500.00 |
| 200206 | 63,600.00 | -0- | -0- | -0- | -0- | -0- | 63,600.00 |
| **Intrastate Comm** | | | | | | | |
| 200006 | 86.46 | -0- | -0- | -0- | -0- | 86.46 | -0- |
| **IW dba Italia Wang** | | | | | | | |
| 199906 | 32,000.00 | -0- | -0- | -0- | -0- | 32,000.00 | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| **John Ching** | | | | | | | |
| 200006 | 1,075.00 | -0- | -0- | -0- | -0- | 1,075.00 | -0- |
| **Kimura International** | | | | | | | |
| 200106 | 19,428.68 | -0- | -0- | -0- | -0- | 19,428.68 | -0- |
| 200206 | 11,562.42 | -0- | -0- | -0- | -0- | 11,562.42 | -0- |
| **Kobayashi Doi** | | | | | | | |
| 199806 | 65,837.29 | -0- | -0- | -0- | -0- | -0- | 65,837.29 |
| 199906 | 61,140.22 | -0- | -0- | -0- | -0- | -0- | 61,140.22 |
| 200006 | 57,966.64 | -0- | -0- | -0- | -0- | -0- | 57,966.64 |
| 200106 | 67,758.54 | -0- | -0- | -0- | -0- | -0- | 67,758.54 |
| 200206 | 76,116.85 | -0- | -0- | 2,195.28 | -0- | | 73,921.57 |
| **KPMG** | | | | | | | |
| 199806 | 17,291.00 | -0- | -0- | -0- | -0- | 17,291.00 | -0- |
| 200006 | 8,854.11 | -0- | -0- | -0- | -0- | 8,854.11 | -0- |
| **L.C. Financial** | | | | | | | |
| 199806 | 451.00 | -0- | -0- | -0- | -0- | 451.00 | -0- |
| **Leung Pang** | | | | | | | |
| 200006 | 1,800.00 | -0- | -0- | -0- | -0- | 1,800.00 | -0- |
| **Lorin Kushiyama** | | | | | | | |
| 199906 | 20,000.00 | -0- | -0- | -0- | -0- | | 20,000.00 |
| **Melvin Kam** | | | | | | | |
| 199806 | 760.50 | -0- | -0- | -0- | -0- | 760.50 | -0- |
| **Michael Toigo** | | | | | | | |
| 199806 | 246.75 | -0- | -0- | -0- | -0- | 246.75 | -0- |
| 200006 | 1,291.60 | -0- | -0- | -0- | -0- | 1,291.60 | -0- |
| **Pension Services** | | | | | | | |
| 200006 | 781.20 | -0- | -0- | -0- | -0- | 781.20 | -0- |
| **Procomm** | | | | | | | |
| 200006 | 751.60 | -0- | -0- | -0- | -0- | 751.60 | -0- |
| 200106 | 1,734.92 | -0- | -0- | -0- | -0- | 1,734.92 | -0- |
| **Professional Image** | | | | | | | |
| 200206 | 125.68 | -0- | -0- | -0- | -0- | 125.68 | -0- |
| **Profit Concepts** | | | | | | | |
| 200006 | 360.00 | -0- | -0- | -0- | -0- | 360.00 | -0- |
| 200106 | 7,400.00 | -0- | -0- | -0- | -0- | 7,400.00 | -0- |
| **Quadrel Labeling** | | | | | | | |
| 199806 | 14,142.33 | -0- | -0- | -0- | -0- | 14,142.33 | -0- |
| **Rhanda Kim** | | | | | | | |
| 200106 | 7,127.56 | -0- | -0- | -0- | -0- | 7,127.56 | -0- |
| 200206 | 7,658.81 | -0- | -0- | -0- | -0- | 7,658.81 | -0- |
| **Richard Kitagawa** | | | | | | | |
| 200006 | 4,500.00 | -0- | -0- | -0- | -0- | | 4,500.00 |
| 200106 | 500.00 | -0- | -0- | -0- | -0- | 500.00 | -0- |
| 200206 | (1,000.00) | -0- | -0- | -0- | -0- | (1,000.00) | -0- |

| | Total | Criminal Investigation | Grand Jury Proceedings | Criminal Trial | Fees Re: Jin Sook Lee | Fees Accepted As Ordinary and Necessary | Other Fees |
|---|---|---|---|---|---|---|---|
| RJR Packaging | | | | | | | |
| 200206 | 745.00 | -0- | -0- | -0- | -0- | 745.00 | -0- |
| Servend of Hawaii | | | | | | | |
| 199906 | 2,500.00 | -0- | -0- | -0- | -0- | 2,500.00 | -0- |
| Stewart Engineering | | | | | | | |
| 199906 | 8,853.60 | -0- | -0- | -0- | -0- | 8,853.60 | -0- |
| 200006 | 2,197.78 | -0- | -0- | -0- | -0- | 2,197.78 | -0- |
| Tricia Young | | | | | | | |
| 200006 | 613.60 | -0- | -0- | -0- | -0- | 613.60 | -0- |
| TRI Pac | | | | | | | |
| 199906 | 10,000.00 | -0- | -0- | -0- | -0- | -0- | 10,000.00 |
| Vending Consulting | | | | | | | |
| 200006 | 60,000.00 | -0- | -0- | -0- | -0- | -0- | 60,000.00 |
| 200106 | 15,000.00 | -0- | -0- | -0- | -0- | -0- | 15,000.00 |
| Watson Wyatt | | | | | | | |
| 199906 | 15,857.00 | -0- | -0- | -0- | -0- | -0- | 15,857.00 |
| Wayne Arakaki | | | | | | | |
| 200106 | 353.60 | -0- | -0- | -0- | -0- | 353.60 | -0- |
| Amortization | | | | | | | |
| 199806 | 30,643.54 | -0- | -0- | -0- | -0- | -0- | 30,643.54 |
| 199906 | 116,176.10 | -0- | -0- | -0- | -0- | -0- | 116,176.10 |
| 200006 | 38,387.03 | -0- | -0- | -0- | -0- | -0- | 38,387.03 |
| 200106 | 45,080.13 | -0- | -0- | -0- | -0- | -0- | 45,080.13 |
| 200206 | 40,570.67 | -0- | -0- | -0- | -0- | -0- | 40,570.67 |
| Total Other Professional Fees | | | | | | | |
| 199806 | 160,924.92 | -0- | -0- | -0- | -0- | 64,444.09 | 96,480.83 |
| 199906 | 298,009.68 | -0- | -0- | -0- | -0- | 74,836.36 | 223,173.32 |
| 200006 | 273,835.87 | -0- | -0- | -0- | -0- | 112,982.20 | 160,853.67 |
| 200106 | 207,156.39 | -0- | -0- | -0- | -0- | 52,817.72 | 154,338.67 |
| 200206 | 205,132.57 | -0- | 2,195.28 | -0- | -0- | 24,845.05 | 178,092.24 |
| Total Legal and Other Professional Fees | | | | | | | |
| 199806 | 1,836,071.34 | 394,967.60 | 699,081.77 | 53,911.87 | 474,591.00 | 82,482.80 | 130,996.30 |
| 199906 | 1,410,550.00 | -0- | 847,803.17 | 59,896.96 | 117,487.86 | 83,531.56 | 301,830.45 |
| 200006 | 2,671,518.30 | -0- | 96,985.95 | 2,207,999.62 | 6,297.00 | 168,940.02 | 191,295.71 |
| 200106 | 1,990,674.61 | -0- | 5,000.00 | 1,756,169.06 | 438.25 | 62,553.77 | 166,513.53 |
| 200206 | 2,313,051.99 | -0- | 2,195.28 | 2,052,651.31 | 452.64 | 32,318.23 | 225,434.53 |

[1]In at least one of petitioners' submissions to the Court, petitioners erroneously include this amount a second time in other professional fees paid by Carlsmith Ball for 200206.

[2]In at least one of their submissions to the Court, petitioners erroneously list Howard Chang's total charges for 199806 as $39,027.63.  The correct total charges is $42,853.42, or in other words $3,825.79 greater than that reported by petitioners ($42,853.42 – $39,027.63 = $3,825.79).